No. 24-60227

_____

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY,
*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*

consolidated with
_____

No. 24-60256
_____

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY;
SIERRA CLUB; AMERICAN CHEMISTRY COUNCIL,
*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents.*

_____

On Petition for Review of a Rule of the
Environmental Protection Agency
89 Fed. Reg. 39,254

_____

# BRIEF OF THE NATIONAL ASSOCIATION OF MANUFACTURERS AS *AMICUS CURIAE* IN SUPPORT OF INDUSTRY PETITIONERS AND VACATUR

———————————

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street NW, Ste. 1000
Washington, D.C.  20006
(202) 783-8400

Kasdin M. Mitchell, P.C.
Shane D. O'Connor
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Tex.  75205
(214) 972-1770

*Counsel for Amicus Curiae National Association of Manufacturers*

# CERTIFICATE OF INTERESTED PERSONS

Nos. 24-60227, 24-60256

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY;
SIERRA CLUB; AMERICAN CHEMISTRY COUNCIL,
*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*.

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Petitioners' Certificates of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification.

**Amicus Curiae:**

**National Association of Manufacturers.** The National Association of Manufacturers has no parent corporation. No publicly held company has any ownership interest in the National Association of Manufacturers.

**Counsel to the National Association of Manufacturers:**

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street NW, Ste. 1000
Washington, D.C. 20006
(202) 783-8400

Kasdin M. Mitchell, P.C.
Shane D. O'Connor
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Tex. 75205
(214) 972-1770

Dated: October 30, 2024

*/s/ Kasdin M. Mitchell*
    Kasdin M. Mitchell, P.C.

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................2

ARGUMENT ......................................................................................................3

    A.   The Court Should Interpret TSCA As Written....................................3

    B.   Congress *Did Not* Assign EPA The Power It Claims.........................5

    C.   Congress *Could Not* Assign EPA The Power It Claims. ....................8

CONCLUSION .................................................................................................19

# TABLE OF AUTHORITIES

**CASES**

*Allstates Refractory Contractors, LLC v. Su*,
    144 S. Ct. 2490 (2024)..................................................................13

*Bowsher v. Synar*,
    478 U.S. 714 (1986).....................................................................9

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023).....................................................8, 18

*Corrosion Proof Fittings v. EPA*,
    947 F.2d 1201 (5th Cir. 1991)...................................................6

*Crater v. Galaza*,
    508 F.3d 1261 (9th Cir. 2007)...................................................9

*Gundy v. United States*,
    588 U.S. 128 (2019)........................................ 9, 10, 11, 12, 13, 14, 15

*INS v. Chadha*,
    462 U.S. 919 (1983).....................................................................10

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022)......................................................16

*Loving v. United States*,
    517 U.S. 748 (1996)...............................................................11, 12

*Miller v. French*,
    530 U.S. 327 (2000)....................................................................8

*Mistretta v. United States*,
    488 U.S. 361 (1989)...................................................................14

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019).......................................................15

# TABLE OF AUTHORITIES

## (continued)

Page(s)

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935)...................................................................12

*Perez v. Mortgage Bankers Association*,
    575 U.S. 92 (2015)....................................................................15

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978)..............................................................16, 19

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014)..................................................................17

*Wayman v. Southard*,
    23 U.S. 1 (1825)........................................................................12

*Whitman v. American Trucking Associations, Inc.*,
    531 U.S. 457 (2001)..............................................................14, 17

*Yakus v. United States*,
    321 U.S. 414 (1944)..................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)....................................................................9

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)......................................................................18

## Statutes

15 U.S.C. § 2601.............................................................................2, 3

15 U.S.C. § 2605......................................................................4, 5, 6, 7

## Rules

Federal Rule of Appellate Procedure 29 ...........................................2

# TABLE OF AUTHORITIES

(continued)

Page(s)

**Other Authorities**

88 Fed. Reg. 39,652 (June 16, 2023) ....................................................18

88 Fed. Reg. 49,180 (July 28, 2023) ....................................................18

89 Fed. Reg. 39,254 (May 8, 2024) ....................................................1, 6

89 Fed. Reg. 65,066 (Aug. 8, 2024)....................................................17

Brief of the Chamber of Commerce of the United States of
   America and National Association of Manufacturers as
   *Amici Curiae*, *United Steel v. EPA*,
   No. 24-1151 (D.C. Cir.) ....................................................7

1 Baron de Montesquieu, THE SPIRIT OF THE LAWS
   (J.V. Prichard ed., Thomas Nugent trans.,
   D. Appleton & Co. 1900) (1748) ....................................................9

THE FEDERALIST NO. 62 (Clinton Rossiter ed., 1961)........................9, 10, 11, 15

John F. Manning, *Lawmaking Made Easy*,
   10 GREEN BAG 2d 191 (2007)....................................................10

Transcript of Oral Argument,
   *Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) (No. 22-451) ....................................................15

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector. Manufacturing employs nearly 13 million men and women, contributes $2.91 trillion to the United States economy annually, has the largest economic impact of any major sector, and accounts for more than half of all private-sector research and development in the nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The NAM is well-positioned to aid this Court's review of the methylene chloride rule at issue in this case, 89 Fed. Reg. 39,254 (May 8, 2024) (the "Final Rule"), which arises under the Toxic Substances Control Act ("TSCA") regulatory program and has far-reaching implications for manufacturing interests. Many of the NAM's members operate in various sectors that are directly or indirectly affected by the Final Rule and, more generally, TSCA—a statute that applies to the manufacturing, processing, distribution, or use of regulated substances, and whose reach, in recent

years, has been extended to substances in some finished articles. The Final Rule adversely affects several sectors, including not only chemicals, but also coatings, refining, petrochemicals, petroleum, forestry, wood products, batteries, electronics, energy, electricity, and defense, among many others.

The NAM submits this brief in support of the Industry Petitioners pursuant to Federal Rule of Appellate Procedure 29 and the Court's Order (No. 24-60256, Doc. 98-2) granting the parties' joint motion to set a briefing schedule, which joint motion provided that amicus briefs in support of petitioners would be due on October 30, 2024 (No. 24-60256, Doc. 92 at 3.). All parties to this petition have consented to the filing of this brief.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress assigned limited authority to the Environmental Protection Agency in TSCA to "regulate chemical substances and mixtures which present an unreasonable risk." 15 U.S.C. § 2601(b)(2).[2] In doing so, Congress

---

[1] No party's counsel authored this brief in whole or in part. No party and no party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amicus curiae*, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] Unless expressly included, all citations and internal quotation and alteration marks have been omitted.

2

commanded EPA to carry out its regulatory power "in a reasonable and prudent manner," balancing "the environmental, economic, and social impact" of its actions. *Id.* § 2601(c). And to ensure EPA balances these values, Congress built multiple substantive and procedural guardrails into TSCA's text and structure.

As the Industry Petitioners explain in their brief, in promulgating the Final Rule, EPA defied these statutory safeguards multiple times over. The NAM fully agrees with the Industry Petitioners' position and urges the Court to invalidate the Final Rule on the grounds the Industry Petitioners assert. The NAM submits this brief to underscore further that not only did Congress *not* authorize EPA to exercise the authority it claims in the Final Rule, but it *could not* have done so without creating serious separation-of-powers issues. This Court should interpret TSCA as written to avoid these separation-of-powers problems and, in so doing, protect the workers, businesses, and industries whose livelihoods are at risk under the Final Rule.

## ARGUMENT

### A. The Court Should Interpret TSCA As Written.

As the Industry Petitioners correctly explain, Congress granted EPA limited powers to regulate chemicals that unreasonably harm health or the

environment. Brief for Industry Petitioners at 36–45, 50–55 [hereinafter "Indus. Pets.' Br."].[3] Specifically, TSCA empowers EPA to promulgate regulations "prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce" of "chemical substance[s]" it finds "present[] an unreasonable risk of injury to health or the environment." *Id.* at 23 (citing 15 U.S.C. § 2605(a)).

This is not a blank check to ban any use of any chemical that presents any risk. To the contrary, as the Industry Petitioners explain, Congress promulgated a two-step balancing framework: EPA first must determine that a chemical "'presents an unreasonable risk of injury . . . under the conditions of use.'" Indus. Pets.' Br. at 24 (quoting § 2605(b)(4)(A)). Then it may impose tailored, enumerated regulatory requirements that range from notice and recordkeeping requirements to limitations, restrictions, or the prohibition of manufacturing the chemical—and only "to the extent necessary so that the chemical substance or mixture no longer presents such risk." *Id.* at 23–24 (citing § 2605), 38 (describing two-step framework).

---

[3]    Citations to pages in the Industry Petitioners' Brief refer to the ECF page numbers.

In choosing among the various statutorily prescribed approaches, EPA's discretion is further constrained. The agency must "consider and publish a statement" weighing "the effects of the chemical substance," "the benefits of the chemical substance," and "the reasonably ascertainable economic consequences of the rule," including "the likely effect of the rule on the national economy," and a comparison of the "costs and benefits" and "cost effectiveness" of the rule against "1 or more primary alternative regulatory actions." 15 U.S.C. § 2605(c)(2)(A). In addition, if EPA's preferred approach would "substantially prevent[] a specific condition of use of a chemical," EPA must determine "whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute." 15 U.S.C. § 2605(c)(2)(C).

These procedural and substantive safeguards are baked into TSCA's text and structure. And they properly constrain EPA's regulatory authority.

**B.      Congress *Did Not* Assign EPA The Power It Claims.**

In the Final Rule, EPA disregarded Congress's statutory guardrails, disrupting Congress's carefully balanced two-step framework. *See* Indus. Pets.' Br. at 36–45, 50–55. EPA's interpretation of TSCA would give the

agency unbridled authority to regulate *any* chemical to *any* extent based on its sole judgment that the chemical presents *any* risk to health or the environment. That claimed power has no basis in the statute.

As the Industry Petitioners explain, EPA's interpretation rewrites the careful, two-step framework that Congress set forth in TSCA. *See id.* at 38. At the first step, EPA dilutes Congress's "unreasonable risk" requirement into a mere "some potential risk"—or even a "zero risk"—requirement. *See id.* at 34–37 (detailing EPA's erroneous benchmark analysis); *see also Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1215 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) ("Congress did not enact TSCA as a zero-risk statute."); *see also* Indus. Pets.' Br. at 28.[4] After lowering that bar, EPA then, at step two, claims it may completely "[p]rohibit the manufacture, processing, and distribution" of a chemical—here, methylene chloride—"for all consumer use," as well as "[p]rohibit most [of its] industrial and commercial use[s]." 89 Fed. Reg. at 39,255. And it does so without seriously weighing (1) "the benefits of the chemical substance or mixture for various uses" against (2) "the reasonably

---

[4]     Although the Court's *Corrosion Proof Fittings* decision pre-dates TSCA's 2016 amendments, both section 2605(a)'s current and previous language use the phrase "unreasonable risk."

ascertainable economic consequences of the rule," including "the likely effect of the rule on the national economy" and the costs, benefits, and cost-effectiveness of at least one alternative. *See* 15 U.S.C. § 2605(c)(2)(A); *see also* Indus. Pets.' Br. at 77–82.

The EPA's claimed power to ban *an entire chemical* from the market, regardless of any particular "condition[] of use," in an attempt to eliminate *any* potential risk, is a far cry from Congress's mandate to regulate only "to the extent necessary" to prevent an "unreasonable risk" of specific "conditions of use." Indus. Pets.' Br. at 38–45; *see also* Brief of the Chamber of Commerce of the United States of America and National Association of Manufacturers as *Amici Curiae*, *United Steel v. EPA*, No. 24-1151 (D.C. Cir.), Doc. No. 2080554 at 18–23. It would authorize EPA to "'regulat[e] *any manner or method* of commercial use of such [chemical] substance or mixture'" after determining, in its sole judgment, that the chemical poses what it views as an "unreasonable risk." Indus. Pets.' Br. at 51 (emphasis added, quoting § 2605(a)(5)). Never mind how small any such risk might be. Never mind whether certain conditions of use pose no risk at all. Never mind the utility of the chemical to American industry or the American consumer. And never

mind how great the economic impact. That is not a power Congress assigned to EPA in TSCA.

## C. Congress *Could Not* Assign EPA The Power It Claims.

Nor could Congress assign so great a power to an agency consistent with the Constitution's separation of powers. At a minimum, this Court should interpret TSCA so as to avoid an unconstitutional delegation of power from Congress to an executive agency. Even assuming that EPA's interpretation were "otherwise acceptable" (and it is not), that interpretation "would raise serious constitutional problems"—so "the Court [should] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc), *aff'd on other grounds*, 602 U.S. 406 (2024).

1. "The Constitution enumerates and separates the powers of the three branches of Government in Articles I, II, and III." *Miller v. French*, 530 U.S. 327, 341 (2000). Under Article I, Congress makes the law. Under Article II, the Executive enforces the law. And under Article III, the Judiciary interprets the law. "[I]t is this very structure of the Constitution that exemplifies the concept of separation of powers." *Id.* at 341.

This separation of powers was no accident. "The Framers considered the division of governmental power into separate departments a vital check against tyranny." *Crater v. Galaza*, 508 F.3d 1261, 1263 (9th Cir. 2007) (Reinhardt, J., dissenting from the denial of rehearing en banc). As explained by Montesquieu—whose "thesis that checks and balances were the foundation of a structure of government that would protect liberty" heavily influenced the Constitution, *Bowsher v. Synar*, 478 U.S. 714, 722 (1986)— "[w]hen the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty." 1 Baron de Montesquieu, THE SPIRIT OF THE LAWS 182 (J.V. Prichard ed., Thomas Nugent trans., D. Appleton & Co. 1900) (1748); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[T]he Constitution diffuses power the better to secure liberty.").

Indeed, the Framers understood that one of "the diseases to which our governments are most liable" was "the facility and excess of law-making." THE FEDERALIST NO. 62, at 378 (James Madison) (Clinton Rossiter ed., 1961). And "[t]hey believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty." *Gundy v. United States*, 588 U.S. 128, 154 (2019) (Gorsuch, J., dissenting). The Framers thus

"went to great lengths to make lawmaking difficult." *Id.* They "insisted that any proposed law must win the approval of two Houses of Congress—elected at different times, by different constituencies, and for different terms in office—and either secure the President's approval or obtain enough support to override his veto." *Id.* This "finely wrought and exhaustively considered" procedure, *INS v. Chadha*, 462 U.S. 919, 951 (1983)—bicameralism and presentment—"make[s] lawmaking difficult *by design*." John F. Manning, *Lawmaking Made Easy*, 10 GREEN BAG 2d 191, 202 (2007) (emphasis in original).

The legislative process has a number of salutary effects. It "assures that the legislative power would be exercised only after opportunity for full study and debate in separate settings." *Chadha*, 462 U.S. at 951. It "doubles the security to the people by requiring the concurrence of two distinct bodies." THE FEDERALIST NO. 62, at 378–79. And it "ensure[s] that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting). "Article I's precise rules of representation, member qualifications, bicameralism, and voting procedure" thus "make Congress the branch most capable of responsive and

deliberate lawmaking." *Loving v. United States*, 517 U.S. 748, 757–58 (1996) (Kennedy, J.).

The upshot is that the legislative process—as contemplated by the Constitution—"ensure[s] the people [are] subject to a relatively stable and predictable set of rules." *Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting). "It will be of little avail to the people that the laws are made by men of their own choice," Madison observed, if they "undergo such incessant changes that no man, who knows what the law is today, can guess what it will be tomorrow." THE FEDERALIST NO. 62, at 381. "[A] continual change even of good measures is inconsistent with every rule of prudence and every prospect of success." *Id.* at 380. Though "[s]ome occasionally complain about Article I's detailed and arduous processes for new legislation," "to the framers these were bulwarks of liberty." *Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting).

2.     Though "Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is . . . vested," "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will

enable it to perform its function." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935).

Where Congress enacts legislation that is "sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether" its standards have been met, Congress may assign to "an administrative officer . . . ample latitude" to execute Congress's command. *Yakus v. United States*, 321 U.S. 414, 425–26 (1944). Put differently, "as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to 'fill up the details.'" *Gundy*, 588 U.S. at 157 (Gorsuch, J., dissenting) (quoting *Wayman v. Southard*, 23 U.S. 1, 43 (1825) (Marshall, C.J.)).

But in granting the executive branch this authority, Congress is not truly "delegating" its power. "Congress can no more 'delegate' some of its Article I power to the Executive than it could 'delegate' some to one of its committees." *Loving*, 517 U.S. at 777 (Scalia, J., concurring in part and in the judgment). "What Congress does is to *assign responsibilities* to the Executive; and when the Executive undertakes those assigned responsibilities it acts, not as the 'delegate' of Congress, but as the agent of the People." *Id.* (emphasis in original).

3.    Under the Supreme Court's present framework, "a delegation is constitutional so long as Congress has set out an 'intelligible principle' to guide the delegee's exercise of authority." *Gundy*, 588 U.S. at 145 (plurality op.). Stated differently, "a delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'" *Id.* at 146.

"Those standards" are "not demanding." *Id.* "Judges and scholars representing a wide and diverse range of views have condemned [the current intelligible-principle framework] as resting on misunderstood historical foundations." *Gundy*, 588 U.S. at 164 (Gorsuch, J., dissenting). "At least five Justices have already expressed an interest in reconsidering [the Supreme Court's] approach to Congress's delegations of legislative power." *Allstates Refractory Contractors, LLC v. Su*, 144 S. Ct. 2490, 2491 (2024) (Thomas, J., dissenting from denial of certiorari). "Even Justice Douglas, one of the fathers of the administrative state, came to criticize excessive congressional delegations in the period when the intelligible principle 'test' began to take hold." *Gundy*, 588 U.S. at 164–65 (Gorsuch, J., dissenting).

The Supreme Court has acknowledged that its present nondelegation jurisprudence is "driven" not by any particular fidelity to the Constitution's

separation of powers but "by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). And the Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474–75 (2001) (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

As a result, the legislative branch has been able to "legislate" at the 30,000-foot level and defer nearly everything else to the executive branch. The executive branch, in turn, essentially has "a blank check to write a code of conduct" in such cases. *Gundy*, 588 U.S. 171–72 (Gorsuch, J., dissenting). In *Gundy*, for example, "Congress could not achieve the consensus necessary to resolve the hard problems" associated with whether the federal Sex Offender Registration and Notification Act's registration requirements could be applied to pre-Act offenders, so it simply "passed the potato to the Attorney General." *Id.* "[F]reed from the need to assemble a broad supermajority for his views," the Attorney General then decided "to apply

the statute retroactively to a politically unpopular minority." *Id.* But that role-reversal—where the executive engages in policymaking that Congress could not accomplish—defies our constitutional structure.

It also undermines the "stab[ility] and predictab[ility]" that the legislative process ensures. *Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting). The Sex Offender Registration and Notification Act at issue in *Gundy* is again instructive. There, as in so many other contexts, "the executive branch found itself rapidly adopting different positions across different administrations." *Id.* at 171.[5] And where executive "edicts" are "frequent and shifting," Americans lack "fair notice" of what behavior is or is not allowed, and thus cannot order their daily lives. *Id.* at 172; *see also* THE FEDERALIST NO. 62, at 381 ("The internal effects of a mutable policy are still more calamitous. . . . It will be of little avail to the people that the laws are made by men of their own

---

[5]     *See also, e.g.*, Transcript of Oral Argument at 74, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) (No. 22-451) (Justice Kavanaugh describing the NLRB as "mov[ing] from pillar to post fairly often"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 98 (2015) (describing Secretary of Labor's twice-changed opinion regarding whether mortgage-loan officers fall under the FLSA's exemption to minimum-wage and maximum-hour requirements); *Mozilla Corp. v. FCC*, 940 F.3d 1, 17 (D.C. Cir. 2019) (discussing the FCC's longstanding inconsistency concerning internet regulation under the Telecommunications Act of 1996).

choice if the laws . . . undergo such incessant changes that no man, who knows what the law is today, can guess what it will be tomorrow. Law is defined to be a rule of action; but how can that be a rule, which is little known and less fixed?").

4.     The power EPA claims in the Final Rule—to ban an entire chemical based on any perceived risk to health or the environment, and without seriously weighing the impacts—cannot be squared with these foundational separation-of-powers principles. If, as EPA claims, TSCA lacks any legislatively prescribed guardrails, then Congress would have granted EPA the *unilateral* power to "alter[] the legal rights, duties and relations" of private parties. *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024). But it is "emphatically" the "exclusive province of the Congress" to "formulate legislative policies" and "mandate programs and projects," as well as "establish their relative priority for the Nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); *see also Jarkesy*, 34 F.4th at 461 ("Government actions are 'legislative' if they have the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch."). The Constitution prohibits Congress

from delegating those core legislative powers to the executive branch. *See Whitman*, 531 U.S. at 472.

That is especially so where an agency claims to exercise unbridled, unilateral legislative power to rule over "a significant portion of the American economy." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). That is the case here. Methylene chloride is "central to a wide range of commercial and industrial processes." Indus. Pets.' Br. at 20. It is used in countless industrial processes, including "adhesives, sealants, automotive products," and "paint strippers and coating removers" spanning wide sectors of the U.S. economy, including "refining, petroleum, batteries, electronics, and energy." *Id.* And because in many cases there is no viable alternative to methylene chloride, industries that depend on its use—including much of the furniture-refinishing business—will have no choice but to shutter their doors, affecting more than 900,000 American workers. *Id.* at 29, 52–53.

Nor does EPA claim that its power in this regard is limited to methylene chloride. Far from it. As the Industry Petitioners explain, EPA currently is considering proposals to regulate other chemicals that have significant industrial and consumer utility. *See id.* (citing 89 Fed. Reg. 65,066

(Aug. 8, 2024) (bromopropane: a "widely used solvent in a variety of occupational and consumer applications"); 88 Fed. Reg. 49,180 (July 28, 2023) (carbon tetrachloride: "used as a feedstock . . . in the making of products such as refrigerants, aerosol propellants, and foam-blowing agents"); 88 Fed. Reg. 39,652 (June 16, 2023) (perchloroethylene: a "widely used solvent in a variety of occupational and consumer applications")). EPA cannot commandeer Congress's power to "make[] laws" to "shape the Nation's course." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015).

*    *    *

In EPA's telling, Congress empowered it, through TSCA, to ban chemicals based on its sole judgment and subject to no real legislative constraints. The Industry Petitioners correctly explain that EPA's interpretation of TSCA is wrong. But if EPA's interpretation were to prevail (and it should not), such a holding would raise serious separation-of-powers concerns that threaten TSCA as a whole.

Even assuming that EPA's construction were plausible (and it is not), the Court must "construe the statute to avoid such [constitutional] problems." *Cargill*, 57 F.4th at 471. This Court therefore should interpret

TSCA as written, enforcing Congress's mandate and protecting its "exclusive province." *Tenn. Valley Auth.*, 437 U.S. at 194.

## CONCLUSION

The Court should grant the petitions and vacate the Final Rule.

Dated:  October 30, 2024

Respectfully submitted,

*/s/ Kasdin M. Mitchell*
Kasdin M. Mitchell, P.C.
Shane D. O'Connor
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Tex.  75205
(214) 972-1770
kasdin.mitchell@kirkland.com
shane.oconnor@kirkland.com

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street NW, Ste. 1000
Washington, D.C.  20006
(202) 783-8400
edavis@shb.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 3,720 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016, in 14-point Book Antiqua font.

Dated:  October 30, 2024              */s/ Kasdin M. Mitchell*
                                                      Kasdin M. Mitchell, P.C.

                                                      *Counsel for Amicus Curiae*