No. 24-60227

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY,
*Petitioners*,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*.
CONSOLIDATED WITH

No. 24-60256

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY; SIERRA CLUB;
AMERICAN CHEMISTRY COUNCIL,
*Petitioners*,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*.

On Petitions for Review of a Final Rule
of the Environmental Protection Agency

# BRIEF OF INTERVENOR AMERICAN CHEMISTRY COUNCIL
# IN SUPPORT OF RESPONDENTS

Laura Ford Gooding
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002

David Y. Chung
Amanda Shafer Berman
Warren Lehrenbaum
Kathy Dzienkowski
CROWELL & MORING LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2587
dchung@crowell.com

*Counsel for American Chemistry Council*

No. 24-60256 & 24-60227

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

EAST FORK ENTERPRISES, INC., *et al.*,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*

*Respondents*.

On Petitions for Review of a Final Rule
of the Environmental Protection Agency

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners:** East Fork Enterprises, Inc.; Epic Paint Company; American Chemistry Council; Sierra Club

**Counsel for Petitioners East Fork Enterprises, Inc. and Epic Paint Company:** Keith Bradley, Caffey Norman, and Allan Kacenjar, Squire Patton Boggs (US) LLP

**Counsel for Petitioner American Chemistry Council:** David Y. Chung, Amanda Shafer Berman, Warren Lehrenbaum, Kathy Dzienkowski, Crowell & Moring LLP

**Counsel for Petitioner Sierra Club:** Jonathan Kalmuss-Katz and Lakendra Barajas, Earthjustice

**Respondents:** U.S. Environmental Protection Agency, Michael Regan, in his capacity as Administrator, U.S. Environmental Protection Agency

**Counsel for Respondents:** Merrick Garland, Attorney General; Todd Kim, Assistant Attorney General; Laura J. Brown, Senior Attorney, U.S. Department of Justice

**Respondent-Intervenor**: American Chemistry Council. American Chemistry Council has no parent corporations and no publicly held corporation owns more than 10% or more of its respective stock.

**Counsel for Respondent-Intervenor**: David Chung, Amanda Shafer Berman, Warren Lehrenbaum, Kathy Dzienkowski, Crowell & Moring LLP

**Amici Curiae**: National Association of Manufacturers; University of California San Francisco Program on Reproductive Health and Environment

**Counsel for Amicus Curiae National Association of Manufacturers**: Kasdin M. Mitchell, Kirkland & Ellis, L.L.P.; Elliott M. Davis, Shook, Hardy & Bacon, L.L.P.

**Counsel for Amicus Curiae University of California San Francisco Program on Reproductive Health and Environment**: Robert M. Sussman, Sussman & Associates

*/s/ David Y. Chung*
David Y. Chung

## STATEMENT REGARDING ORAL ARGUMENT

This case presents important and novel questions regarding the validity of an expansive rule issued under the Toxic Substances Control Act by the Environmental Protection Agency. Oral argument would assist the court in its consideration of these issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ............................................................................... vi

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF ISSUES ................................................................................. 4

STATEMENT OF THE CASE ............................................................................ 4

I.     Statutory and Regulatory Background ..................................................... 4

      A.    Risk Evaluation, Determination, and Management Under
TSCA Sections 6 and 26. .................................................... 5

      B.    Coordination of TSCA Regulation with Other EPA
Regulatory Schemes Under Section 9(b). ......................... 10

II.    Regulatory Proceedings Relevant to Methylene Chloride ........................ 12

      A.    Methylene Chloride Risk Evaluation .............................................. 12

      B.    EPA Reverses Course and Announces Plans to Develop a
New Fenceline Screening Tool. ...................................... 15

            1.    Purpose of the New Fenceline Screening Tool. .................... 16

            2.    Uncertainties Associated with the Draft Fenceline
Methodology. .............................................................. 18

      C.    The Draft Fenceline Methodology's Impact on the Final
Rule........................................................................... 20

SUMMARY OF ARGUMENT .......................................................................... 21

STANDARD OF REVIEW ................................................................................ 23

ARGUMENT ..................................................................................................... 23

I.     Sierra Club's Claims Regarding EPA's Approach to Fenceline
Communities Lack Merit. .............................................................. 23

A.     EPA Appropriately Excluded Exposure Pathways Relevant to Fenceline Communities from Risk Evaluation...........................................................................24

B.     EPA Appropriately Declined to Make an Unreasonable Risk Determination Given the Significant Limitations of the Draft Fenceline Methodology. ....................................26

     1.     An Exceedance of EPA's Benchmark Value Does Not Equate to a Finding of Unreasonable Risk. ....................27

     2.     EPA Appropriately Declined to Determine Conclusively Whether Potential Risks to Fenceline Communities Would be Unreasonable. ................................28

C.     TSCA Does Not Authorize EPA to Regulate Elevated Risks. ...............................................................................32

D.     Sierra Club's Arbitrary and Capricious Argument Misses the Mark. ...........................................................................34

E.     Sierra Club Ignores the Comprehensive Regulatory Framework Governing Methylene Chloride Air Emissions..........................................................................35

II.     EPA Appropriately Excluded Ozone Depletion From the Scope of Its Risk Evaluation. ..................................................37

CONCLUSION ...................................................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**Cases**

*ADT, L.L.C. v. Richmond*,
    18 F.4th 149 (5th Cir. 2021) ...................................................................24

*Apter v. Dep't of Health & Human Servs.*,
    80 F.4th 579 (5th Cir. 2023) ...................................................................25

*Corrosion Proof Fittings. v. EPA*,
    947 F.2d 1201 (5th Cir. 1991) .................................................................32

*Noranda Alumina, L.L.C. v. Perez*,
    841 F.3d 661 (5th Cir. 2016) ...................................................................34

*Sw. Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)................................................................................24

*Tex. Chem. Council v. EPA*,
    No. 24-1185 (D.C. Cir. June 6, 2024) ....................................................26

*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001)..................................................................................38

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health &
    Hum. Servs.*,
    985 F.3d 472 (5th Cir. 2021) ...................................................................34

*West Virginia v. EPA*,
    597 U.S. 697 (2022)................................................................................38

**Statutes**

15 U.S.C. § 2601(b)(2)....................................................................................4

15 U.S.C. § 2605.......................................................................................1, 27

15 U.S.C. § 2605(a) ...........................................................................1, 5, 22, 32

15 U.S.C. § 2605(b) ........................................................................................1

15 U.S.C. § 2605(b)(4)(A) ...................................................6, 37

15 U.S.C. § 2605(b)(4)(B) ...................................................8, 25

15 U.S.C. § 2605(b)(4)(D) .................................................*passim*

15 U.S.C. § 2605(b)(4)(F)(i) ......................................................7

15 U.S.C. § 2605(b)(4)(F)(iv) ..................................................32

15 U.S.C. § 2605(b)(4)(G) ...............................................*passim*

15 U.S.C. § 2605(b)(4)(G)(i) ......................................................6

15 U.S.C. § 2605(b)(4)(G)(ii) .....................................................6

15 U.S.C. § 2605(c)(1) ...........................................................2, 6

15 U.S.C. § 2608(b) .................................................................5

15 U.S.C. § 2608(b)(1) .........................................................2, 11

15 U.S.C. § 2608(b)(2) ............................................................11

15 U.S.C. § 2625 ....................................................................4

15 U.S.C. § 2625(h) .......................................................*passim*

15 U.S.C. § 2625(h)(1) .........................................................7, 33

15 U.S.C. § 2625(h)(2) ............................................................33

15 U.S.C. § 2625(h)(4) .............................................................7

15 U.S.C. § 2625(i) ........................................................*passim*

15 U.S.C. § 2625(k) .......................................................*passim*

42 U.S.C. § 7412(b) ...............................................................36

42 U.S.C. § 7412(d)(6) ............................................................37

42 U.S.C. § 7412(f) ............................................................36, 37

42 U.S.C. § 7412(f)(2) .....................................................27, 36, 37

**Regulations**

40 C.F.R. Part 702 (2017) ..................................................................25

40 C.F.R. § 702.41(c)(2) (2017) ...........................................................9

**Other Authorities**

162 Cong. Rec. H3028 (May 24, 2016)................................................12

162 Cong. Rec. S3511-01 (daily ed. June 7, 2016) ........................5, 6, 32

59 Fed. Reg. 13044 (Mar. 18, 1994)....................................................39

82 Fed. Reg. 7464 (Jan. 19, 2017) ......................................................40

82 Fed. Reg. 33726 (July 20, 2017).............................................*passim*

88 Fed. Reg. 28284 (May 3, 2023) ...................................17, 20, 27, 36

89 Fed. Reg. 37028 (May 3, 2024) ......................................................16

89 Fed. Reg. 39284 (May 8, 2024) ..........................................14, 20, 29

EPA, *An Examination of EPA Risk Assessment Principles and Practices* (Mar. 2004) .........................................................................17

H. Rep. No. 114-176 (2015) ...............................................................11

S. Rep. No. 94-698 (1976) .................................................................11

S. Rep. No. 114-67 (2015) .........................................................8, 9, 10

**INTRODUCTION**

This Court should reject Petitioner Sierra Club's attempt to compel the U.S. Environmental Protection Agency ("EPA") to regulate outside of its authority under section 6 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2605.

TSCA section 6(a) authorizes EPA to manage "unreasonable risk" from chemicals to human health or the environment. To do so, EPA must "apply one or more [of the statute's enumerated] requirements," and then only "to the extent necessary so that the chemical . . . no longer presents such risk." *Id.* § 2605(a). The TSCA risk management process begins with EPA conducting a risk evaluation to determine whether an activity (or combination of activities) involving a chemical presents unreasonable risk. *See id.* § 2605(b). And Congress commands EPA to "publish the scope of the risk evaluation to be conducted." *Id.* § 2605(b)(4)(D). During the scoping process, EPA must specify the "hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator *expects to consider*." *Id.* (emphasis added). Thus, if EPA does not expect to consider certain hazards, exposures, conditions of use, or subpopulations, it can exclude them from risk evaluation.

When exercising its risk evaluation and risk management authority, EPA must consider "reasonably available information," including hazard and exposure information, but EPA need not search excessively or arbitrarily to obtain such

1

information, or otherwise wait an inordinate amount of time for some non-existent or nascent science or methodologies to evolve. *Id.* § 2625(k). EPA must also comply with the statutory "best available science" and "weight of the scientific evidence" standards when conducting risk evaluation and, if EPA finds unreasonable risk, when exercising its risk management authority. *See id.* § 2625(h)-(i). EPA must do all of this while adhering to statutory deadlines. *See id.* § 2605(b)(4)(G), (c)(1).

Equally important, TSCA does not exist in a vacuum. When Congress amended the Act in 2016, it ensured that TSCA does not supplant other federal environmental laws. TSCA section 9 directs EPA to "coordinate actions taken under" TSCA, such as risk evaluation, "with actions taken under other Federal laws administered in whole or in part" by EPA. 15 U.S.C. § 2608(b)(1). Through such intra-agency coordination, EPA can reasonably determine that it does not expect to consider certain hazards, exposures, etc., because they are subject to other regulatory frameworks.

Sierra Club overlooks or downplays these statutory constraints on EPA action in alleging that EPA violated TSCA by failing to: determine whether methylene chloride presents unreasonable risk to fenceline communities; regulate alleged "elevated" risk to such communities; and evaluate ozone depletion potential. None of these contentions has merit. EPA appropriately excluded air,

water, and exposure pathways for the general population, including fenceline communities, following intra-agency coordination, because methylene chloride is heavily regulated under numerous other environmental laws. And while EPA later generated preliminary screening level data related to fenceline communities using a draft methodology that was not designed to support regulatory decisions, it correctly declined to flout statutory deadlines or TSCA's scientific standards requirements by opting against further study or exercising its risk management authority to regulate the mere potential for elevated risk. EPA likewise appropriately excluded ozone depletion from risk evaluation, consistent with its longstanding determination that methylene chloride has no ozone depletion potential.

For these reasons, EPA was not required to do anything more to evaluate whether methylene chloride presents unreasonable risk to fenceline communities or whether it has any effect on the ozone layer. Rather than remand the final rule for further analysis, the Court should dismiss Sierra Club's petition and instead vacate the rule due to the fatal flaws detailed in the Industry Petitioner's brief.

## JURISDICTIONAL STATEMENT

Respondent-Intervenor American Chemistry Council ("ACC") agrees with EPA's jurisdictional statement.

## STATEMENT OF ISSUES

1.      Whether EPA's approach to assessing and addressing methylene chloride's potential effects on fenceline communities is consistent with statutory constraints on the exercise of EPA's TSCA section 6 authority.

2.      Whether EPA properly excluded ozone depletion from the scope of the methylene chloride risk evaluation under 15 U.S.C. § 2605(b)(4)(D).

## STATEMENT OF THE CASE

### I.      Statutory and Regulatory Background

In 1976, Congress enacted TSCA to "regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(b)(2). Congress overhauled TSCA in 2016. As relevant here, the 2016 amendments significantly altered EPA's section 6 authority by creating a two-step process to conduct risk evaluations and, if appropriate, to manage activities involving such chemicals that present an unreasonable risk of injury to health or the environment. *See generally id.* § 2605. Congress also amended section 26, *id.* § 2625, by placing various guardrails—*e.g.*, scientific standards—on EPA's exercise of section 6 authority, thus making it clear that risk evaluations are not boundless, roving endeavors to collect and assess information regardless of quality or inconsistency with the intended use of information. *See id.* § 2625(h)-(i), (k). Finally, Congress reinforced that section 9, as originally

intended, reflects Congress's intent that TSCA operates to fill gaps in the regulation of chemical substances; it does not supplant or displace other regulatory frameworks. *See id.* § 2608(b).

A. **Risk Evaluation, Determination, and Management Under TSCA Sections 6 and 26.**

TSCA section 6(a) commands EPA to promulgate regulations prohibiting or otherwise restricting the "manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture" if the Agency determines that any of these activities or a combination of such activities "presents an unreasonable risk of injury to health or the environment." *Id*. § 2605(a). The Act explicitly directs EPA to regulate only "*to the extent necessary* so that the chemical substance or mixture no longer presents such risk." *Id.* (emphasis added). As explained in the legislative history, "'[u]nreasonable risk' does not mean *no risk*; it means that EPA must determine, on a case-by-case basis, whether the risks posed by a specific high priority substance are *reasonable* in the circumstances of exposure and use." 162 Cong. Rec. S3511-01, S3522 (daily ed. June 7, 2016) (statement of Sen. Vitter) (emphasis added).

Before it can promulgate a risk management rule under section 6(a), EPA must "conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to

a potentially exposed or susceptible subpopulation . . . under the conditions of use"
15 U.S.C. § 2605(b)(4)(A). As part of the risk evaluation process, EPA must
"publish the scope of the risk evaluation to be conducted, including the hazards,
exposures, conditions of use, and the potentially exposed or susceptible
subpopulations [EPA] *expects to consider*[.]" *Id.* § 2605(b)(4)(D) (emphasis
added). EPA can exclude certain activities, exposures, and health or environmental
hazards and to instead focus on what raises the greatest potential for risk. *See id.*;
*accord* 162 Cong. Rec. S3511-01, S3519 (statement by Sen. Vitter) (EPA is "given
the discretion to determine the conditions of use" to allow EPA's focus on
conditions "that raise the greatest potential for risk").

EPA must complete risk evaluations "as soon as practicable, but not later
than 3 years after the date on which the Administrator initiates the risk evaluation."
15 U.S.C. § 2605(b)(4)(G)(i). That statutory deadline affords EPA some leeway,
but "for not more than 6 months." *Id.* § 2605(b)(4)(G)(ii). Congress also
established statutory deadlines for EPA's promulgation of risk management rules
under section 6(a), with limited ability for extensions. *See id.* § 2605(c)(1).

Apart from these deadlines, Congress placed additional constraints on EPA's
authority under TSCA section 6:

*First*, EPA must "take into consideration information relating to a chemical
substance or mixture, including hazard and exposure information, under the

conditions of use, that is *reasonably available* to the Administrator." *Id.* § 2625(k) (emphasis added). This provision must work in harmony with the other parts of the statute. So, while EPA cannot bury its head in the sand and ignore information that satisfies the Act's "best available science" requirements, the Agency also cannot ignore the statutory deadlines for EPA actions under section 6 in a quest to obtain perfect data.

*Second*, EPA must "integrate and assess available information on hazards and exposures for the conditions of use" and "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." *Id.* § 2605(b)(4)(F)(i), (iv). TSCA section 26(h) requires EPA to "use scientific information, technical procedures, measures, methods, protocols, methodologies, or models, employed in a manner consistent with the best available science." *Id.* § 2625(h). The "best available science" standard mandates, among other considerations, "the extent to which the scientific information, technical procedures, measures, methods, protocols, methodologies, or models employed to generate the information are *reasonable for and consistent with the intended use of the information*" and "the extent to which the variability and uncertainty in the information, or in the procedures, measures, methods, protocols, methodologies, or models, are evaluated and characterized." *Id.* § 2625(h)(1), (4) (emphasis added).

*Third*, EPA must premise its TSCA section 6 determinations "on the weight of the scientific evidence." *Id.* § 2625(i). Though Congress did not define this phrase, the legislative history explains that this provision was "intended to ensure that EPA safety assessments and determinations are clear to the public, and based on credible, reliable scientific information." S. Rep. No. 114-67, at 9 (2015).

In accordance with Congress's requirement that EPA "establish, by rule, a process to conduct risk evaluations," 15 U.S.C. § 2605(b)(4)(B), EPA promulgated detailed procedures in 2017. *See* 82 Fed. Reg. 33726 (July 20, 2017) (hereinafter, "2017 Risk Evaluation Rule"). The procedures in that rule were in effect when EPA finalized the risk evaluation underlying the methylene chloride rule at issue here. Several aspects of that procedural rule are relevant.

Scoping – after reviewing the statutory text and history, EPA concluded it can "determine the conditions of use that the Agency will address in its evaluation . . . to ensure that the Agency's focus is on the conditions of use that raise the greatest potential for risk." *Id.* at 33728. EPA further concluded that TSCA's scoping provision does not require consideration of all conditions of use and thus, "EPA may, on a case-by-case basis, exclude certain activities that EPA has determined to be conditions of use in order to focus its analytical efforts on those exposures that are likely to present the greatest concern, and consequently merit an unreasonable risk determination." *Id.* at 33729. As part of scoping, EPA will

clarify what "potentially exposed or susceptible subpopulations . . . EPA plans to evaluate." *Id.* at 33751 (§ 702.41(c)(2)). Relevant here, EPA ultimately declined a request to codify a definition of "potentially exposed or susceptible subpopulations" that explicitly references "fence line communities," explaining that TSCA "gives the Administrator the authority to identify all relevant subpopulations that EPA 'expects to consider'" and that determinations about what subpopulations to consider in any given evaluation will be case-specific. *See Response to Public Comment on Proposed 2017 Risk Evaluation Rule*, at 21 (2017).[1]

  <u>Reasonably available information</u> – EPA defined this phrase to mean "information that EPA possesses or can reasonably generate, obtain, and synthesize for use in risk evaluations, *considering the deadlines specified in TSCA section 6(b)(4)(G) for completing such evaluation*." 2017 Risk Evaluation Rule at 33748 (emphasis added). As EPA explained, it "recognizes that there may be circumstances where additional information may need to be developed within the time frames of the risk evaluation process." *Id.* at 33732. Simultaneously, however, EPA stressed that if "longer-term testing" is needed "to address data gaps," EPA "does not think information that could be generated through such testing should be

---

[1] *Available at* https://www.regulations.gov/document/EPA-HQ-OPPT-2016-0654-0109.

viewed as 'reasonably available.'" *Id.*; *accord Response to Public Comment on Proposed 2017 Risk Evaluation Rule*, at 33 ("EPA does not interpret the statute to allow EPA to 'pause' the risk evaluation process or to extend the 3-year deadline beyond the 6 months authorized.").

Science requirements – TSCA does not "explicitly define" the terms "best available science" and "weight of the scientific evidence." Thus, EPA promulgated regulatory definitions for these terms that incorporate "the statutory requirements" outlined in TSCA sections 26(h) and (i), 15 U.S.C. § 2625(h)-(i). *See* 2017 Risk Evaluation Rule at 33727, 33739. The purpose of these regulatory definitions, and related provisions in the 2017 Risk Evaluation Rule, is to "clarify that EPA's risk evaluations will be consistent with TSCA's new requirements in section 26 related to best available science and weight of the scientific evidence," including EPA's evaluation of hazard and exposure data. *Id.* at 33739.

## B. Coordination of TSCA Regulation with Other EPA Regulatory Schemes Under Section 9(b).

TSCA's text leaves no room for doubt that the statute does not operate in a vacuum and does not have primacy over any other statutes, environmental or otherwise. In Section 9(b), Congress commanded EPA to "coordinate actions" under TSCA, including *both* risk evaluation and risk management, with actions under other EPA-administered laws and further directed that EPA "shall use such authorities [in other laws] to protect against such risk" if EPA determines that a

risk "could be eliminated or reduced to a sufficient extent." 15 U.S.C. §

2608(b)(1). And EPA may act under TSCA *only* if it is in the public interest. That

determination requires EPA to "consider, based on information reasonably

available to [EPA], all relevant aspects of the risk . . . and a comparison of the

estimated costs and efficiencies of the action" to be taken under TSCA versus a

different federal law. *Id.* § 2608(b)(2).

The statutory language, coupled with the legislative history, makes clear

TSCA's role as a gap-filler in the grand scheme of EPA's—and other agencies'—

regulatory regimes. This is consistent with why Congress enacted TSCA in the first

place: TSCA "is designed to fill a number of regulatory gaps which currently

exist." S. Rep. No. 94-698, at 1 (1976).

The legislative history for the 2016 Amendments illustrates Congress's

intent to reinforce the presumption that EPA regulate risks under other laws before

using TSCA. A House Report describes the amendments to section 9, including the

addition of the public interest consideration, as "reinforc[ing] TSCA's original

purpose of filling gaps in Federal law that otherwise did not protect against the

unreasonable risks," H. Rep. No. 114-176, at 28 (2015), and "encourag[ing]

decisions that avoid confusion, complication, and duplication." *Id*. Relatedly,

Representative Pittenger summarized the amended section 9 as "reemphasiz[ing]

and strengthen[ing] Congress' intent that TSCA serve as *an authority of last resort*

for the regulation of a chemical when another authority under EPA's jurisdiction, or another Federal agency, *already regulates the chemical and the risk identified by EPA*," meaning EPA "may not promulgate a rule under section 6 of TSCA … when … *the agency either already regulates that chemical through a different statute under its own control*, like the Clean Air Act, *and that authority sufficiently protects against a risk of injury to human health or the environment …*" 162 Cong. Rec. H3028 (May 24, 2016) (emphasis added).

## II.    Regulatory Proceedings Relevant to Methylene Chloride

### A.    Methylene Chloride Risk Evaluation

EPA published its methylene chloride risk evaluation in June 2020. *2020 Risk Evaluation for Methylene Chloride* ("2020 Risk Evaluation"), AR 275, JA___. Applying the 2017 Risk Evaluation Rule, EPA excluded, "on a case-by-case basis, certain exposure pathways that fall under the jurisdiction of other EPA-administered statutes" from the scope of the risk evaluation. *Id.* at 57 (invoking authority under TSCA section 6(b)(4)(D)). This appropriately focused EPA's "analytical efforts on exposures that are likely to present the greatest concern and consequently merit a risk evaluation under TSCA." *Id.*; *accord Problem Formulation of the Risk Evaluation for Methylene Chloride*, at 14 (2018) ("Problem Formulation"), AR 33, JA___ (explaining that "EPA believes that certain programs under other Federal environmental laws adequately assess and

effectively manage the risks for the covered exposure pathways" and emphasizing, among other things, the need "to avoid duplicating efforts taken pursuant to other Agency programs" and "to meet the three-year statutory deadline"). And in recognition of the statute's gap-filling role, EPA explicitly noted that TSCA section 9(b)(1) "provides EPA authority to coordinate actions with other EPA offices without ever making a risk finding," including "tailoring the scope of TSCA risk evaluations to focus on areas of greatest concern rather than exposure pathways addressed by other EPA-administered statutes and regulatory programs." 2020 Risk Evaluation at 57-58, JA___.

EPA's risk evaluation recounts the extensive intra-agency coordination that informed EPA's conclusion "that specific exposure pathways are well-regulated by the [following] EPA statutes and regulations":

- As a "hazardous air pollutant" under the Clean Air Act ("CAA"), methylene chloride is subject to numerous "technology-based standards for source categories that emit methylene chloride to ambient air," which must "adequately protect public health and the environment."

- Methylene chloride is subject to an enforceable Maximum Contaminant Level regulation under the Safe Drinking Water Act

("SDWA"), and "public water systems are required to monitor" and "ensure compliance with the maximum contaminant level."

- Methylene chloride is a priority pollutant under the Clean Water Act, and EPA has developed water quality criteria to protect human health, for states to adopt as water quality standards and implement through discharge permits.

- Methylene chloride is listed as a hazardous waste under the Resource Conservation and Recovery Act ("RCRA"), and releases to ambient air during waste incineration, as well as releases related to land disposal (*e.g.*, via underground injection or landfills), are regulated under the CAA, RCRA, and SDWA.

*Id.* at 60-63, JA___-___.

Because various other regulatory programs address air, water, and disposal exposures to the general population, including subsets thereof like fenceline communities, *see* 89 Fed. Reg. 39284-85 (May 8, 2024), AR 723, JA___, EPA appropriately tailored its risk evaluation to focus on areas of greater concern. In response to comments raising concerns about fenceline communities, EPA reiterated that it "evaluated and considered the impact of existing laws and regulations" and concluded that exposure pathways relevant to such communities are addressed by other regulatory programs; thus, it was appropriate to exclude

such pathways from EPA's risk evaluation. *See Response to Peer Review and Comments on Draft Risk Evaluation*, at 190-92 (2020), AR 252, JA___. Similarly, EPA explained that "[a]ssessing ozone depletion is out of scope for this Risk Evaluation" and that exposures resulting from emissions to ambient air are appropriately excluded from TSCA risk evaluation because they are addressed under the CAA. *See id.* at 219; *see also* Problem Formulation at 78-81, JA___-___.

**B.    EPA Reverses Course and Announces Plans to Develop a New Fenceline Screening Tool.**

One year after EPA published its risk evaluation for methylene chloride, EPA began trying to abandon the prior administration's approach to risk evaluation (codified in the 2017 Risk Evaluation Rule), announcing it was changing how it assesses exposure pathways covered by other environmental laws and potential exposures to fenceline communities. *See* EPA, *EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ("Path Forward"), AR 43, JA___. EPA would develop a "screening-level approach" using existing data and information "to determine if there is the potential for unreasonable risk to fenceline communities associated with air and water exposures." *Id.*, JA___.

If that forthcoming screening-level approach indicated that there "*may be . . .* unreasonable risk to [fenceline] communities that cannot be addressed without supplementing the risk evaluation or *through the risk management approaches the agency is already considering*," EPA would "conduct a more comprehensive

assessment of fenceline communities and supplement the risk evaluation[.]" *Id.*, JA___ (emphases added).[2]

### 1.    Purpose of the New Fenceline Screening Tool.

In 2022, EPA issued a *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0* (2022) ("Draft Fenceline Methodology"), AR 1164, JA___. The Draft Fenceline Methodology is "intended to present a proposed methodology for conducting screening-level analyses for chemicals undergoing a TSCA section 6 evaluation," and EPA cautioned that the screening results for three case study chemicals, including methylene chloride, "are presented for *illustrative purposes only* to demonstrate the applicability and efficacy of the proposed methodology and do not represent final agency actions in relation to environmental release assessments, exposure assessments, or risk characterizations." *Id.* at 10, JA___ (emphasis added).

The Draft Fenceline Methodology repeatedly states it is not designed to support formal determinations of unreasonable risk, much less risk management rulemaking under TSCA section 6(a). *E.g.*, *id.* at 11, 18, 62, JA___, ___, ___. Those disclaimers align with EPA's longstanding determination that screening

---

[2] EPA would eventually codify these changes by amending the 2017 Risk Evaluation Rule, but those changes did not take effect until *after* EPA finalized the Methylene Chloride Rule. *See* 89 Fed. Reg. 37028, 37040 (May 3, 2024).

level tests yield only preliminary, conservative predictions that necessitate refining through further analysis before making final regulatory decisions. *See* EPA, *An Examination of EPA Risk Assessment Principles and Practices*, at 24-25 (Mar. 2004)[3] (screening assessments "tend[] to use default assumptions to avoid underestimating risk" and "typically provide high-end and bounding estimates;" if "screening tests show that the risks are potentially of concern, then a more refined risk assessment may be warranted that uses more detailed data, models, etc."). Not surprisingly, EPA's Science Advisory Committee on Chemicals ("Science Advisors") cautioned that the Draft Fenceline Methodology can "only be used as part of a *tiered approach* to evaluate risk to fenceline communities[.]" *Final Report on Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0*, at 15 (2022) ("SACC Report on Draft Fenceline Methodology"), AR 841, JA___ (emphasis added).

The Draft Fenceline Methodology evaluated exposures to fenceline communities and characterized such risks using "reasonably available data, information, and models." Draft Fenceline Methodology at 11, JA___. EPA used a cancer risk benchmark of 1-in-1,000,000, but EPA later explained that "as a matter of risk management policy," it considers a range of 1-in-1,000,000 to 1-in-10,000 as the "appropriate benchmark." 88 Fed. Reg. 28284, 28326 (May 3, 2023), AR

---

[3] *Available at* https://semspub.epa.gov/work/10/500006305.pdf.

721, JA___. EPA further explained that 1-in-10,000 "generally represent[s] the upper bound of acceptability for estimated excess cancer risk." *Id.* at 28327, JA___.

To illustrate how EPA might use results produced with its draft methodology, EPA provided five "hypothetical examples . . . only to provide insights" into possible next steps (i.e., outcomes). Draft Fenceline Methodology at 18, JA___. One such outcome is to conduct additional analysis beyond the screening level (Outcome 5). *Id.* at 20, JA___. Nowhere in EPA's discussion of these hypothetical outcomes does EPA acknowledge or discuss the statutory deadlines in TSCA section 6 or how to ensure consistency with the 2017 Risk Evaluation Rule's definition of "reasonably available information."

## 2. Uncertainties Associated with the Draft Fenceline Methodology.

Although EPA took a "conservative approach" to the Draft Fenceline Methodology, EPA disclosed myriad uncertainties about the analysis, *Id.* at 30, JA___, especially with respect to its reliance on Toxics Release Inventory ("TRI") program data, which EPA concluded "may warrant use of other, or additional, datasets for more detailed analyses under TSCA or other statutory programs administered by EPA." *Id.* at 21, JA___. EPA acknowledged the dataset lacked "actual release point locations which can affect the estimated concentrations at varying distances modeled." *Id.* at 58, JA___. The dataset also does not include the

number of release days for each facility, which left EPA to "assume[] the number of release days . . . is equal to the estimated number of operating days for its assigned [occupational exposure scenario(s)]." *Id.* at 24, JA\_\_\_. And because the TRI program allows facilities with total air releases of under 500 lb/year to report using a streamlined form that does not specify exact release amounts, EPA assumed "total releases of 500 lb/year" for those facilities, while recognizing that is the "upper limit on total releases to all environmental media from the facility" and thus, "assessing the air emissions at [that] value likely overestimates actual air emissions from the facility." *Id.* at 56, JA\_\_\_.

EPA's Science Advisors took issue with using only one year of data, and they urged EPA to revise the Draft Fenceline Methodology accordingly. *See* SACC Report on Draft Fenceline Methodology at 22-23, JA\_\_\_-\_\_\_. Consequently, EPA prepared a sensitivity analysis, which evaluated multiple years of chemical release data for the fourteen identified facilities flagged during the initial screen. Memorandum from Kevin Vuilleumier & Franklyn Hall, Existing Chem. Risk Assessment Div., EPA, to, Joel Wolf, Existing Chem. Risk Mgmt. Div., EPA, on Methylene Chloride: TRI Release Data Sensitivity Analysis (Sept. 1, 2022) ("Sensitivity Analysis"), AR 778, JA\_\_\_.

### C. The Draft Fenceline Methodology's Impact on the Final Rule.

After conducting its screening level analysis, EPA proposed a risk management rule for methylene chloride. *See* 88 Fed. Reg. at 28284, JA___. In the proposed rule, EPA explained it "did not find risks from incidental oral and dermal exposure to surface water" during screening. *Id.* at 28326, JA___. And while EPA identified one facility with potential drinking water risk, "there are no source drinking water intakes for public drinking water systems in proximity to the facility estimated to have risk[.]" *Id.* Regarding the inhalation pathway, EPA identified fourteen facilities, representing nine conditions of use, with "some indication of expected exposure and associate cancer risk" due to releases into the air. *Id.* at 28326, JA___. Of the fourteen, only three had an indication of risk out to 100 meters from a releasing facility. *Id.* EPA further explained how potential exposures would be limited due to several National Emission Standards for Hazardous Air Pollutants ("NESHAPs") issued under the CAA. *Id.* at 28327, JA___.

EPA published the final methylene chloride risk management rule on May 8, 2024, which again summarized EPA's considerations of the results of the Draft Fenceline Methodology and Sensitivity Analysis. 89 Fed. Reg. at 39254, 39256. On the potential risks to fenceline communities identified during EPA's screening level analyses, EPA explained that it was unable to "formally determine . . .

whether those risks contribute to the *unreasonable* risk, because the screening methodology was not developed for that purpose." *Id.* at 39284, JA___ (emphasis added).

Despite that finding, EPA maintained that it needed to prohibit manufacturing, processing, and distribution for all consumer use and most commercial use to "address the majority of exposures to the general population, including fenceline communities." *Id.* Although six of the fourteen facilities with associated levels of risk will continue to use methylene chloride, EPA concluded that in the Final Rule's risk management plan "exposures at the fenceline at the remainder of those facilities would be addressed," *e.g.*, by existing CAA regulations. *Id.*

## SUMMARY OF ARGUMENT

Sierra Club's petition raises two arguments. The Court should reject both and deny the petition.

First, Sierra Club wrongly contends that EPA violated TSCA by failing to make a formal determination as to whether methylene chloride presents unreasonable risk to fenceline communities and by failing to eliminate potential "elevated" risks that EPA identified using a screening-level analysis with a methodology that has yet to be finalized. But EPA appropriately determined, following extensive intra-agency coordination, that: (i) air, water, and disposal

exposures to fenceline communities were well regulated under numerous other EPA-administered statutes; (ii) EPA did not "expect[] to consider" such pathways in the methylene chloride risk evaluation, 15 U.S.C. § 2605(b)(4)(D); and (iii) EPA would instead focus on areas of greater concern in the risk evaluation. Although EPA later generated tentative screening data on such pathways using a draft methodology, that nonbinding, still-evolving methodology does not support risk management regulatory decisions. Operating within the constraints of TSCA's statutory deadlines and requirements for scientific standards, EPA could not proceed further with that fenceline screening data. *E.g., id.* §§ 2605(b)(4)(G), 2625(h), (k). Relatedly, absent a formal determination of unreasonable risk to fenceline communities, EPA could not regulate under TSCA section 6(a). *Id.* § 2605(a). That provision does not allow EPA to regulate based on a finding of elevated risk or the potential for unreasonable risk; rather, EPA can only regulate "to the extent necessary" to prevent "unreasonable risk." *Id.*

Second, Sierra Club argues—again incorrectly—that EPA violated TSCA by failing to assess *all* risks associated with methylene chloride, including ozone depletion risks. This argument fails as it depends on a misreading of TSCA and a distortion of facts. TSCA does not require EPA to assess all risks in a risk evaluation. Sierra Club ignores that Congress directed EPA to specify the "hazards, exposures, conditions of use, and the potentially exposed or susceptible

subpopulations the Administrator expects to consider." *Id.* § 2605(b)(4)(D). That command necessarily requires EPA to exclude certain hazards or exposures from the scope of a risk evaluation and instead focus on areas that raise the greatest potential for risk (and that are not adequately regulated under other authorities). Consistent with its longstanding position that methylene chloride is not an ozone depleting substance, EPA appropriately excluded ozone depletion from the scope of the methylene chloride risk evaluation.

## STANDARD OF REVIEW

ACC agrees with EPA's statement of the standard for reviewing Sierra Club's petition.

## ARGUMENT

## I. Sierra Club's Claims Regarding EPA's Approach to Fenceline Communities Lack Merit.

Sierra Club argues that EPA violated TSCA by failing to "determine and eliminate unreasonable risks to fenceline communities," Sierra Club Br. 26, but Sierra Club's arguments rest on incorrect interpretations of TSCA and mischaracterizations of EPA's Draft Fenceline Methodology and the preliminary screening results it produced, which EPA explained "will not be used as presented to support risk management actions or associated rulemaking activities[.]" Draft Fenceline Methodology at 10, JA___. Moreover, Sierra Club's contention that EPA arbitrarily departed from that methodology misstates the significance of that

document and ignores statutory boundaries on EPA's authority. Finally, because methylene chloride is subject to extensive regulation under the CAA, EPA correctly declined to pursue additional regulation under TSCA.

A.    **EPA Appropriately Excluded Exposure Pathways Relevant to Fenceline Communities from Risk Evaluation.**

In arguing that EPA violated TSCA by not determining whether methylene chloride presents unreasonable risks to fenceline communities, Sierra Club wrongly contends that EPA was required to consider *all* exposures and *all* potentially exposed or susceptible subpopulations during risk evaluation. *See* Sierra Club Br. 27-28. TSCA's plain text requires EPA to determine the appropriate scope of a risk evaluation. At all relevant times here, EPA codified that approach in its risk evaluation regulations.

When publishing the scope of a risk evaluation, EPA must include "hazards, *exposures*, conditions of use, and *the potentially exposed or susceptible subpopulations* the Administrator *expects to consider*." 15 U.S.C. § 2605(b)(4)(D) (emphasis added). Giving the phrase "expects to consider" its ordinary meaning, Congress commanded EPA to determine whether to include or exclude hazards, exposures, conditions of use, and potentially exposed or susceptible subpopulations in the scope of its risk evaluation. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (statutory language must be read according to its "ordinary, contemporary, common meaning" (internal citations removed)); *see also ADT, L.L.C. v.*

*Richmond*, 18 F.4th 149, 156 (5th Cir. 2021) (statutes must be read "to give effect to their every word."). Congress plainly contemplated that EPA would specify certain exposures or subpopulations that it did *not* expect to consider; otherwise, Congress would have simply directed EPA to include *all* hazards, exposures, conditions of use, and potentially exposed or susceptible subpopulations in the scope of a risk evaluation.

EPA agreed with this straightforward reading in codifying the statutorily mandated 2017 Risk Evaluation Rule. *See* 15 U.S.C. § 2605(b)(4)(B); 40 C.F.R. Part 702 (2017). Indeed, as EPA explained in the methylene chloride risk evaluation, "[t]he approach discussed in the Risk Evaluation Rule and applied in the problem formulation documents is informed by the legislative history of the amended TSCA, which supports the Agency's exercise of discretion to focus the risk evaluation on areas that raise the greatest potential for risk." 2020 Risk Evaluation at 57, JA___.

Sierra Club ignores the statutory phrase "expects to consider" and instead focuses on the fact that EPA began changing this interpretation in the 2021 "Path Forward" pronouncement, Sierra Club Br. 27, but that "non-binding agency policy statement" "lack[s] the force of law." [4] *Apter v. Dep't of Health & Human Servs.*,

---

[4] Years later, EPA codified this changed interpretation in a 2024 rulemaking. ACC and others have challenged that interpretation as contrary to TSCA's text and

80 F.4th 579, 590 (5th Cir. 2023). Under the operative (2017) risk evaluation rule that governed throughout the relevant rulemaking proceedings, EPA appropriately exercised its authority, coordinated closely across multiple offices "that administer and implement regulatory programs" under various statutes, and "determined that specific exposure pathways are well-regulated by [those] statutes and regulations." 2020 Risk Evaluation at 60, JA___; *see supra* pp. 13-14. That EPA has since backpedaled on its legal interpretation and chose to generate nonfinal, screening-level data that EPA itself stated would not be used to support risk management actions or rulemaking activities should not diminish the soundness of EPA's prior intra-agency coordination or its resulting determination to exclude exposure pathways relevant to fenceline communities from the methylene chloride risk evaluation.

### B. EPA Appropriately Declined to Make an Unreasonable Risk Determination Given the Significant Limitations of the Draft Fenceline Methodology.

Sierra Club faults EPA for not making an unreasonable risk determination as to fenceline communities following its screening-level analysis, but Sierra Club misstates the significance of EPA's cancer risk benchmark values and misconstrues the limited purpose of the Draft Fenceline Methodology. EPA

---

legislative intent. Pet'n, *Tex. Chem. Council v. EPA*, No. 24-1185 (D.C. Cir. June 6, 2024).

explained that the methodology was a preliminary screening tool to determine *the potential* for unreasonable risk to fenceline communities, while repeatedly cautioning that the nonfinal screening level results are not designed to support risk management actions or rulemakings. In fact, had EPA proceeded to find unreasonable risk based on those results, as Sierra Club implies was warranted, EPA would have violated TSCA's mandate to use "best available science." Sierra Club. Br. 27-28.

### 1. An Exceedance of EPA's Benchmark Value Does Not Equate to a Finding of Unreasonable Risk.

Sierra Club wrongly asserts that EPA found cancer risks to several fenceline communities that exceeded "the Agency's unreasonable risk benchmark." Sierra Club. Br. 28. Unlike the CAA, which has a statutorily defined cancer risk benchmark, TSCA has no such requirement. *Compare* 42 U.S.C. § 7412(f)(2) (requiring EPA to set emissions standards if current standards to not reduce lifetime excess cancer risks to less than 1-in-1,000,000) *with* 15 U.S.C. § 2605. Given TSCA's silence, EPA chose an "appropriate benchmark" *range* of 1-in-1,000,000 to 1-in-10,000 "as a matter of risk management policy." 88 Fed. Reg. at 28326-27, JA___-___. Although EPA stated its *preference* "to have the air concentration of methylene chloride result in an increased cancer risk closer to the 1-in-1,000,000 benchmark," it recognized that a 1-in-10,000 benchmark "generally represent[s] the upper bound of acceptability." *Id.* at 28327. Accordingly, finding

an exceedance of EPA's 1-in-1,000,000 benchmark is not a finding of unreasonable risk. As EPA explained, that benchmark is not a "bright line," because TSCA section 6 requires EPA to "consider[] *a number of factors* when determining unreasonable risk," not just the exceedance of a benchmark. *See id.* (emphasis added). Put simply, there is no "unreasonable risk benchmark of 1-in-1,000,000," Sierra Club Br. 28, and as explained more fully below, EPA appropriately declined to make an unreasonable risk determination based on screening level results that exceeded that benchmark.

2.    **EPA Appropriately Declined to Determine Conclusively Whether Potential Risks to Fenceline Communities Would be Unreasonable.**

When EPA announced its intent to create the Draft Fenceline Methodology, the Agency explained that it could use the method to assess "*a potential for unreasonable risk* to fenceline communities," but that it did not intend to use the method to conclusively determine whether an unreasonable risk is present. Path Forward, JA___ (emphasis added). The methodology itself echoes this purpose, stating that it only "present[s] a proposed methodology for conducting screening-level analyses" for chemicals undergoing a TSCA section 6 evaluation and that any results generated through such analyses were to be used "for illustrative purposes only . . . *and do not represent final agency actions* in relation to environmental

release assessments, exposure assessments, or risk characterizations." Draft Fenceline Methodology at 10, 62 (emphasis added), JA___, ___.

In finalizing the Methylene Chloride Rule, EPA reiterated the Draft Fenceline Methodology "was not developed for [the] purpose" of making unreasonable risk determinations. *See* 89 Fed. Reg. at 39284, JA___. As EPA explained in responding to comments on this issue, EPA is "continuing to develop the science that will allow the Agency to go beyond a screening level methodology to a more rigorous assessment." *Response to Public Comments: Regulation of Methylene Chloride under TSCA Section 6(a)*, at 29, 31 ("2024 Response to Comments"), AR 944, JA __, __. EPA further stated that "while the use of this screening approach indicates some level of risk to fenceline communities, EPA cannot determine, without further data and quantitative analysis," whether such risk would be unreasonable. *Id.* at 86, 110, JA___, ___.

Similarly, EPA cautioned that the "science is evolving on addressing cumulative and aggregate exposures," while reminding commenters that "a risk evaluation is not required to assess aggregate exposure, but to describe whether aggregate exposures were considered under TSCA section (6)(b)(4)(F)(ii)," which the Agency did in its 2020 Risk Evaluation. *Id.* at 30, JA____; *contra* Sierra Club Br. 36-39. Given these limitations, it is not surprising that EPA's Science Advisors recognized that "the methodology could only be used as part of a tiered approach

to evaluate risk to fenceline communities and should not be used to evaluate risks in isolation." *MeCl Meeting Minutes Final Report 03/02/2020*, at 15 (Mar. 15, 2020), AR 251, JA___.

EPA's refusal to make an unreasonable risk determination based on screening level data is thus no "excuse" as Sierra Club suggests. Sierra Club Br. 29. The Draft Fenceline Methodology was far from ready for primetime, as the science was (and still is) evolving and the statutory deadline for risk evaluation was approaching. *See* 15 U.S.C. § 2605(b)(4)(G). EPA had to conclude its risk evaluation based on "reasonably available information," *id.* § 2625(k), and in accordance with the 2017 Risk Evaluation Rule, EPA simply could not pause the clock indefinitely to generate additional data or conduct quantitative analysis. *See* 2017 Risk Evaluation Rule at 33732, 33748; *see also supra* pp. 9-10. Based on the information before it, EPA reasonably declined to make any unreasonable risk determination as to fenceline communities.

In fact, had EPA jumped the gun to find unreasonable risk based on nonfinal screening level data, it would have violated TSCA sections 26(h) and (i). Section 26(h) requires EPA to carry out its responsibilities under section 6 using "scientific information, technical procedures, measures, methods, protocols, methodologies, or models, employed in a manner consistent *with the best available science*." 15 U.S.C. § 2625(h) (emphasis added). Among other things, EPA must consider the

extent to which scientific information and methodologies are "reasonable for and consistent with the intended use of the information;" whether information is "relevant" for EPA's decision on a particular chemical; and the extent to which "variability and uncertainty" in the information or methodologies used are "evaluated and characterized." *Id.* Section 26(i) in turn mandates that EPA "shall" make decisions under section 6 based on the "weight of the scientific evidence." *Id.* § 2625(i).

EPA consistently has stated that the Draft Fenceline Method was not developed for the purpose of making unreasonable risk determinations and that screening level results generated with that method cannot be used to support risk management actions and regulations. Moreover, by EPA's acknowledgement, there is considerable uncertainty surrounding the Draft Fenceline Method. For instance, EPA explained that the dataset it used for screening-level analysis lacked release point locations—a data gap that is "particularly relevant" to a risk calculation because it could "shift the actual modeled exposure concentration . . . to well outside of the facility property-line where fenceline communities may be exposed." Draft Fenceline Methodology at 58, JA___. Additionally, because the dataset did not include the number of release days, EPA made the unrealistic assumption that facilities are releasing methylene chloride 350 days/year, *see id.* at 24, which ignores the reality that operation days are facility- and use-specific. EPA also

acknowledged its methodology "likely overestimates actual air emissions" from various facilities by assuming total releases for some facilities equaled 500 lb/year. *Id.* at 56, JA___.

These are only a few of the overly conservative assumptions EPA made in the Draft Fenceline Methodology. Consequently, use of the methodology and the tentative screening level results it produced to make risk management decisions under TSCA section 6 would run afoul of the statutory "best available science" standard, 15 U.S.C. § 2625(h), as well as Congress's directive that EPA take into account the "*likely* duration, intensity, frequency, and number of exposures under the conditions of use." *Id.* § 2605(b)(4)(F)(iv) (emphasis added).

## C. TSCA Does Not Authorize EPA to Regulate Elevated Risks.

Sierra Club's claim that EPA violated TSCA by "fail[ing] to eliminate the elevated risks it identified in its fenceline assessment," rests on a fundamental misreading of TSCA. Congress did not intend for unreasonable risk to mean "no risk," 162 Cong. Rec. S3511-01, S3522, and it "did not enact TSCA as a zero-risk statute." *Corrosion Proof Fittings. v. EPA*, 947 F.2d 1201, 1215 (5th Cir. 1991).

Congress did not authorize EPA to eliminate "elevated" risks. Rather, it directed EPA to regulate chemicals "to the extent necessary" to prevent "unreasonable risk." 15 U.S.C. § 2605(a). As explained in the Industry Petitioners' brief, the term "unreasonable" must be accorded its role as a modifier of risk.

Industry Petitioners' Br. 20-21. The term "elevated" is not synonymous with "unreasonable," and TSCA does not allow EPA to regulate merely "increased" risks. *Elevated*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/elevated (last visited Dec. 31, 2024) ("increased especially abnormally (as in a degree or amount)").

Contrary to Sierra Club's suggestion, EPA's approach to fenceline communities does not render TSCA section 6 toothless, but instead comports with EPA's authority to regulate only unreasonable risk. Sierra Club Br. 31-32. As explained above, EPA must adhere to the requirements in TSCA section 26 when implementing section 6. *See supra* pp. 7-8. EPA need only consider "reasonably available information" given the statutory deadlines for risk evaluation. 15 U.S.C. §§ 2605(b)(4)(G), 2625(k). It must also consider whether information, methods, etc. "are reasonable for and consistent with the intended use of the information" and consider "the extent to which the information is relevant for the Administrator's use in making a decision about a chemical substance or mixture." *Id.* § 2625(h)(1)-(2). EPA cannot disregard these constraints and invoke its section 6(a) risk management authority to address all "elevated" risks. Here, information generated using a draft methodology that is not designed to support "unreasonable risk" determinations cannot support a finding of "unreasonable risk" that would comply with TSCA's best available science and weight of the scientific evidence

standards. Thus, EPA could not have exercised its section 6(a) risk management authority with respect to fenceline communities.

**D.    Sierra Club's Arbitrary and Capricious Argument Misses the Mark.**

Sierra Club's argument that EPA arbitrarily reversed "past positions and current guidance" on evaluating and addressing fenceline community risks boils down to one contention: EPA departed from the five options for following up on potential risks outlined in the Draft Fenceline Method. *See* Sierra Club Br. 32-35. That argument fails for two reasons:

First, the Draft Fenceline Method is not a "settled policy" that EPA must give a "reasoned explanation" for departing from. *See Noranda Alumina, L.L.C. v. Perez*, 841 F.3d 661, 665 (5th Cir. 2016).[5] On its face, the Draft Fenceline Methodology is marked "Public Comment Draft – Do Not Cite or Quote," and EPA has yet to finalize the "proposed methodology" therein. Draft Fenceline Methodology at 10-11, JA___. More importantly, the draft methodology does not directly address or explain why EPA was abandoning its prior interpretations of

---

[5] Neither *Perez* nor the *M.D. Anderson* case that Sierra Club relies on (at 32) are relevant here. In *Perez*, the agency failed to explain why it did not apply its administrative adjudication precedents consistently, while in *M.D. Anderson*, the agency failed to justify disparate enforcement of codified regulations. *See Perez*, 841 F.3d at 667-69; *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479–80 (5th Cir. 2021). Neither case involved a proposed methodology that was still under development.

TSCA sections 6(b)(4)(D) and 9(b)(1), articulated in the 2017 Risk Evaluation Rule and as applied to methylene chloride: namely, that TSCA authorizes EPA to exclude certain exposure pathways addressed by other EPA-administered laws from the exposures and subpopulations that EPA "expects to consider" and to instead focus on "exposures that are likely to present the greatest concern." 2020 Risk Evaluation, at 56-63, JA___-___.

Second, the Draft Fenceline Methodology cannot lawfully extend the statutory deadlines governing risk evaluation, *see* 15 U.S.C. § 2605(b)(4)(G), nor can it override EPA's interpretation—codified in the 2017 Risk Evaluation Rule— that EPA lacks authority to "pause" deadlines indefinitely to conduct additional analysis and that "reasonably available information" does not encompass information that may be generated through longer-term testing, but that would extend beyond the statutory deadline for risk evaluation. *See supra* at pp. 9-10.

For these reasons, it was not arbitrary and capricious for EPA to depart from a draft methodology that was misaligned with the statutory text and the operative risk evaluation rule at the time.

### E. Sierra Club Ignores the Comprehensive Regulatory Framework Governing Methylene Chloride Air Emissions.

As referenced in EPA's brief, "existing Clean Air Act regulations for methylene chloride . . . limit [facilities'] leeway to vent methylene chloride into the

air in the way Sierra Club fears." EPA Br. 117-18. This point deserves additional emphasis.

Congress crafted a robust program to regulate sources of hazardous air pollutants, including methylene chloride, a chlorinated solvent. *See* 42 U.S.C. § 7412(b). EPA must promulgate standards to protect public health with "an ample margin of safety." *Id.* § 7412(f). If the standards are applicable to sources emitting pollutants "classified as a known, probable or possible human carcinogen" and "do not reduce lifetime excess cancer risks to the individual most exposed … to less than one in a one million, the [EPA] shall promulgate standards under this subsection for such source category." *Id.* § 7412(f)(2). Simply put, the CAA commands EPA to promulgate residual risk standards of a potential carcinogen as necessary to achieve an ample margin of safety.

Sierra Club barely acknowledges EPA's extensive regulation of a wide range of methylene chloride uses under the CAA. *See* Sierra Club Br. 35 n.16. In fact, EPA has issued various source-specific NESHAPs for methylene chloride. *See* 2020 Risk Evaluation at 554-56, JA___-___; *see also* 88 Fed. Reg. at 28327, JA___; 2024 Response to Comments, at 145 JA___ (potential exposures outside the fenceline "would be limited as a result of the numerous existing [NESHAPs] for methylene chloride" and any exceedances would "be an enforcement issue).

For each of these CAA rulemakings, EPA had to ensure an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f). What is more, the CAA "requires EPA to conduct risk assessments for each source category subject to section 112(d) [] standards, and to determine if additional standards are needed to reduce remaining risks." 2020 Risk Evaluation at 556, JA___; *see also* 42 U.S.C. § 7412(f)(2). EPA must also periodically review and revise standards, as necessary, taking into account developments in practices, processes and control technologies. *See id.* § 7412(d)(6). Accordingly, EPA has conducted, and will continue to conduct, such residual risk and technology reviews for the various source-specific standards for methylene chloride. *See* 2020 Risk Evaluation at 556, JA___.

Given the comprehensive regulation of methylene chloride under the CAA, there is no basis for EPA to do any more than it did under TSCA.

## II.  EPA Appropriately Excluded Ozone Depletion From the Scope of Its Risk Evaluation.

Sierra Club argues that EPA violated TSCA by "failing to evaluate the risks associated with methylene chloride's depletion of the ozone layer when conducting the Risk Evaluation," Sierra Club Br. 43, and it insists that TSCA section 6(b)(4)(A) "requires EPA to evaluate *all* the risks posed by methylene chloride." Sierra Club Br. 47 (citing 15 U.S.C. § 2605(b)(4)(A)). Sierra Club improperly reads that provision in isolation, ignoring a neighboring provision (section 6(b)(4)(D)), which requires EPA to determine and publish the scope of a risk

evaluation. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Not once does Sierra Club mention that TSCA section 6 requires EPA to publish the scope of a risk evaluation, including the "hazards" and "exposures" that "the Administrator expects to consider." 15 U.S.C. § 2605(b)(4)(D). As explained above, *supra* pp. 25-26, the phrase "expects to consider" serves no purpose if EPA were required to assess *all* potential hazards or exposures, as Sierra Club suggests. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant" (internal citations removed)).

Sierra Club misplaces its reliance on EPA's revised risk determination for methylene chloride and EPA's 2024 amendments to the 2017 Risk Evaluation Rule. *See* Sierra Club Br. 48-49. That EPA decided to consider certain hazards or exposure pathways in a TSCA risk evaluation that are also regulated by other statutes does not mean EPA lacks the ability to exclude other hazards and exposures during scoping. And while EPA recently (and wrongly) has changed its interpretation of the statutory phrase "expects to consider," that change did not take

effect until *after* EPA finalized the methylene chloride risk evaluation and risk management rule at issue here.

Here, EPA appropriately excluded ozone depletion risks during the scoping process, because "ozone depletion risks are adequately assessed and effectively managed" under the CAA's Title VI regime. *See EPA's Responses to Public Comments Received on the Scope Documents for the First Ten Chemicals for Risk Evaluation under TSCA*, at 6, (June 7, 2018), AR 36, JA___. Under the CAA's Significant New Alternatives Policy ("SNAP") program, EPA "reviews substitutes for [ozone-depleting substances]." *Id.* Under that program, "[v]arious environmental and health risks of methylene chloride . . . including [its] ozone-depletion potential, have been evaluated for specific uses under the SNAP program." *Id.*

Specifically, when EPA first listed methylene chloride as an acceptable substitute in various industrial end-uses, such as a blowing agent in polyurethane foam, in cleaning solvents, in aerosol solvents, and in adhesives and coatings, EPA considered its ozone depletion potential ("ODP"). *See Protection of Stratospheric Ozone*, 59 Fed. Reg. 13044 (Mar. 18, 1994). EPA noted that methylene chloride has a "very short atmospheric lifetime[] and [is] not considered to contribute to ozone depletion," while simultaneously acknowledging that toxicity concerns are

addressed under section 112 of the CAA, RCRA waste handling standards, and OSHA workplace standards. *See id.* at 13091.

EPA's prior conclusion holds true today. In 2017, EPA reiterated that "[m]ethylene chloride is not an ozone-depleting substance and is listed as acceptable under the [SNAP] program for metal and electronic cleaning (degreasing), aerosol solvents, foam blowing agents, and other uses." *Methylene Chloride and N-Methylpyrrolidone; Regulation of Certain Uses Under TSCA Section 6(a)*, 82 Fed. Reg. 7464, 7649 (Jan. 19, 2017). Given EPA's prior analyses and conclusion that methylene is not an ozone-depleting substance, EPA appropriately excluded ozone depletion from the scope of its TSCA risk evaluation under 15 U.S.C. § 2605(b)(4)(D). Sierra Club's dissatisfaction with the extent of EPA's analyses or its conclusions is no reason to upend EPA's determination, under TSCA's scoping provision, to focus its time-limited analysis on the areas of greatest concern. *See* Sierra Club Br. 50-51.

## CONCLUSION

ACC respectfully requests that the court dismiss Sierra Club's petition.

Dated: January 3, 2025

Respectfully submitted,

*/s/ David Y. Chung*

Laura Ford Gooding
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002

David Y. Chung
Amanda Shafer Berman
Warren Lehrenbaum
Kathy Dzienkowski
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2587
dchung@crowell.com

*Counsel for the American Chemistry Council*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of this Court's September 24, 2024 Order, because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 8,654 words.

This brief also complies with the typeface and type style requirements of Fed. R. App. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

*/s/ David Y. Chung*
David Y. Chung

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing through the CM/ECF system, which will send a notice of filing to all registered CM/ECF users.

*/s/ David Y. Chung*
David Y. Chung

Dated:  January 3, 2025