No. 24-60227

# United States Court of Appeals
# For the Fifth Circuit

EAST FORK ENTERPRISES, INC.; EPIC PAINT COMPANY,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, United States Environmental
Protection Agency,
*Respondents*.

CONSOLIDATED WITH

No. 24-60256

EAST FORK ENTERPRISES, INC.; EPIC PAINT COMPANY; SIERRA
CLUB; AMERICAN CHEMISTRY COUNCIL,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, United States Environmental
Protection Agency,
*Respondents*.

On Petition to Review Final Action by the
United States Environmental Protection Agency

**BRIEF OF THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS ("AFL-CIO") AS AMICUS CURIAE IN SUPPORT OF RESPONDENTS AND OPPOSITION TO THE INDUSTRY PETITIONERS**

Randy S. Rabinowitz
Victoria L. Bor
OSH Law Project, LLC
P.O. Box 3769
Washington, DC 20027
T: 202-256-4080
T: 301-785-3204
randy@oshlaw.org
victoriabor87@gmail.com

*Counsel for AFL-CIO*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  <u>Petitioners</u>: East Fork Enterprises, Inc.; Epic Paint Company; Sierra Club; American Chemistry Council

2.  <u>Counsel for Petitioners East Fork Enterprises, Inc. and Epic Paint Company</u>: Keith Bradley, W. Caffey Norman, Allan A. Kacenjar, Katherine E. Wenner, Squire Patton Boggs (US) LLP

3.  <u>Counsel for Petitioner American Chemistry Council</u>: David Chung, Amanda Shafer Berman, Warren Lehrenbaum, Crowell & Moring

4.  <u>Counsel for Petitioner Sierra Club</u>: Jonathan Kalmuss-Katz, Lakendra Barajas, Earthjustice

5.  <u>Respondents</u>: United States Environmental Protection Agency; Michael S. Regan, in his capacity as Administrator, U. S. Environmental Protection Agency

6.  <u>Counsel for Respondents</u>: Merrick Garland, Attorney General; Todd Sunhwae Kim, Assistant Attorney General; Laura J. Brown, Samuel Stratton, U.S. Department of Justice; Daniel DePasquale, Jori Reilly-Diakun, U.S. Environmental Protection Agency

7.    Amici Curiae: AFL-CIO; National Association of Manufacturers

8.    Counsel for AFL-CIO: Randy S. Rabinowitz, Victoria L. Bor, OSH Law Project, LLC

9.    Counsel for National Association of Manufacturers: Kasdin Miller Michael, Elliott Marc Davis, Kirkland & Ellis, L.L.P.


January 3, 2025                  /s/ Randy S. Rabinowitz

                                 Randy S. Rabinowitz
                                 Victoria L. Bor
                                 OSH Law Project, LLC
                                 P.O. Box 3769
                                 Washington, DC 20027
                                 T: 202-256-4080
                                 T: 301-785-3204
                                 randy@oshlaw.org
                                 victoriabor87@gmail.com

                                 *Counsel for AFL-CIO*

ii

## CORPORATE DISCLOSURE STATEMENT

The American Federation of Labor & Congress of Industrial Organizations ("AFL-CIO"), a not-for-profit labor organization, states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public, and no publicly held company has 10% or greater ownership in it.

Dated: January 3, 2025

/s/ Randy S. Rabinowitz

Randy S. Rabinowitz
Victoria L. Bor
OSH Law Project, LLC
P.O. Box 3769
Washington, DC 20027
T: 202-256-4080
T: 301-785-3204
randy@oshlaw.org
victoriabor87@gmail.com

*Counsel for AFL-CIO*

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE..................................................................1

ARGUMENT.................................................................................................4

    I.      Section 9(a) Grants EPA Broad Discretion Whether to Refer Risk Management to Other Federal Agencies.....................................4

          A.    TSCA's Plain Language Grants EPA Discretion Whether to Refer Risk Management to Another Agency..............................................................................5

          B.    The Legislative History of the 1976 Act Demonstrates Congress Deliberately Granted the Administrator Discretion Whether to Make a Referral...............................................................................9

          C.    EPA Has Long Interpreted Section 9(a) to Grant it Broad Discretion Whether Referral to OSHA Is Appropriate...........................................................................11

          D.    The 2016 Amendments Reaffirmed EPA's Obligation to Address Unreasonable Occupational Risks.........................18

          E.    The Administrator Properly Exercised his Discretion in This Case.....................................................................21

    II.    EPA Carefully Harmonized Its Risk Management Rule with OSHA's Methylene Chloride Standard..........................................26

    III.    EPA Properly Based Its Risk Determination on Worker Exposures without Assuming Use of Personal Protective Equipment................................................................................29

CONCLUSION...........................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Corrosion Proof Fittings v. EPA,*
   947 F.2d 1201 (5th Cir. 1991) ...................................................... *passim*

*Industrial Union Dep't v. American Petroleum Inst.,*
   448 U.S. 607 (1980) ........................................................................ 32, 33

*Labor Council for Latin American Advancement v. EPA,*
   12 F.4th 234 (2d Cir. 2021) ...............................................................2

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024) ................................................................. 5, 6,12

*Michigan v. EPA,*
   576 U.S. 743 (2015) ...........................................................................6

*Miles v. Apex Marine Corp.,*
   498 U.S. 19 (1990)……………………………………..…………….19

*Nat'l Maritime Safety Ass'n v. OSHA,*
   649 F.3d 743 (D.C. Cir. 2011)........................................................31

*Neighbors for Environmental Justice v. EPA,*
   No. 20-72091 (9th Cir., brief filed July 16, 2020) .................................3

*Petteway v. Galveston Cnty.,*
   111 F.4th 596 (5th Cir. 2024).............................................................9

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) .........................................................................12

**Statutes**

15 U.S.C. § 2602(12) ...........................................................................7

15 U.S.C. § 2603(b)(2)(A) .................................................................8

15 U.S.C. § 2603(e)(2)(A) .................................................................8

15 U.S.C. § 2604(f)(5) .......................................................................8

15 U.S.C. § 2605 .............................................................................18

15 U.S.C. § 2605(a) .......................................................................6, 7

15 U.S.C. § 2605(b)(4)(A) ..............................................................30

15 U.S.C. § 2608(a)(1) ............................................................ *passim*

15 U.S.C. § 2608(a)(2) .....................................................................5

15 U.S.C. § 2608(a)(3) .....................................................................5

15 U.S.C. § 2608(a)(4) .....................................................................5

15 U.S.C. § 2608(c) ..........................................................................8

15 U.S.C. § 2608(d) .....................................................................7, 26

29 U.S.C. § 654(a)(2) ......................................................................31

**Public Laws**

Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016) .......................................................3, 9

**Regulations**

29 C.F.R. § 1910.1052(b) ...............................................................32

29 C.F.R. § 1910.1052(d)(3) ..........................................................28

29 C.F.R. § 1910.1052(f)(1) ......................................................27, 31

29 C.F.R. § 1910.1052(g)(2) ..........................................................31

29 C.F.R. § 1910.1052(h) ...............................................................30

29 C.F.R. § 1910.134(a)–(l) ...........................................................28

29 C.F.R. § 1910.134(d)(3)(i)(A) ...................................................29

40 C.F.R. § 751.109(d)(3) ..............................................................28

40 C.F.R. § 751.109(e) ........................................................................27

40 C.F.R. § 751.109(f) .................................................................28, 29

**Legislative Materials**

162 Cong. Rec. S3516–22 (daily ed. June 7, 2016)……………..19, 20, 22

"Joint Explanatory Statement of the Committee of Conference," H.R. Rep. No. 94-1679 (1976) ...........................................................…11, 22

H.R. 14032, 94th Cong. (1976) ...........................................................10

H.R. Rep. No. 94-1341 (1976).............................................................10

House Energy and Commerce Committee, Subcommittee on Oversight and Investigations, "EPA's Asbestos Regulations: Report on a Case Study on OMB Interference in Agency Rulemaking," 99th Cong. (1985)…………………………………………………………………...14

Senate Committee on Environment and Public Works, "Office of Management and Budget Interference with Agency Regulations," S. Rep. No. 99-156 (1986).........................................................................13

**Administrative Materials**

EPA, 1,3-Butadiene; Decision To Report to the Occupational Safety and Health Administration, 50 Fed. Reg. 41393 (Oct. 10, 1985) ...............16

EPA, 4,4-Methylenedianiline; Initiation of Regulatory Action (ANPR), 48 Fed. Reg. 42898 (Sept. 20, 1983)...................................................16

EPA, Asbestos; Manufacture, Importation, Processing and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29467 (July 12, 1989) .........17

EPA, Methylene Chloride, Regulation under the Toxic Substances Control Act (NPRM), 88 Fed. Reg. 28284 (May 3, 2023).........23, 24, 25

EPA, Methylene Chloride; Regulation under the Toxic Substances
Control Act, 89 Fed. Reg. 39254 (May 8, 2024)     …….…….*passim*

EPA, Toxic Substances; 1,3-Butadiene; Initiation of Regulatory Action,
    (ANPR), 49 Fed. Reg. 20524 (May 15, 1984)......................................16

OSHA, Occupational Exposure to 1,3-Butadiene,
    61 Fed. Reg. 56746 (Nov. 4, 1996)……………………………………15

OSHA, Occupational Exposure to 4,4'-Methylenedianiline,
    57 Fed. Reg. 35630 (Aug. 10, 1992)......................................................16

OSHA, Occupational Exposure to Asbestos (NPRM),
    49 Fed. Reg. 14116 (Apr. 10, 1984).......................................................17

OSHA, Occupational Exposure to Methylene Chloride,
    62 Fed. Reg. 1494 (Jan. 10, 1997).........................................................22

**Miscellaneous**

EPA, Estimated Costs for Respirator PPE for 2024 TSCA Risk
Management Economic Analyses, *available at*
https://www.regulations.gov/document/EPA-HQ-OPPT-2020-0465-
0413.................................................................................................................32

Memorandum of Understanding Between the Environmental Protection
Agency and the Department of Labor (Feb. 6, 1986), *available at*
https://www.osha.gov/laws-regs/mou/1986-02-06.................................15

NIOSH's Comments on Methylene Chloride Risk Evaluation, *available at*
https://www.regulations.gov/document/EPA-HQ-OPPT-2016-0742-
0144...........................................................................................................26, 32

OSHA's Comments on Methylene Chloride Risk Evaluation, *available at*
https://www.regulations.gov/document/EPA-HQ-OPPT-2016-0742-
0144.....................................................................................................26, 32, 33

Rachel Rothschild, "Unreasonable Risk: The Failure to Ban Asbestos and the Future of Toxic Substance Regulation," 47 HARVARD ENV. L. REV. 531 (2023)..............................................................................................14

U.S. Dep't of Labor, "Agency Rule List - Fall 2024," *available at* https://tinyurl.com/mvxbvj7a (last accessed Dec. 23, 2024)...................24

**INTEREST OF AMICUS CURIAE**

The American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") submits this brief in support of the Environmental Protection Agency ("EPA"), seeking affirmance of its Final Rule: Methylene Chloride; Regulation under the Toxic Substances Control Act ("TSCA"), 89 Fed. Reg. 39254 (May 8, 2024) (the "Rule"), and in opposition to the petition for review filed by Petitioners American Chemistry Council, East Fork Enterprises, Inc., and Epic Paint Company (collectively, "Industry Petitioners").[1]

Occupational exposure to methylene chloride is a well-recognized health hazard. EPA adopted the Rule to accomplish its statutory duty to eliminate the unreasonable risks methylene chloride poses to workers. *Id.* at 39255. It does so by banning methylene chloride for

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), counsel for the AFL-CIO state that no counsel for any of the parties authored any part of this brief, and that no party, counsel for a party or any other person or entity other than the AFL-CIO, its affiliated organizations and members contributed money intended to fund this brief.

Under Federal Rule of Appellate Procedure 29(a)(2), all parties to this appeal have consented to the filing of this brief.

many uses and permitting its continued use in other instances, so long as owners/operators implement stringent worker protections. *Id.*

The AFL-CIO is a federation of 60 labor unions that together represent 12.5 million workers across industry sectors. Tens of thousands of members of AFL-CIO-affiliated unions are exposed to methylene chloride at work. If Industry Petitioners' challenge is successful, these workers will lose the critical occupational health protections EPA's Rule promises.

The AFL-CIO and its affiliated unions have been engaged in efforts to control methylene chloride's hazards for decades, seeking reductions in the chemical's exposure limits before the Occupational Safety and Health Administration ("OSHA") in proceedings dating back to the 1980s and 1990s. The unions continued to push for increased protections from methylene chloride when EPA began to evaluate those risks under TSCA, by commenting on EPA's risk evaluation and its proposed risk management rule. And the unions have participated actively in methylene-chloride-related litigation under TSCA. *See, e.g., Lab. Council for Latin Am. Advancement v. EPA,* 12 F.4th 234 (2d Cir. 2021) (petition by AFL-CIO affinity group; *amicus* brief by North

America's Building Trades Unions, AFL-CIO's construction trades affiliate); *Neighbors for Env't Just. v. EPA,* No. 20-72091 (9th Cir. Brief filed July 16, 2020) (petition challenging EPA risk evaluation for methylene chloride by AFL-CIO affiliate United Steelworkers).

The challenged Rule is among the first risk management rules EPA has adopted since Congress amended TSCA in 2016 by passing the Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016).  EPA has touted this Rule as a template for future TSCA risk management rules. Resolution of the pending petitions therefore may set toxic regulatory policy for decades to come, impacting the chemical exposures union members face and the occupational risks they encounter from methylene chloride and other chemicals whose risks EPA may evaluate.

The AFL-CIO thus has a strong interest in opposing Industry Petitioners' efforts to weaken or eliminate the Rule's worker protections. The AFL-CIO agrees with EPA that exposure to methylene chloride poses unreasonable risks to its members' health and fully supports EPA's arguments with respect to occupational exposure issues before this Court. The AFL-CIO is filing this amicus brief to underscore

why EPA acted fully within its discretion by not referring methylene chloride's unreasonable risks to OSHA and why, in conducting its risk evaluation, it correctly refused to assume that workers exposed to methylene chloride are routinely and effectively protected by personal protective equipment ("PPE").

## ARGUMENT

### I.    Section 9(a) Grants EPA Broad Discretion Whether to Refer Risk Management to Other Federal Agencies

Industry Petitioners assert the Rule is unlawful because EPA failed to refer regulation of methylene chloride's risks to OSHA. The gist of their argument is that because it is hypothetically possible that OSHA "may" address the unreasonable risks EPA identified, TSCA Section 9(a) required EPA to refer the matter to OSHA. Industry Petitioners' Brief ("Ind. Pet. Br.") 57, 60. We agree with EPA that Industry Petitioners' rigid reading of Section 9(a) misconstrues the statute. Respondent's Brief ("EPA Br.") 96–101. Their arguments also ignore Congress' clear intent that EPA protect workers from unreasonable risks even if OSHA *may* also do so and EPA's longstanding, consistent interpretation of TSCA Section 9(a). Moreover, the Industry Petitioners mischaracterize EPA's reasons for its

4

discretionary determination not to refer management of methylene chloride's risks to OSHA.

## A. TSCA's Plain Language Grants EPA Discretion Whether to Refer Risk Management to Another Agency

Section 9(a) addresses the relationship between TSCA and laws other Federal agencies administer. It provides that if EPA determines, based on its risk evaluation, that a chemical presents "an unreasonable risk of injury to health or the environment," and "determines, *in the Administrator's discretion,* that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator," EPA is to issue a report to the agency that administers that law.  15 U.S.C. § 2608(a)(1) (emphasis added). If the Administrator submits such a report—*i.e.,* makes a referral—to another agency, EPA may not regulate until that agency determines, within a specified timeframe, whether and how it will proceed; EPA may move forward only if the other agency either fails or declines to do so. *Id.* §§ 2608(a)(2)–(4).

Congress may lawfully empower agencies to "exercise a degree of discretion," and "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright Enters. v.*

*Raimondo*, 603 U.S. 369, 394–95 (2024) (citing *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). Here, Congress did so expressly. TSCA emphasizes that the Administrator's power to determine that a chemical's "unreasonable risk of injury to health" may be "prevented or reduced to a sufficient extent" by another agency's action is *discretionary*. 15 U.S.C. § 2608(a)(1). And it sets forth the "term[s]" or "phrase[s]" delimiting that flexibility:  As a pre-requisite to such a determination, the Administrator must find that: (1) another agency may take action to address the "unreasonable risk" EPA identified; (2) such action would "prevent[] or reduce[]" the risk; and (3) it would do so "to a sufficient extent," considering TSCA's mandate that regulated chemicals "no longer present[] such risk." *Id.* § 2605(a).

Industry Petitioners—citing no case law—instead read Section 9(a) as "limitations on EPA's authority" that mandate referral whenever "another agency's statutory authority 'may' address the risks" EPA's risk evaluation identified. Ind. Pet. Br. 58, 60. This reading is unfaithful to the law that Congress wrote. First, it reads the term "in the Administrator's discretion" out of the statute by effectively making referral to OSHA mandatory in all cases involving occupational uses.

6

Second, it untethers this supposedly-mandatory referral requirement from *any* determination that the other agency be able to "prevent[] or reduce[]" risk "to a sufficient extent." Instead, Industry Petitioners would mandate referral on a bare showing that another agency has authority to regulate the substance in the workplace, without regard to whether: (1) it applied the same "unreasonable risk of injury to health" standard enforced by EPA; or (2) this authority empowered it to apply rules that would ensure that the "chemical . . . no longer presents such risk." 15 U.S.C. § 2605(a).

Industry Petitioners' notion that EPA is required to refer occupational regulation of chemicals to OSHA is further belied by other sections of TSCA. TSCA requires the Administrator to: consult and coordinate with OSHA in administering the Act, 15 U.S.C. § 2608(d); take account of the risk to workers in evaluating risk, *id.* § 2602(12) (defining "workers" as a "susceptible subpopulation" EPA must consider in evaluating risk); consult with the National Institute of Occupational Safety and Health ("NIOSH") in prescribing epidemiological studies, *id.* § 2603(b)(2)(A); include OSHA and NIOSH on committees to recommend chemicals for priority consideration, *id.* § 2603(e)(2)(A)(ii);

7

and consult with OSHA before prohibiting or restricting new chemical applications that address workplace exposures, *id.* § 2604(f)(5). Finally, the statute expressly provides that—unlike action by other Federal agencies—EPA's regulation of a toxic substance under TSCA will not preclude OSHA from regulating the same hazardous substance. *Id.* § 2608(c). This provision would be superfluous if Congress intended EPA to routinely defer all rulemaking in the occupational sphere to OSHA whenever OSHA might be authorized to regulate that risk.

In short, both Section 9(a)'s language and TSCA's overall structure make clear that, as this Court recognized in *Corrosion Proof Fittings v. EPA,* "TSCA speaks of the necessity of . . . *protecting United States workers.*" 947 F.2d 1201, 1209 (5th Cir. 1981) (emphasis added). The statute obligates EPA to take worker health into account in evaluating risk and authorizes EPA to issue risk management rules that protect workers. TSCA does not require EPA to refer all regulation of workplace hazards to OSHA. Instead, as the statute's plain language explicitly states, the Administrator is to exercise *discretion* in deciding whether OSHA will "prevent[] or reduce[]" the unreasonable risks the Agency has determined a toxic substance poses "to a sufficient extent."

8

## B. The Legislative History of the 1976 Act Demonstrates Congress Deliberately Granted the Administrator Discretion Whether to Make a Referral

Because Section 9(a) unambiguously vests EPA with discretion to determine when another agency's actions would prevent or reduce risk "to a sufficient extent"—rather than imposing some sort of referral mandate—recourse to legislative history is unnecessary here. *See, e.g., Petteway v. Galveston Cnty.*, 111 F.4th 596, 607 (5th Cir. 2024) (en banc) (declining to address arguments concerning legislative history because "the text of [the statute] is clear").

Nevertheless, should the Court deem it necessary to consider materials beyond the statute, TSCA's legislative history demonstrates that from the beginning, Congress intended EPA to have broad discretion whether to refer unreasonable risks to another agency for regulation.

In debates over the 1976 Act, the House and Senate both addressed the relationship between EPA and other Federal agencies that could potentially address risks EPA found to be unreasonable. During the House deliberations, EPA urged the House explicitly to "preclude EPA from taking action . . . which the Secretary of Labor

9

could take under the Occupational Safety & Health Act." H.R. Rep. No. 94-1341 at 74 (1976).

The House took a different path. Its bill provided that if the Administrator "has reason to believe" a chemical substance causes unreasonable risk, "and determines that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator," the Administrator shall "request that the other agency declare whether it agreed that the activity posed a risk and, if so, whether the agency would act to address the risk." H.R. 14032, 94th Cong. § 9(a) (1976).[2]

The Senate bill—which included the language that eventually became law[3]— provided the Administrator more explicit discretion

---

[2] H.R. 14032, the last of the House's various versions of TSCA, was the bill the Conference Committee considered.

[3] The Senate's version, codified in the 1976 law, stated that if the Administrator "has reasonable basis to conclude" that activity involving a toxic substance "presents or will present an unreasonable risk of injury to health or the environment, and determines, *in the Administrator's discretion*, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, the Administrator shall" refer the matter to the other agency. S. 3159, 94th Cong. § 9(a) (1976).

regarding referral. The conferees described Section 9(a) as providing that

> if the Administrator *makes a discretionary determination (which is not subject to judicial review)* that the risk [of injury] may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, then the Administrator must give the other agency an opportunity to act to protect against such risk . . .

"Joint Explanatory Statement of the Committee of Conference," H.R. Rep. No. 94-1679, at 84 (Sept. 23, 1976) ("1976 Conf. Rep.") (emphasis added).

Accordingly, TSCA's legislative history shows that in 1976, Congress expressly rejected the "mandatory referral" reading Industry Petitioners press here, and instead took pains to preserve the Administrator's discretion to do so only in those situations where another agency's action would "prevent[]" or "reduce[]" the risk of injury to a "sufficient extent."

## C. EPA Has Long Interpreted Section 9(a) to Grant it Broad Discretion Whether Referral to OSHA Is Appropriate

Consistent with the statute's unambiguous language, for forty years EPA has understood Section 9(a) to require it to look beyond any hypothetical possibility another agency *might* be able to address the

11

risk, and instead to consider the probability another agency would address the risks EPA identified to a "sufficient extent" – *i.e.,* in a timely, effective, and efficient manner. The Court should afford this longstanding interpretation substantial weight. *See Loper Bright Enters.,* 144 S. Ct. at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (the weight a court gives an agency's interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.")

As early as 1984, EPA's then-Assistant Administrator Alvin Alm issued an "Interim Policy for Referring Workplace Exposure Problems to the Department of Labor," setting forth that EPA would not refer a chemical to OSHA if the Administrator determined OSHA could not adequately address the risk. Among the considerations that would drive that determination were whether "(1) too much of the exposure lies beyond [OSHA's] reach . . . ; (2) a single rule under TSCA would be more efficient than piecemeal regulation under several authorities; or (3) a full or partial ban on the production or use of the chemical, or

12

other remedies uniquely available under § 6 of the TSCA, provide the most effective or efficient remedy."[4]

Administrator William Ruckelshaus echoed this policy in explaining why in 1984, even though OSHA was considering an asbestos standard, EPA determined not to cede its jurisdiction to OSHA. In a letter to Congressman Dingell, then-Chairman of the House Energy & Commerce Committee, Ruckelshaus assured the Chairman that EPA and OSHA had closely coordinated and viewed their roles as complementary, but that given OSHA's limitations—the agency cannot ban a chemical and its standards do not apply to most public employees or non-occupational populations—"there are significant residual risks [for EPA to address] after OSHA's standards are in place."[5]

---

[4] Senate Committee on Environment and Public Works, "Office of Management and Budget Interference with Agency Regulations," S. Rep. No. 99-156, at 44 (1986).

[5] House Energy and Commerce Committee, Subcommittee on Oversight and Investigations, "EPA's Asbestos Regulations: Report on a Case Study on OMB Interference in Agency Rulemaking," 99th Cong. at 16 (Oct. 1985). As both reports detail, in early 1985, OMB overruled EPA's view that it had discretion whether to refer worker safety issues to OSHA, and under pressure from OMB, Acting Deputy Administrator Barnes announced that Section 9(a) referral was mandatory. Within a few months, however, EPA returned to its earlier view, expressed in the text, that referral was discretionary. Then-General Counsel Gerald H.

In 1986, EPA and OSHA signed a memorandum of understanding ("MOU") setting out a "process for notification and consultation" to aid EPA in carrying out its obligations under Section 9(a). Implicit in the MOU is the understanding that the mere fact OSHA may be able to regulate a particular chemical's risks does not require EPA to cede jurisdiction. Instead, the policy provides that EPA will discuss any potential referral with OSHA informally and will not formally refer a chemical to OSHA for regulation unless both agencies agree to that course.[6]

In the almost five decades since Congress enacted TSCA, EPA has only made *two* formal referrals to OSHA, both in the early 1980s. Each time, both agencies were actively evaluating the affected chemicals' risks, and EPA made the referral based, in part, on the fact that OSHA

---

Yamada issued the 1985 Memorandum cited in the Industry Petitioners Brief (at page 58) during this brief interim period. *See* Rachel Rothschild, "Unreasonable Risk: The Failure to Ban Asbestos and the Future of Toxic Substance Regulation," 47 HARVARD ENV. L. REV. 531, 557–60 (2023) (detailing OMB's interference with EPA's decisionmaking).

[6] Memorandum of Understanding Between the Environmental Protection Agency and the Department of Labor (Feb. 6, 1986), *available at* https://www.osha.gov/laws-regs/mou/1986-02-06.

was poised to engage in rulemaking the Administrator concluded could prevent or reduce the unreasonable risk "to a sufficient extent."

In 1984, OSHA and EPA jointly published a request for information regarding 1,3-Butadiene ("BD"), to "determine whether to initiate appropriate action to prevent or reduce the risk from the chemical or find that the risk is not unreasonable." OSHA, "Final Rule: Occupational Exposure to [BD]," 61 Fed. Reg. 56746, 56748 (Nov. 4, 1996) (describing events leading to OSHA's final rule). Four months later, EPA published an Advance Notice of Proposed Rulemaking ("ANPR") to determine how to effectively control BD's hazards under TSCA, but also stated it was working with OSHA to decide how best to address BD's risks. 49 Fed. Reg. 20524 (proposed May 15, 1984). EPA ultimately referred the matter to OSHA, 50 Fed. Reg. 41393 (Oct. 10, 1985), which agreed a revised OSHA standard could reduce BD's risks.[7]

Similarly, with 4,4'-Methylenedianiline ("MDA"), EPA began by publishing an ANPR, announcing its joint effort with OSHA to

---

[7] OSHA began the rulemaking process on October 1, 1986, 61 Fed. Reg. at 56749; it published its final rule ten years later, on November 4, 1996.

15

determine the most effective means of addressing MDA's risks. 48 Fed. Reg. 42898 (proposed Sept. 20, 1983). Concluding that MDA's primary risks were occupational, which OSHA regulation could effectively address, EPA referred the matter to OSHA, and OSHA responded by agreeing to initiate rulemaking. *See* OSHA, "Occupational Exposure to [MDA]," 57 Fed. Reg. 35630, 35631–32 (Aug. 10, 1992) (describing events leading to final rule).[8]

Finally, although EPA had already begun to address asbestos, in 1985 it announced its intention to suspend its own activity and refer the matter to the Consumer Product Safety Commission and to OSHA, which had already published a notice of proposed rulemaking on asbestos. 49 Fed. Reg. 14116 (proposed Apr. 10, 1984). EPA never made a formal referral, however. When OSHA regulated asbestos, feasibility constraints meant it could not eliminate the significant risks asbestos posed to exposed workers. EPA, "Asbestos; Manufacture, Importation, Processing and Distribution in Commerce Prohibitions," 54 Fed. Reg. 29460, 29467 (July 12, 1989) (EPA asbestos ban discussing limitations

---

[8] OSHA issued its final rule seven years after EPA's referral. *Id.*

of OSHA's authority). EPA subsequently banned asbestos products under TSCA "because no one other authority could address all the risks posed 'throughout the life cycle' by asbestos, and any action by one or more of the other agencies still would leave an unacceptable residual risk." *Corrosion Proof Fittings,* 947 F.2d at 1216. Although this Court vacated the ban on other grounds, it found "proper" EPA's "basic decision to use TSCA as a comprehensive statute designed to fight a multi-industry problem." *Id.*

In short, since Congress passed TSCA in 1976, EPA has consistently understood and, with one short-lived exception lasting mere months in 1985, treated Section 9(a) as granting it discretion to determine whether another agency would effectively, efficiently and timely address the unreasonable risk EPA identified "to a sufficient extent," and has exercised its discretion consistent with that interpretation.

### D. The 2016 Amendments Reaffirmed EPA's Obligation to Address Unreasonable Occupational Risks

Congress amended TSCA in 2016 to jumpstart EPA's control of toxic substances. Among other significant changes, Congress directed EPA to establish priorities for evaluating toxic substances, mandated

regulations to reduce any unreasonable risks EPA identified, and imposed tight deadlines for the agency's regulatory action. 15 U.S.C. § 2605.

Congress made minimal changes to Section 9(a)'s substance, merely aligning it with EPA's enhanced obligations,[9] and to ensure regulatory action stayed on track, specifying that any agency to which EPA made a referral must act within time limits the Administrator imposed. Presumably aware of both EPA's implementation of this provision since 1976 and this Court's approval of EPA's exercise of discretion in *Corrosion Proof Fittings,* Congress made *no* changes to the language entrusting to the Administrator's discretion any decision about whether referral to another agency would "sufficient[ly]" prevent or reduce the risk.[10]

---

[9] The amendments made clear EPA is to make any referral only after completing a risk evaluation and conformed the section to the revised approach to risk evaluation Congress mandated (*i.e.,* that the risk evaluation is to be conducted "without consideration of costs or other nonrisk factors" and to include "unreasonable risk to potentially exposed or susceptible subpopulation(s)").

[10] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation").

Congress did not convene a formal conference committee to reconcile the House and Senate bills amending TSCA. However, members of both chambers met to hammer out a final version of what became the Frank R. Lautenberg Chemical Safety for the 21st Century Act. The Democrats involved in the negotiations submitted a report to the record "describ[ing] the intent of the negotiators on elements of the final bill text." "Detailed Analysis and Additional Views of Democratic Members on the Motion to Concur in the House Amendment to the Senate Amendment to the Bill HR 2576 Entitled 'An Act to Modernize the Toxic Substances Control Act and for Other Purposes,'" 162 Cong. Rec. S3516 (daily ed. June 7, 2016). The report characterized "TSCA as the primary statute for the regulation of toxic substances," explaining:

> EPA's authorities and duties . . . have been significantly expanded . . . , now including comprehensive deadlines and throughput expectations for chemical prioritization, risk evaluation, and risk management. [Section 9's] interagency referral process . . . must now be regarded in a different light since TSCA can no longer be construed as a 'gap-filler' statutory authority of last resort. The changes in Section 9 are consistent with this recognition and do not conflict with the fundamental expectation that, where EPA concludes that a chemical presents an unreasonable risk, the Agency should act in a timely manner to ensure that the chemical substance no longer presents such risk. Thus, . . . Section 9(a) is not intended to supersede or modify the Agency's obligations . . . to address risks from activities involving the

> chemical substance, except as expressly identified in a Section 9(a) referral for regulation by another agency which EPA believes has sufficient authority to eliminate the risk and where the agency acts in a timely and effective manner to do so.

*Id.* at S3517. The Democratic Members concluded their comments on Section 9 by emphasizing that "none of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner." *Id.*

After Senator Udall entered the Democrats' report into the record, Senators Vitter and Inhofe explained the bill's "intent" from the Republicans' perspective. Addressing Section 9, the Senators took issue with none of the Democrats' remarks concerning Section 9(a). Instead, they addressed coordinating the disposal of chemicals under TSCA and other statutes EPA administers, under Section 9(b). *See id.* at S3519, S3522 (comments of Sens. Inhofe & Vitter).

Therefore, nothing in the 2016 amendments cast doubt on EPA's consistent, 40-year-long interpretation of the statute, which makes clear that EPA has discretion to determine not just whether another agency

20

has the authority to act, but whether referral to another federal agency would accomplish TSCA's objectives.

### E. The Administrator Properly Exercised his Discretion in this Case

The statutory text, decades of consistent agency practice, and persuasive legislative history from both TSCA's initial enactment in 1976 and its amendment in 2016 thus demonstrate that Congress vested the EPA Administrator with considerable discretion whether to refer a chemical for regulation to another agency. Here, EPA reasonably exercised its discretion in determining that methylene chloride's unreasonable risks could not "be prevented or reduced to a sufficient extent by action taken" by OSHA and that no referral was therefore warranted under Section 9(a).[11]

OSHA issued a methylene chloride standard in 1997, reducing the permissible exposure limit ("PEL") from 500 parts per million (ppm) to

---

[11] The statute (*see* EPA Br. 97) and the legislative history demonstrate that Congress did not intend for referral decisions to be subject to judicial review. *See* 1976 Conf. Rep. at 84; 162 Cong. Rec. S3517 (daily ed. June 7, 2016). Nevertheless, even assuming the Administrator's discretionary determinations were subject to some form of deferential judicial review, EPA's exercise of discretion in this matter was eminently reasonable.

21

25 ppm. Occupational Exposure to Methylene Chloride, 62 Fed. Reg. 1494 (Jan. 10, 1997). OSHA chose that level not because it adequately protected workers from the significant risks of cancer OSHA identified—indeed, OSHA pointedly admitted that it did not—but because OSHA concluded industry could not then feasibly meet lower exposure limits by relying principally on engineering and work practice controls. *Id.* at 1562. OSHA calculated that under its standard, employees would continue to face cancer risks from methylene chloride of 3.62 per 1,000, a level of risk OSHA described as "clearly significant." *Id.*

EPA has determined that methylene chloride poses an unreasonable risk to workers at 2 ppm—a level an order of magnitude lower than OSHA's PEL. In explaining its decision not to refer methylene chloride regulation to OSHA, EPA acknowledged that the limits of feasibility may have changed since 1997 and thus, that OSHA theoretically might be able to set a lower PEL. However, OSHA lacks authority to ban a product, which EPA felt would be appropriate in this case. EPA, Methylene Chloride, Regulation under TSCA (NPRM), 88 Fed. Reg. 28284, 28331 (proposed May 3, 2023) ("Proposed Rule").

Further, when addressing occupational hazards, OSHA lacks jurisdiction over state and local government workers, military personnel, health hazards regulated by other federal agencies, and self-employed workers. Rule, 89 Fed. Reg. at 39287. EPA expressed particular concern about OSHA's inability to protect self-employed workers, pointing to furniture refinishing as a major use of methylene chloride, and noting that "many [furniture refinishing] workshops are run by self-employed artisans." *Id.* at 39266. As EPA noted, there have been 85 methylene chloride-related deaths since OSHA adopted its methylene chloride standard, EPA Br. 79, many of which resulted from over-exposure in bathroom remodeling, a construction activity involving many self-employed workers.

EPA also explained that, with the 2016 amendments, "[f]ollowing an unreasonable risk determination, EPA must apply risk management requirements to the extent necessary to address the unreasonable risk and only consider costs and benefits to the extent practicable," instructions very different from OSHA's charge. Proposed Rule, 88 Fed. Reg. at 28331. EPA must, moreover, issue risk management rules on a tight schedule, and here, it could not estimate a timetable for action by

23

OSHA. *Id.* In fact, since methylene chloride is not currently on OSHA's regulatory agenda,[12] EPA had no reason to believe OSHA might further regulate methylene chloride, as compared to its previous referrals, when OSHA was actively engaged in rulemaking to regulate the chemicals EPA was evaluating. Any referral of methylene chloride risks to OSHA therefore would not have been based not on a realistic probability that OSHA would act, but on the "mere open-ended possibility of action by the other agency"—a possibility that, as early as 1976, Congress had viewed as an inappropriate basis for referral. 1976 Conf. Rep. at 84–85.

Finally, because EPA determined methylene chloride posed risks in both occupational and consumer settings, regulation outside of TSCA would require the piecemeal regulation that Congress had sought to avoid. Proposed Rule, 88 Fed. Reg. at 28330–31. For all these reasons, EPA concluded that TSCA is the "only regulatory authority able to

---

[12] *See* U.S. Dep't of Labor, "Agency Rule List - Fall 2024," *available at* https://tinyurl.com/mvxbvj7a (last accessed Dec. 23, 2024). Even if methylene chloride were on OSHA's regulatory agenda, EPA's concern about timely rulemaking would be appropriate: OSHA took 10 and 7 years, respectively, after EPA's referral to issue its standards for BP and MDA. *See* n.7–8, *supra.*

prevent or reduce unreasonable risk of methylene chloride to a sufficient extent across the range of conditions of use, exposures, and populations of concern." Rule, 89 Fed. Reg. at 39287. Exercising its discretion, the Agency reasonably chose not to refer methylene chloride risk management to OSHA or any other Federal agency.

In short, even if Congress had intended judicial review of EPA's exercise of discretion, there would be absolutely no basis for finding that the Administrator abused his discretion in declining to "give . . . OSHA . . . the opportunity to exercise its authority" to manage methylene chloride's risks. Ind. Pet. Br. 60. Instead, as in *Corrosion Proof Fittings,* ample grounds exist for this Court to find the Administrator's exercise of discretion was "proper." 947 F.2d at 1216.

## II. EPA Carefully Harmonized Its Risk Management Rule with OSHA's Methylene Chloride Standard

Section 9(d) requires EPA to confer with OSHA and to avoid duplicative regulation. 15 U.S.C. § 2608(d). EPA did so. It sought and received comments from both OSHA and NIOSH on its risk evaluation.[13] EPA conferred extensively with OSHA to carefully

---

[13] OSHA's Comments on Methylene Chloride Risk Evaluation ("OSHA Comments") and NIOSH's Comments on Methylene Chloride Risk

25

harmonize its risk management rule with OSHA's existing methylene chloride standard. Section 9(d) requires nothing more.

This coordination is apparent in the Rule's worker protection provisions. The Rule bans methylene chloride for all uses where EPA lacked information that the owners and operators could reduce workplace exposures to below EPA's Existing Chemical Exposure Limit ("ECEL") of 2 ppm.  Where EPA had evidence that owners and operators could feasibly reduce exposures to the ECEL, the Rule permits continued methylene chloride use so long as the owner or operator implements a Workplace Chemical Protection Program ("WCPP"). The WCPP's requirements follow the hierarchy of controls, a well-established industrial hygiene principle OSHA has long used in developing its own standards and that underpins OSHA's methylene chloride standard. As EPA explained, the Rule requires "entities implementing the WCPP to use [the preferred techniques of] elimination and substitution, followed by the use of engineering controls, administrative controls, and work practices prior to requiring

Evaluation ("NIOSH Comments") are Apps B & C, respectively, to the comments filed by several public health and labor organizations, available at EPA-HQ-OPPT-2016-0742-0144.

26

the use of PPE (*i.e,* respirators) as a means of controlling inhalation exposures." Rule, 89 Fed. Reg. at 39278.[14]

EPA's Rule parallels the structure of OSHA's standard. Like OSHA, EPA is requiring initial monitoring of workplaces and periodic monitoring, depending on the initial monitoring results. *Id.* at 39271. Like OSHA and to "ensure the highest degree of protection to potentially exposed persons," the Rule explicitly requires air samples to be measured without taking respiratory protections into account. *Id.* at 39277. Like OSHA's standard, the Rule requires employers then to utilize the hierarchy of controls to limit over-exposures revealed through monitoring. EPA has used language from OSHA's standard to describe how to demarcate the regulated areas where the controls must be implemented, *id.* at 39279, as well as expressly incorporating provisions of OSHA's respirator standard, *see* 40 C.F.R. § 751.109(f) (incorporating most of 29 C.F.R. § 1910.134(a)–(l)). And in finalizing its proposed rule, EPA adjusted the compliance timeframes to accommodate the need for employers covered by the OSHA standard to

---

[14] *Compare* 40 C.F.R. § 751.109(e) *with* 29 C.F.R. § 1910.1052(f)(1) (methods of compliance in OSHA's methylene chloride standard).

monitor and adjust for EPA's lower exposure limits. Rule, 89 Fed. Reg. at 39269.

The Rule does not duplicate OSHA's standard in every respect, for the obvious reason that EPA has determined that methylene chloride's unreasonable risks occur at far lower exposure levels than OSHA's PEL. It has therefore included additional provisions it deemed necessary to ensure a higher degree of protection.[15]  However, contrary to the Industry Petitioners' contentions, Ind. Pet. Br. 59, none of these requirements conflict with OSHA's. Instead, by complying with the Rule, employers will also comply with the analogous provisions of OSHA's standard. Thus, in crafting the Rule, EPA endeavored to make it as consistent as possible with OSHA's, while taking account of the fact that TSCA *requires* it to afford a higher level of protection to potentially exposed workers.

---

[15] For example, the Final Rule imposes minimal additional monitoring, *compare* 40 C.F.R. § 751.109(d)(3) (Table) *with* 29 C.F.R. § 1910.1052(d)(3) (if initial monitoring shows no exposures above respective limits, EPA requires covered entities to monitor again in 5 years, while OSHA does not); and is adjusting the respirator requirements to account for the fact that the lower exposure limits dictate different respirator protection factors. *Compare* 40 C.F.R. § 751.109(f) *with* 29 C.F.R. § 1910.134(d)(3)(i)(A).

### III. EPA Properly Based Its Risk Determination on Worker Exposures without Assuming Use of Personal Protective Equipment

Industry Petitioners claim that workers routinely use personal protective equipment such as respirators, Ind. Pet. Br. 10, and that EPA over-estimated the risks to workers by "refusing to account for PPE that workers routinely use," *id.* at 29. According to this theory, if EPA had reduced the air measurements of employee exposure by assuming PPE use, it would have found methylene chloride exposure posed no unreasonable risks to workers. They cite no evidence for the proposition that workers routinely wear respirators designed to protect them at the levels of exposure EPA has determined pose unreasonable risk. Instead, they simply cite a provision of OSHA's methylene chloride standard which requires protective clothing and goggles "whenever needed" to prevent skin and eye irritation. Ind. Pet. Br. 30; 29 C.F.R. § 1910.1052(h). This provision says nothing about respirator use to protect workers from inhaling methylene chloride fumes.

The argument that EPA should discount airborne exposure measurements by assuming respirator or other PPE use when evaluating risk is inconsistent with TSCA's plain language: TSCA

prohibits EPA from considering "costs or other nonrisk factors" when determining whether a chemical poses unreasonable risks. 15 U.S.C. § 2605(b)(4)(A). Respirators and other PPE are risk management tools, and thus, "nonrisk factors."

This argument also misconstrues OSHA requirements: It is premised on a "theoretical" duty to provide respirators to all employees exposed to methylene chloride, regardless of the level of exposure, and assumes that these respirators will protect employees to whatever level of risk EPA identifies. Industry Petitioners cite no reference for this proposition because no such duty exists. The OSH Act requires employers to comply with OSHA standards. 29 U.S.C. § 654(a)(2). OSHA's methylene chloride standard requires employers to implement engineering and work practice controls and then—and *only* then—to resort to PPE if those preferred control methods cannot feasibly bring exposures to the 25 ppm PEL. 29 C.F.R. § 1910.1052(f)(1). Employers are not permitted to routinely rely on respirators to meet OSHA's PEL. And even with PPE use, employers are not required to implement any controls—PPE or other controls —to bring exposures below 25 ppm. Respirator use below OSHA's PEL is entirely voluntary, and EPA is not

required to take voluntary measures into account to preempt regulation. *See Nat'l Maritime Safety Ass'n v. OSHA,* 649 F.3d 743, 751 (D.C. Cir. 2011) (OSHA is not required to take voluntary measures into account when deciding whether a risk is significant).

What is more, EPA had evidence that few employers actually have respiratory protection programs in place. OSHA's methylene chloride standard requires employers using respirators to implement comprehensive programs to ensure employees use and maintain their equipment so that it actually protects workers.  29 C.F.R. § 1910.1052(g)(2).   EPA found the percentage of establishments *without* a baseline respiratory protection plan ranged from 72%-96%.  EPA, Estimated Costs for Respirator PPE for 2024 TSCA Risk Management Economic Analyses (EPA-HQ-OPPT-2020-0465-0413) at C-9. Indeed, EPA cited evidence that even when trained workers wore respirators, those devices often failed to protect them. Rule, 89 Fed. Reg. at 39258.

In addition to ignoring reality, Industry Petitioners' argument is contrary to the expert advice OSHA and NIOSH provided to EPA. NIOSH told EPA the assumption "that every worker would be in a respirator . . . is an incorrect assumption and should not be used in risk

estimation nor in developing findings of unreasonable risk." NIOSH Comments at 3. OSHA told EPA "[f]or regulatory purposes, OSHA does not evaluate respirator impact in an initial characterization of risk since it presumes all workers in an occupational application group will be properly trained, fitted, and wear respirators which is rarely the case." OSHA Comments at 5. Both OSHA's and EPA's final rules reflect the long-standing industrial hygiene practice that employee exposure is measured without regard to respirators. *See* 29 C.F.R. § 1910.1052(b) (OSHA definition of employee exposure); Rule, 89 Fed. Reg. at 39271 (EPA agrees exposure monitoring should be conducted without regard to respirator protection). EPA, relying on the expert opinions of OSHA and NIOSH, reasonably made its risk determination about methylene chloride without considering assumed respirator use. *Cf. Industrial Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 656 (1980) (OSHA must rely on a reputable body of scientific thought in deciding whether a risk is significant).[16]

---

[16] EPA, however, did not entirely ignore respirator use. While TSCA does not permit EPA to consider respirator use—a nonrisk mitigation method—during risk evaluation, EPA may, and in fact did, consider the use of respirators and other risk management tools, such as engineering and work practice controls, in its risk management rule.

OSHA concluded more than 25 years ago that at 25 ppm, employees would continue to face significant cancer and other risks from methylene chloride exposure. EPA found similar cancer risks, as well as liver toxicity, at exposures as low as 2 ppm. It would be unreasonable for EPA to assume that employers routinely mandate respirator use to reduce exposures below OSHA's PEL, much less to levels an order of magnitude lower than the PEL. *See* OSHA Comments at 1. ("[R]espirators are required only when concentrations will exceed the PEL.") Industry Petitioners provided no evidence that it is common practice for employers to provide and ensure the proper use of appropriate PPE, including respirators, at levels of exposure to methylene chloride below OSHA's PEL. EPA was correct in not assuming it is.

## CONCLUSION

EPA reasonably exercised its discretion in refusing to defer to OSHA and instead, issuing the challenged risk management rule to address the unreasonable risks methylene chloride poses to exposed workers. Moreover, EPA reasonably and appropriately evaluated methylene chloride's risk to workers without assuming they are

33

currently protected by PPE. For the reasons stated in this amicus brief

and in EPA's brief, this Court should reject the Industry Petitioners'

challenge to the Rule.

Respectfully submitted,

/s/ Randy S. Rabinowitz
Randy S. Rabinowitz
Victoria L. Bor
OSH Law Project, LLC
P.O. Box 3769
Washington, DC 20027
T: 202-256-4080
T: 301-785-3204
randy@oshlaw.org
victoriabor87@gmail.com

*Counsel for Amicus Curiae*

January 3, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2025, I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit. The Court's CM/ECF system was used to file the brief, and service will thus be accomplished by the CM/ECF system on all CM/ECF registered counsel.

/s/ Victoria L. Bor
Randy S. Rabinowitz
Victoria L. Bor
OSH Law Project, LLC
P.O. Box 3769
Washington, DC 20027
T: 202-256-4080
T: 301-785-3204
randy@oshlaw.org
victoriabor87@gmail.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,495 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

Dated: January 3, 2025

/s/ Randy S. Rabinowitz
Randy S. Rabinowitz
Victoria L. Bor
OSH Law Project, LLC
P.O. Box 3769
Washington, DC 20027
T: 202-256-4080
T: 301-785-3204
randy@oshlaw.org
victoriabor87@gmail.com

*Counsel for Amicus Curiae*
