No. 24-60227

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,

Respondents.

---

Consolidated with No. 24-60256

---

EAST FORK ENTPERPRISES, INCORPORATED; EPIC PAINT COMPANY; SIERRA CLUB; AMERICAN CHEMISTRY COUNCIL,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,

Respondents.

---

On Petitions for Review of Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 39,254 (May 8, 2024)

---

## BRIEF OF PROFESSOR RACHEL ROTHSCHILD
## AS AMICUS CURIAE IN SUPPORT OF RESPONDENTS

Filed: January 3, 2025

Evan Bianchi
Spiro Harrison & Nelson
40 Exchange Place, Ste. 1100
New York, New York 10005
(646) 412-5616
ebianchi@shnlegal.com

*Counsel for Amicus Curiae*
*Professor Rachel Rothschild*

ii

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSIONS

Nos. 24-60227, 24-60256
*East Fork Enters., Inc. v. EPA*

The undersigned counsel of record certifies that, in addition to persons and entities listed in the certificates of interested persons filed in this matter to date, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the Judges of this Court may evaluate possible disqualification.

Amicus Curiae:

    Professor Rachel Rothschild

Counsel to Professor Rachel Rothschild:

    Evan Bianchi
    Spiro Harrison & Nelson
    40 Exchange Place, Ste. 1100
    New York, New York 10005
    (646) 412-5616
    ebianchi@shnlegal.com

        Respectfully submitted,

        */s/ Evan Bianchi*
        Evan Bianchi
        Spiro Harrison & Nelson
        40 Exchange Place, Ste. 1100
        New York, New York 10005
        (646) 412-5616
        ebianchi@shnlegal.com

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSIONS......iii

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES.................................................................. v

INTEREST OF AMICUS CURIAE ....................................................... 1

INTRODUCTION .............................................................................. 3

ARGUMENT .................................................................................... 5

I.   A History of TSCA and Its Amendments ......................................... 5

    a.   The purpose and passage of 1976 TSCA ...................................... 5

    b.   EPA's first attempt to regulate asbestos under TSCA ............. 8

    c.   This Court's *Corrosion Proof Fittings* decision ........................ 12

    d.   TSCA's 2016 amendments and the removal of the "least burdensome" requirement ........................................................... 14

II.  TSCA's Text and History Undermine Industry Petitioners' Arguments ..................................................................................... 18

    a.   The language and history of Section 9 demonstrate that TSCA is not simply a statute of last resort. ............................... 18

    b.   Industry Petitioners' attempt to revive the "least burdensome" requirement should be rejected. ......................... 22

CONCLUSION ................................................................................. 28

CERTIFICATE OF SERVICE .............................................................. 29

CERTIFICATE OF COPMLIANCE ....................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Bailey v. United States,*
    516 U.S. 137 (1995) .................................................................. 24

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
    447 U.S. 102 (1980) .................................................................. 20

*Corrosion Proof Fittings v. EPA,*
    947 F.2d 1201 (5th Cir. 1991) ....................................... 12, 13, 23, 25

*Huffman v. Western Nuclear, Inc.,*
    486 U.S. 663 (1988) .................................................................. 26

*Silva-Trevino v. Holder,*
    742 F.3d 197 (5th Cir. 2014) ...................................................... 24

*State Nat. Ins. Co. Inc. v. Yates,*
    391 F.3d 577 (5th Cir. 2004) ...................................................... 27

*W. Nuclear, Inc. v. Huffman,*
    825 F.2d 1430 (10th Cir. 1987) .................................................. 26

*West Virginia v. EPA,*
    No. 24-1120 (D.C. Cir. Oct. 18, 2024) ........................................... 2

**Statutes**

15 U.S.C. § 2605 ............................................................ 4, 16, 22, 26, 27

15 U.S.C. § 2608 ....................................................................... 4, 16, 19

Frank R. Lautenberg Chemical Safety for the 21st Century Act,
    Pub. L. No. 114-182, 130 Stat. 448 ............................................ 15

Toxic Substances Control Act of 1976,
Pub. L. No. 94-469, 90 Stat. 2003 .................................. 5, 6, 13, 16

## Rules

Federal Rule of Appellate Procedure 29 ................................................ 2

## Congressional Materials

*Assessing the Effectiveness of U.S. Chemical Safety Laws, Hearing before the Subcomm. on Superfund, Toxics and Env't Health of the Comm. on Env't and Pub. Works,*
112th Cong. 72 (2011) ................................................... 15

*EPA's Asbestos Regulations, Hearing Before the Subcomm. On Oversight and Investigations of the H. Comm. On Energy and Com.,*
99th Cong. 233 (1985) ................................................. 9, 11

H.R. Rep. No. 94-1679 (1976) ............................................... 7, 19

H.R. Rep. No. 114-176 (2015) ................................................. 20

*Oversight Hearing on the Federal Toxic Substances Control Act: Joint Hearing before the Subcomm. On Superfund, Toxics, and Env't Health and the Comm. On Env't and Pub. Works & the S. Comm. On Env't and Pub. Works,*
111th Cong. 173 (2009) .................................................. 8

*Proceedings and Debates of the 94th Congress: Conference Report on S. 3149, Toxic Substances Control Act,*
122 Cong. Rec. H11343 (Sept. 28, 1976) ........................... 21

*Proceedings and Debates of the 94th Congress: Toxic Substances Control Act,*
122 Cong. Rec. S4397 (Mar. 26, 1976) ................................ 5–7, 24

*Proceedings and Debates of the 114th Congress, Second Session: Congressional Record—Extension of Remarks*,
162 Cong. Rec. E836-01 (June 7, 2016) ...................................... 9, 16

*Proceedings and Debates of the 114th Congress, Second Session: TSCA Modernization Act of 2015*,
162 Cong. Rec. S3511-01 (June 7, 2016) ........................................ 16

Staff of H. Comm. on Energy and Com., Subcomm. on Oversight and Investigations, 99th Cong., *EPA's Asbestos Regulations: Report on a Case Study on OMB Interference in Agency Rulemaking* (Comm. Print 1985) ................................................................................................ 12

S. Rep. No. 94-698 (1976) ............................................... 5–7, 19

## Executive Materials

EPA, Office of Pollution Prevention and Toxics, *Economic Analysis of the Proposed Regulation of Methylene Chloride Under TSCA Section 6(a)* (Apr. 2023) ............................................................................. 18

Exec. Order No. 12,291, 3 C.F.R. 127 (1981) ............................................ 3

Memorandum: Minutes of Meeting between the Office of Toxic Substances (OTS) and the Office of Management and Budget (OMB) Staff Concerning OTS Asbestos Program (Mar. 26, 1984) .............................. 10

Toxic Substances Control Act: Statement by the President on Signing S. 3149 into Law (Oct. 12, 1976) ................................................... 3

## Federal Register Notices

Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions,
54 Fed. Reg. 29460-01 (July 12, 1989) ............................................ 8

Commercial and Industrial Use of Asbestos Fibers and Consumer
Products Containing Asbestos; Statement of Policy on Coordination of
Regulatory Activities,
44 Fed. Reg. 60056 (Oct. 17, 1979) .................................................. 8


**Other Sources**

Charles Franklin & Allison Reynolds, *TSCA Reform and Preemption: A
Walk on the Third Rail*,
27 Nat. Res. & Env't 14, 17 (2012) ................................................ 15

*Discretion*, Black's Law Dictionary (12th ed. 2024)................................ 19

Granta Y. Nakayama, Case Note, Corrosion Proof Fittings v. EPA*: No
Death Penalty for Asbestos under TSCA*,
1 Geo. Mason Indep. L. Rev. 99 (1992)........................................... 14

Interview by Jody A. Roberts & Kavita D. Hardy with E. Donald Elliott,
former Gen. Couns., EPA, at Willkie Farr & Gallagher LLP, Washington,
D.C.,
Oral History Transcript No. 0686 (Jan. 22, 2010)........................ 14

Letter from Edward W. Warren, Kirkland & Ellis, to John A. Moore,
Assistant Adm'r, Off. of Pesticides and Toxic Substances, EPA (May 14,
1984).............................................................................................. 10

Letter from Lee M. Thomas, Adm'r, EPA, to Rep. John Dingell (Oct. 31,
1985).............................................................................................. 12

Letter from Rep. John Dingell to William D. Ruckelshaus, Adm'r, EPA
(July 9, 1984) ................................................................................ 11

Letter from Robert P. Bedell, Deputy Adm'r, Off. of Info. and Regul. Affs.,
to A. James Barnes, Acting Deputy Adm'r, EPA (Mar. 1985) ............... 10

Mark R. Powell, *The 1983-84 Suspensions of EDB Under FIFRA and the 1989 Asbestos Ban and Phaseout Rule under TSCA: Two Case Studies in EPA's Use of Science*,
     Res. for the Future, Discussion Paper No. 97-06 (Mar. 1997) ........ 8

Rachel Rothschild, *Unreasonable Risk: The Failure to Ban Asbestos and the Future of Toxic Substances Regulation*,
     47 Harvard Env't L. Rev. 529 (2023).................... 1, 8–12, 14–16, 18

## INTEREST OF AMICUS CURIAE

Professor Rachel Rothschild is a scholar of environmental law, history, and policy who currently serves as an assistant professor of law at the University of Michigan Law School.

In addition to teaching courses on environmental issues, Professor Rothschild has authored extensive scholarship on toxic substances regulation, pollution problems, and climate change litigation. Relevant here, she is the author of *Unreasonable Risk: The Failure to Ban Asbestos and the Future of Toxic Substances Regulation*, 47 Harvard Env't L. Rev. 529 (2023) ("Article"), which conducted a historic examination of the Environmental Protection Agency's ("EPA") 1989 asbestos ban issued under the Toxic Substances Control Act ("TSCA").

Before joining the Michigan Law faculty, Professor Rothschild was a legal fellow at the Institute for Policy Integrity, where she remains an affiliated scholar. Before that, she served as an assistant professor and faculty fellow at the New York University Gallatin School. Professor Rothschild holds a J.D. from New York University School of Law, a Ph.D. from Yale University's Program in the History of Science and Medicine, and a B.A. from Princeton University's Program in the History of Science.

1

Professor Rothschild has previously drawn on her historical scholarship to assist courts in evaluating challenges to EPA's regulatory authority. As an amicus curiae, she has highlighted the parallels between challenges to EPA's performance standards for sulfur dioxide emissions in the 1970s and recent challenges to the agency's performance standards for greenhouse gas emissions from power plants. *See* Brief for Amicus Curiae Professor Rachel Rothschild in Support of Respondents, *West Virginia v. EPA*, No. 24-1120 (D.C. Cir. Oct. 18, 2024).

This brief draws on Professor Rothschild's research to provide the Court with a more comprehensive understanding of TSCA and its 2016 amendments. As this brief explains, TSCA's text and history undermine East Fork Enterprises, Inc., Epic Paint Co., and American Chemistry Council's ("Industry Petitioners") argument that TSCA should be used *only* as a last resort and their interpretation of "to the extent necessary," as that phrase appears in Section 6(a).[1]

---

[1] Professor Rothschild has authority to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to its filing. Professor Rothschild's counsel authored the brief in whole, no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION

When President Ford signed TSCA into law in 1976, he called it "one of the most important pieces of environmental legislation that has been enacted by the Congress." Toxic Substances Control Act: Statement by the President on Signing S. 3149 into Law (Oct. 12, 1976). In contrast to the array of narrowly focused federal environmental laws existing at that time, TSCA granted EPA with "broad discretionary authority" to "provide comprehensive protection" through chemical regulation. *Id.*

Of course, any hope that TSCA would provide much needed toxic substances regulation was short-lived. After this Court vacated EPA's asbestos ban in 1991, TSCA became a dead letter and EPA did not utilize its authority under Section 6 to remove any existing chemicals from use. As a result, TSCA sat dormant for twenty-five years until a bipartisan Congress amended the statute in 2016. This case presents one of the first opportunities for a court to assess EPA's authority under the reformed and fortified TSCA.

Industry Petitioners levy several assaults against EPA's methylene chloride regulation. Chief among them are the arguments that EPA was required to refer methylene chloride to the Occupational Safety and

Health Administration ("OSHA") and that EPA was prohibited from banning certain uses of the chemical. Both challenges are meritless.

First, Industry Petitioners claim that EPA was *required* to refer methylene chloride to OSHA ignores that EPA's referral obligation is triggered under Section 9 of TSCA only upon a determination made in EPA's discretion. *See* 15 U.S.C. § 2608. It also ignores legislative history demonstrating Congress's intent to provide EPA with comprehensive authority to issue chemical regulations in the first instance. *Infra* 18–22.

Second, Industry Petitioners' interpretation of "to the extent necessary" in Section 6, *see* 15 U.S.C. § 2605, is a brazen attempt to eliminate the discretion that Congress granted EPA in the 2016 amendments and resuscitate the limiting effect of TSCA's "least burdensome" requirement. But Congress struck that requirement when it amended TSCA in 2016, and it would run contrary to all interpretative norms to read "to the extent necessary" as limiting EPA to a single risk management option—particularly when the phrase is more naturally read as a *floor* for EPA's authority, not a ceiling. *Infra* 22–28.

For the reasons explained below, Industry Petitioners' arguments are unsupported by TSCA's text and legislative history.

## ARGUMENT

### I.    A History of TSCA and Its Amendments

#### a.    The purpose and passage of 1976 TSCA

Before 1976, no federal law allowed for comprehensive regulation of chemicals throughout their lifecycle. That changed with the enactment of TSCA. *See* Toxic Substances Control Act of 1976, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. §§ 2601–2629) ("1976 TSCA").

Recognizing the inefficacies of the then-existing fragmented federal regulatory regime, Congress saw a need to provide EPA with centralized authority to regulate chemicals.[2] A Senate report noted that because other laws (*e.g.*, the Clean Air Act, the Clean Water Act, the Occupational Safety and Health Act, and the Consumer Product Safety Act) allowed agencies to operate only "within their jurisdiction in isolation from other

---

[2] *See, e.g.*, *Proceedings and Debates of the 94th Congress: Toxic Substances Control Act*, 122 Cong. Rec. S4397, S4397 (Mar. 26, 1976) (statement of Sen. John Tunney) (noting that TSCA "will close major gaps in the law that leave the public inadequately protected against the unregulated introduction of hazardous chemicals into the environment"); S. Rep. No. 94-698, at 89 (1976) (views of Sen. Howard Baker) ("There is clearly a need for regulatory authority which can, where possible, identify and control the introduction of harmful substances into the environment before damage to health or the environment occurs. This bill permits regulation of toxic chemicals at points in the chain of manufacture and use that are impossible to reach under existing laws.").

5

hazards associated with the same chemical," no agency had "authority to look comprehensively at the hazards associated with the chemical." S. Rep. No. 94-698, at 1–2 (1976).[3] Because "the alternative of preventing or regulating the use of the chemical *in the first instance* may be a far more effective way of dealing with the hazards," Congress intended to give EPA the authority "to look at the hazards in total." *Id.* (emphasis added).

Congress enacted Section 9, titled "Relationship to other Federal laws," to codify this intent. 1976 TSCA at § 2608. Section 9(a)(1) provided that EPA should refer chemicals to other agencies for regulation only when it determined, "in the Administrator's discretion," that another law could sufficiently prevent or reduce a chemical risk. *Id.* § 2608(a)(1). EPA's discretion (which was not intended to be subject to judicial review),

---

[3] *See also Proceedings and Debates of the 94th Congress: Toxic Substances Control Act*, 122 Cong. Rec. S4397, S4400 (Mar. 26, 1976) (statement of Sen. James Pearson) ("Existing Federal legislation simply does not provide the means by which adverse effects on human health and the environment can be ascertained and appropriate action taken before chemical substances are first manufactured and introduced into the marketplace. At present, the only remedy available under such Federal statutes as the Clean Air Act, the [Clean Water] Act, the Occupational Safety and Health Act, and the Consumer Product Safety Act, is to impose restrictions on toxic substances after they have been first manufactured. The shortcomings in the present system have long been evident; corrective action, as evidenced, by [TCSA], is long overdue.").

H.R. Rep. No. 94-1679, at 84 (1976), allowed it to decide when to regulate chemicals directly without referral—a feature of TSCA necessary "to address the issue of controlling industrial chemicals as a means of preventing environmental degradation as an alternative to other forms of control." S. Rep. No. 94-698, at 11 (1976).

Industry members were concerned by the breadth of authority that TSCA would afford EPA. One expressed his belief that TSCA would go "far beyond the gap areas and overlap laws such as the Clean Air Act and the [Clean] Water Act," and should instead be "limited to gap areas not covered by other laws": "I feel this legislation should be operative only when a risk to health and the environment cannot be sufficiently presented or reduced by other Federal laws."[4] Nevertheless, the enacted language of Section 9—which exists today as it did in 1976—reflected Congress's intent to let EPA decide when to use TSCA in the first instance to regulate chemicals.

---

[4] *Proceedings and Debates of the 94th Congress: Toxic Substances Control Act*, 122 Cong. Rec. S4397, S4413 (Mar. 26, 1976) (letter to Sen. Strom Thurmond from Burton Cash, plant manager at Fiber Industries, Inc., dated January 19, 1976).

#### b.　　EPA's first attempt to regulate asbestos under TSCA

Asbestos dangers were widely known when TSCA was enacted, leading EPA to use asbestos as a "test case" for TSCA regulation. Article at 533.[5] EPA began working on asbestos regulation shortly after TSCA became law, issuing an advanced notice of proposed rulemaking in 1979. *See generally* Commercial and Industrial Use of Asbestos Fibers and Consumer Products Containing Asbestos; Statement of Policy on Coordination of Regulatory Activities, 44 Fed. Reg. 60056 (Oct. 17, 1979). However, it was not until 1989 that EPA finalized a regulation banning nearly all uses of asbestos. *See generally* Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29460-01 (July 12, 1989) (to be codified at 40 C.F.R. pt. 763).

The decade-long delay between EPA's advanced notice of proposed rulemaking and finalized regulation has often been wrongfully attributed to EPA's extensive scientific and economic analysis.[6] To be sure, EPA

---

[5] *See also* Mark R. Powell, *The 1983-84 Suspensions of EDB Under FIFRA and the 1989 Asbestos Ban and Phaseout Rule under TSCA: Two Case Studies in EPA's Use of Science*, Res. for the Future, Discussion Paper No. 97-06 at 16 (Mar. 1997).

[6] *See, e.g., Oversight Hearing on the Federal Toxic Substances Control Act: Joint Hearing before the Subcomm. on Superfund, Toxics, and Env't Health and the Comm. on Env't and Pub. Works & the S. Comm. on Env't*

invested significant efforts and resources into collecting and analyzing scientific data and conducting expert analysis. *See* Article at 551. But this work did not take ten years to complete. Rather, the primary source of delay was interference by the Office of Management and Budget ("OMB").

President Reagan's Executive Order 12,291 authorized OMB to review every "regulatory impact analysis" completed by any agency for all "major" rules—and the power to prevent regulations from being issued where it determined that the rule's benefits did not outweigh its costs. Exec. Order No. 12,291 § 3, 3 C.F.R. 127, 128–30 (1981). OMB used that authority to influence EPA's rulemaking processes.[7] Accordingly, after receiving EPA's asbestos regulation regulatory impact analysis in March 1984, OMB orchestrated a multi-faceted political strategy that greatly

---

*and Pub. Works*, 111th Cong. 173, 173 (2009) (statement of Rep. Max Baucus) (referring to EPA's "10-year analysis" and accompanying "45,000-page record produced by EPA"); *Proceedings and Debates of the 114th Congress, Second Session: Congressional Record—Extension of Remarks*, 162 Cong. Rec. E836-01 (June 7, 2016) (speech of Rep. Keith Ellison) (referring to EPA's "10 years of research" and the "more than 100,000 pages of administrative record supporting action").

[7] *See, e.g.*, *EPA's Asbestos Regulations, Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Com.*, 99th Cong. 233, 2 (1985) (describing Congress's concern from 1981 to 1984 that OMB was improperly obstructing EPA).

contributed to EPA's delay in finalizing its asbestos ban. *See* Article at 550–67 (detailing OMB's interference with the regulatory process).

One of OMB's tactics was to assert that Section 9 of TSCA *required* EPA to refer chemicals (*e.g.*, asbestos) to other agencies (*e.g.*, OSHA) for regulation where other federal laws could sufficiently address risks posed by those chemicals.[8] OMB's interpretation of Section 9 as a statute of last resort—which was originated by pro-industry lobbyists[9]—was certainly not how EPA (nor even OSHA itself) read Section 9. *See* Article at 558.[10]

Yet, under immense pressure from OMB and political appointees, EPA reversed course. *See* Article at 558–59 & nn.165–67. EPA released

---

[8] *See* Letter from Robert P. Bedell, Deputy Adm'r, Off. of Info. and Regul. Affs., to A. James Barnes, Acting Deputy Adm'r, EPA (Mar. 1985) at 4 (on file in Folder "July 13–23, 1985," Moore Papers, National Archives Identifier: 76018974, Box 8 of 13, National Archives) (asserting that Section 9 "does not allow EPA to disregard the referral mechanism on its own conclusion" because "Congress decided that TSCA is a 'gap-filling' statute" and "EPA must submit such matters to those other agencies").

[9] *See* Letter from Edward W. Warren, Kirkland & Ellis, to John A. Moore, Assistant Adm'r, Off. of Pesticides and Toxic Substances, EPA (May 14, 1984), at 2 (on file in Folder "July 2–13, 1984," Moore Papers, National Archives Identifier: 76018974, Box 4 of 13, National Archives).

[10] *See* Memorandum: Minutes of Meeting between the Office of Toxic Substances (OTS) and the Office of Management and Budget (OMB) Staff Concerning OTS Asbestos Program (Mar. 26, 1984) at 2 (on file in Folder "May 1–18, 1984", Moore Papers, National Archives Identifier: 76018974, Box 3 of 13, National Archives).

a policy statement and press release stating its position that Section 9 "mandated" its referral of asbestos to OSHA.[11] When the dust settled, it seemed that OMB's maneuver had worked. By holding EPA's asbestos regulation hostage, OMB was able to force EPA to endorse an outlier reading of Section 9 that undermined EPA's own authority.

But OMB could not celebrate for long. When OMB's interference came to light, members of Congress were furious. An investigation led by Representative John Dingell was launched into the "inappropriate" debate concerning EPA's asbestos regulation.[12] *See* Article at 565. The House Subcommittee on Oversight and Investigations within the Energy and Commerce Committee ultimately released a report concluding that OMB had used the Section 9 referral process as a pretext to block the

---

[11] *EPA's Asbestos Regulations, Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Com.*, 99th Cong. 233, 390–91, 396 (1985) (noting that EPA "completely reversed" its interpretation of Section 9 on February 1, 1985, shortly after receiving a memorandum from OBM advocating the same position); *see also id.* at 1–2 (statement of Rep. John Dingell) (lamenting that EPA's "new interpretation of section 9 was apparently inspired in some divine fashion during meetings with OMB officials").

[12] Letter from Rep. John Dingell to William D. Ruckelshaus, Adm'r, EPA (July 9, 1984) at 1 (on file in Folder "August 1–20, 1984," Moore Papers, National Archives Identifier: 76018974, Box 4 of 13, National Archives).

asbestos rule over concerns about its cost to industry. *Id.* at 565–66.[13]

Shortly after the report was released, EPA took the position that OMB's

interpretation of Section 9 was wrong.[14]

### c.   This Court's *Corrosion Proof Fittings* decision

Despite the political and procedural roadblocks that delayed EPA's

rulemaking process for years, EPA finally issued its asbestos ban in 1989.

*See supra* 5. The regulation was quickly challenged by the asbestos

industry and the Canadian government, culminating in this Court's

decision in *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991).

Though *Corrosion Proof Fittings* upheld EPA's "basic decision to use

TSCA as a comprehensive statute designed to fight a multi-industry

problem," *id.* at 1216, it vacated EPA's asbestos ban and remanded to

EPA for further proceedings, *id.* at 1230. Most of this Court's analysis

centered around EPA's approach to assessing costs and benefits of its

regulation. *See* Article at 578. Relevant here, this Court faulted EPA for

---

[13] *See* Staff of H. Comm. on Energy and Com., Subcomm. on Oversight and Investigations, 99th Cong., *EPA's Asbestos Regulations: Report on a Case Study on OMB Interference in Agency Rulemaking* 26–27 (Comm. Print 1985).

[14] *See* Letter from Lee M. Thomas, Adm'r, EPA, to Rep. John Dingell (Oct. 31, 1985) (on file in Folder "November 1–14, 1985," Moore Papers, National Archives Identifier: 76018974, Box 10 of 13, National Archives).

failing to assess the costs and benefits of alternatives to a ban given the "least burdensome" language in Section 6 of TSCA. 947 F.2d at 1216 (criticizing EPA for failing to "calculat[e] how many lives a less burdensome regulation would save, and at what cost"); *see also* 1976 TSCA at § 2605(a) (requiring EPA to use the "least burdensome" requirement to protect against qualifying risks). While this Court noted that the "least burdensome" language required EPA to show "that there is not some intermediate state of regulation that would be superior to both the currently-regulated and the completely-banned world," it went even further, stating that "EPA's regulation cannot stand if there is *any* other regulation that would achieve an acceptable level of risk as mandated by TSCA." 947 F.2d at 1216–17 (emphasis added).

This Court's "least burdensome" interpretation required EPA to demonstrate that its regulation was *definitively* the least burdensome rule that could achieve a similar level of risk reduction. Commentators and EPA officials viewed this holding as imposing an unworkable burden

on EPA.[15] As described below, this aspect of *Corrosion Proof Fittings* became a focal point of efforts to amend TSCA.

### d.   TSCA's 2016 amendments and the removal of the "least burdensome" requirement

After *Corrosion Proof Fittings*, EPA never again attempted to prohibit the use of a chemical under Section 6 of 1976 TSCA. *See* Article at 534. While there were several reasons for EPA's inaction, many viewed the failure of the asbestos regulation as convincing evidence that TSCA was flawed beyond repair. *Id.*[16]

---

[15] *See, e.g.*, Granta Y. Nakayama, Case Note, Corrosion Proof Fittings v. EPA*: No Death Penalty for Asbestos under TSCA*, 1 Geo. Mason Indep. L. Rev. 99, 118–19 (1992) ("A strict limitation of TSCA's statutory reach"—which this Court appeared to apply in *Corrosion Proof Fittings*—"to the single least burdensome regulation would eviscerate TSCA as a toxic substance control device," as "[p]etitioners would be free to posit a different regulation, slightly narrower in scope, which could arguably result in a similar reduction in toxic substance exposure."); Interview by Jody A. Roberts & Kavita D. Hardy with E. Donald Elliott, former Gen. Couns., EPA, at Willkie Farr & Gallagher LLP, Washington, D.C., Oral History Transcript No. 0686, at 7 (Jan. 22, 2010) (on file in The Science History Institute (formerly Chemical Heritage Foundation)), Philadelphia, PA) (explaining that "show[ing] in the record that [EPA has] considered every other possible way of regulating and this is the least drastic one available" is an "impossible and impractical burden").

[16] With respect to asbestos specifically, EPA's decision not to reissue its ban can be traced to demoralization, lack of support from central political appointees, and industry's voluntary phaseouts of key asbestos uses. *See* Article at 584–86. More generally, TSCA was viewed by many as a dead letter based on the misassumption that EPA had spent a decade

Calls for statutory reform initially failed to gain traction, as there was little Republican support for amending TSCA to give EPA greater regulatory authority. *Id.* But that changed when Republicans began to feel industry pressure in response to the ever-increasing state-level chemical regulations that lacked uniformity (creating a compliance nightmare). *Id.* at 534–35.[17]

After prolonged political negotiations, TSCA was amended at last (and for the first time) in 2016 with bipartisan support in both houses. *Id.* at 535; *see also generally* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (codified at 15

---

developing a cost-benefit analysis—if that was not enough to persuade a court, what chance did EPA have of regulating other existing chemicals? *See e.g.*, *id.* at 534, 550 & nn.34, 115–16; *but see id.* at 550–67 (explaining that the delay was caused by "political machinations and procedural roadblocks—not technical research").

[17] *See, e.g.*, *Assessing the Effectiveness of U.S. Chemical Safety Laws, Hearing before the Subcomm. on Superfund, Toxics and Env't Health of the Comm. on Env't and Pub. Works*, 112th Cong. 72 (2011) (statement of Cal Dooley, President and CEO, American Chemistry Council); *see also* Charles Franklin & Allison Reynolds, *TSCA Reform and Preemption: A Walk on the Third Rail*, 27 Nat. Res. & Env't 14, 17 (2012).

U.S.C. §§ 2601–2629). The 2016 amendments focused on Section 6 and the scope of federal preemption. *See* Article at 545–50.[18]

Among other changes it made to Section 6, Congress struck the "least burdensome" requirement. *Compare* 1976 TSCA at § 2605(a) *with* 15 U.S.C. § 2605(a). This revision—like many others affecting Section 6— was a direct response to *Corrosion Proof Fittings. See* Article at 545. As one representative put it, reform was necessary because *Corrosion Proof Fittings*' "least burdensome" interpretation created an "insurmountable" burden for EPA to regulate under TSCA.[19] The "least burdensome"

---

[18] The 2016 amendments left unchanged Section 9's grant of discretion to EPA to determine whether to refer a chemical to another agency for regulation. *See* 15 U.S.C. § 2608(a)(1) (continuing to condition EPA's referral on a determination made "in the Administrator's discretion"); *see also Proceedings and Debates of the 114th Congress, Second Session: TSCA Modernization Act of 2015*, 162 Cong. Rec. S3511-01, S3517 (June 7, 2016) ("Detailed Analysis and Additional Views of Democratic Members on the Motion to Concur in the House Amendment to the Senate Amendment to the Bill H.R. 2576 Entitled 'An Act to Modernize the Toxic Substances Control Act, and for Other Purposes' June 7, 2016") (recognizing that "[n]one of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner").

[19] *Proceedings and Debates of the 114th Congress, Second Session: Congressional Record—Extension of Remarks*, 162 Cong. Rec. E836-01, E836 (June 7, 2016) (speech of Rep. Keith Ellison).

requirement was characterized by others as an "impossible analytical burden" that "came to light only through litigation,"[20] and that "prevented EPA from regulating chemicals."[21] An analysis submitted by a group of senators recognized that the deletion of the "paralyzing 'least burdensome' requirement . . . reject[ed] the regulatory approach and framework" that led to *Corrosion Proof Fittings*.[22] Under the amended Section 6, the senators explained, EPA was *not* required "to definitively determine or select the least-cost alternative, or to select an option that is demonstrably cost-effective or is the least burdensome adequately protective option."[23]

---

[20] *Proceedings and Debates of the 114th Congress, Second Session: TSCA Modernization Act of 2015*, 161 Cong. Rec. H4551-01, H4556 (June 23, 2015) (statement of Rep. Frank Pallone).

[21] *Proceedings and Debates of the 114th Congress, Second Session: TSCA Modernization Act of 2015*, 162 Cong. Rec. H2989-02, H3027 (May 24, 2016) (statement of Rep. Paul Tonko).

[22] *Proceedings and Debates of the 114th Congress, Second Session: TSCA Modernization Act of 2015*, 162 Cong. Rec. S3511-01, S3517 (June 7, 2016) ("Detailed Analysis and Additional Views of Democratic Members on the Motion to Concur in the House Amendment to the Senate Amendment to the Bill H.R. 2576 Entitled 'An Act to Modernize the Toxic Substances Control Act, and for Other Purposes' June 7, 2016").

[23] *Id.*

As this history shows, the purpose of Congress's removal of the "least burdensome" requirement from Section 6 of TSCA was to eliminate the impracticable burden *Corrosion Proof Fittings* placed on EPA.[24]

## II. TSCA's Text and History Undermine Industry Petitioners' Arguments

### a. The language and history of Section 9 demonstrate that TSCA is not simply a statute of last resort.

TSCA was intended, in part, to close regulatory gaps that had been created by federal laws existing before its enactment. *See supra* n.2. But it would be a mistake to interpret TSCA as being *solely* relegated to a "gap-filler" role, such that it can only be used if all other statutes would fail to adequately address a given chemical risk. *See, e.g.*, Opening Brief for Petitioners ("Ind. Pets. Br.") at 57 (asserting that EPA "should" have "referr[ed] the matter to OSHA . . . under TSCA section 9(a)").

---

[24] Notably, with respect to methylene chloride, EPA evaluated the impact of three alternatives across an extensive amount of uses—satisfying cost-benefit analysis best practices. *See generally* EPA, Office of Pollution Prevention and Toxics, *Economic Analysis of the Proposed Regulation of Methylene Chloride Under TSCA Section 6(a)* (Apr. 2023); *see also* Article at 580 & n.301 ("While there is no set number of alternatives that an agency should examine, an appropriate number then and now is typically three or four . . . .").

Any argument that TSCA is a statute of last resort is undermined by the fact that Section 9 conditions EPA's referral of chemicals to other agencies on a determination made "in the Administrator's *discretion*." 15 U.S.C. § 2608(a)(1) (emphasis added). This discretionary grant gives EPA the power to decide when a referral must occur. *See Discretion*, Black's Law Dictionary (12th ed. 2024) (defining "discretion" as "[f]reedom in the exercise of judgment; the power of free decision-making," and "administrative discretion" as "[a] public official's or agency's power to exercise judgment in the discharge of its duties"). EPA is thus solely in control over whether it regulates a chemical at the outset or whether it refers a chemical to another agency under Section 9.

In addition to its unambiguous language, TSCA's legislative history supports reading Section 9 as providing EPA with affirmative regulatory authority. As discussed, Congress intended for EPA to regulate chemicals "in the first instance." S. Rep. No. 94-698, at 2 (1976); *see also supra* 6. Congress ensured that EPA would be able to decide when to exercise such authority by conditioning its referral obligation on a discretionary decision (insulated from judicial review) *made by EPA. See* H.R. Rep. No. 94-1679, at 84 (1976). This legislative history undermines any suggestion

19

that Congress intended to require EPA to refer chemicals to other agencies under Section 9 against its will.

Industry Petitioners do not address, or even acknowledge, this history. Instead, they rely primarily on legislative remarks made *in 2015* relating to TSCA's amendments. *See* Ind. Pets. Br. at 58 (citing H.R. Rep. No. 114-176 (2015)). But the relevant language of Section 9 has existed, unaltered, since it was enacted in 1976, and "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). Indeed, the very report Industry Petitioners cite recognized that the original 1976 language granting EPA discretion was not being amended. *See* H.R. Rep. No. 114-176, at 290 (recognizing that "no amendment to TSCA section 9(a)" was being proposed).

The only timely piece of legislative history Industry Petitioners cite (a 1976 conference report) is inapplicable. *See* Ind. Pets. Br. at 58. The statement of Representative Broyhill concerned Section 9(b), which governs TSCA's relationship with other EPA-administered laws, not Section 9(a), which governs TSCA's relationship with laws EPA does not

20

administer.[25] In any event, as another representative stated immediately after Representative Broyhill, Section 9(b) also conditions EPA's use of other EPA-administrated laws on its own discretionary determination.[26]

Finally, Industry Petitioners suggest EPA "originally understood" that TSCA could not be used in certain situations. Ind. Pets. Br. at 58. That is wrong. When it first attempted to regulate asbestos, EPA actually understood that Section 9 afforded it discretion to determine whether to refer asbestos to another agency. *See supra* 10. Only when faced with massive pressure from OMB and political appointees did EPA capitulate and adopt the legal position that Section 9 "mandated" EPA's referral of asbestos to OSHA. *See id.* at 10–11. EPA ultimately returned to its original reading of Section 9 after Congress openly rebuked OMB's interference with EPA's rulemaking and its weaponization of Section 9. *See id.* at 11–12.

---

[25] *See Proceedings and Debates of the 94th Congress: Conference Report on S. 3149, Toxic Substances Control Act*, 122 Cong. Rec. H11343, H11344 (Sept. 28, 1976) (statement of Rep. James Broyhill). Elsewhere in the report, Representative Broyhill referred to TSCA as providing EPA with "awesome, new responsibilities" and "extensive and wide-ranging authorities to regulate all aspects of the chemical industry." *Id.*

[26] *See id.* (statement of Rep. Harley Staggers).

21

The text and legislative history of Section 9 make clear that TSCA does not mandate that EPA defer to other agencies. While the statute closed gaps in the regulatory framework existing at the time, it also provided EPA with broad discretion to decide when to issue comprehensive regulation in the first instance. The statute's consistent use of the word "discretion" in Section 9 since its enactment demonstrates that Congress intended for EPA to determine, in its sole judgment, whether it needed to refer chemicals to other agencies. Relevant congressional statements further support this reading of Section 9. This Court should therefore decline to treat TSCA as a statute of last resort.

**b.    Industry Petitioners' attempt to revive the "least burdensome" requirement should be rejected.**

TSCA requires EPA to regulate chemicals "to the extent necessary" so that they no longer present unreasonable risk. 15 U.S.C. § 2605(a). Yet, Congress amended TSCA in 2016 to ensure that EPA had authority to determine how to comply with that mandate, rather than requiring EPA to select the "least burdensome" risk management option. Industry Petitioners attempt to eliminate EPA's discretion and revive the very restrictions on its authority that Congress rejected in 2016.

Industry Petitioners argue that EPA cannot prohibit uses of methylene chloride if other, less "burdensome" means of regulation are available. Ind. Pets. Br. at 57 & n.19.[27] They read "to the extent necessary" to constrain EPA to the *single* regulatory option that imposes the least "extent" of regulation. *Id.* at 57; *see also id.* at 56 (arguing that EPA is only allowed to regulate "no more than [is] necessary to achieve" the elimination of unreasonable risk).[28] This argument flies in the face of TSCA's 2016 amendments and Congress's intent. If this Court finds occasion to reach this issue, it should reject Industry Petitioners' position.

---

[27] To be sure, EPA's methylene chloride rule prohibited uses of the chemical only "where the record did not support that a sector could comply with [a Workplace Chemical Protection Plan]. It allowed continued use where the record demonstrated compliance with WCPP was feasible and would address the unreasonable risk." Brief of Respondents at 37. If this Court agrees with EPA's approach, then EPA's rule satisfies even Industry Petitioners' interpretation of Section 6.

[28] Any doubt that Industry Petitioners are attempting to replicate the effects of the stringent "least burdensome" requirement is dispelled by their frequent invocation of *Corrosion Proof Fittings*, *see, e.g.*, Ind. Pets. Br. at 55, which held that EPA was required to "choose the least burdensome method" of reaching an acceptable non-zero risk level, 947 F.2d at 1215. Contrary to Industry Petitioners' suggestion, *Corrosion Proof Fittings* emphasized that this requirement derived from Section 6's "least burdensome" language—not the phrase "to the extent necessary." *See* 947 F.2d at 1215–17.

To start, given that Industry Petitioners ask this Court to read "to the extent necessary" to cause the same result as the "least burdensome" requirement (*i.e.*, forcing EPA to select a single risk management option), they apparently believe that Congress intentionally added superfluity into 1976 TSCA when it included both phrases in Section 6. Of course, it is "an elementary canon of construction that when Congress uses different terms, each term is to have a particular, nonsuperfluous meaning." *Silva-Trevino v. Holder*, 742 F.3d 197, 203 (5th Cir. 2014) (quotation marks and alterations omitted) (quoting *Bailey v. United States*, 516 U.S. 137, 146 (1995)). Industry Petitioners would have this Court ignore that canon and conclude that Congress meant to inject redundancy into 1976 TSCA, such that the removal of the "least burdensome" requirement has no impact on EPA's Section 6 burden.[29]

Industry Petitioners would similarly have this Court ignore that Congress deleted the "least burdensome" requirement when it amended TSCA in 2016, but not the phrase "to the extent necessary." As the

---

[29] In fact, the "least burdensome" requirement was specifically added to prevent EPA from exercising "unlimited authority." *Proceedings and Debates of the 94th Congress: Toxic Substances Control Act*, 122 Cong. Rec. S4397, S4411 (March 26, 1976) (statement of Sen. Howard Cannon).

24

legislative history shows, Congress removed the "least burdensome" requirement to abrogate *Corrosion Proof Fittings*' holding that the requirement limited EPA to selecting a single risk management option, *see supra* 13—the exact meaning Industry Petitioners now impute to "to the extent necessary."[30] If both terms mean the same thing, as Industry Petitioners contend, it would have made no sense for Congress to eliminate one but not the other from Section 6.[31]

Rather than attributing redundancy, carelessness, and futility to Congress—as Industry Petitioners' approach would require—the more

---

[30] Industry Petitioners suggest that *Corrosion Proof Fittings* interpreted "to the extent necessary" as a requirement that EPA determine an acceptable level of non-zero risk "and regulate only to that point." Ind. Pets. Br. at 55. This Court did no such thing. *See Corrosion Proof Fittings*, 947 F.2d at 1215 (emphasizing that Section 6's requirement that EPA "choose the least burdensome method" of reaching an acceptable non-zero risk level derived from the "least burdensome" requirement).

[31] Nor can Industry Petitioners logically assert that the phrase "to the extent necessary" imposes a *different* limitation than the "least burdensome" requirement. This Court interpreted the latter as requiring EPA to select "*the* least burdensome alternative." *Corrosion Proof Fittings*, 947 F.2d at 1220 (emphasis added). And Industry Petitioners read "to the extent necessary" as requiring EPA to select *the* no-more-than-strictly-necessary option. *See* Ind. Pets. Br. at 56–57. Thus, both limitations require EPA to adopt a single specific regulatory option. If those two regulatory options were different, EPA would be unable to comply with both limitations simultaneously.

natural reconciliation of Congress's actions is that "to the extent necessary" doesn't mean what Industry Petitioners says it means. In *Huffman v. Western Nuclear, Inc.*, the Supreme Court reversed the Tenth Circuit but approvingly cited its holding that the phrase "to the extent necessary" sets a *floor* for "the amount of [agency] restriction required," not a ceiling. 486 U.S. 663, 664 (1988) (emphasis added); *see also W. Nuclear, Inc. v. Huffman*, 825 F.2d 1430, 1439 (10th Cir. 1987) ("If a less-than-100% restriction can assure viability, only that lesser level of restriction *is required*." (emphasis added)), *rev'd on other grounds*, 486 U.S. 663 (1988). Applying that meaning here, Section 6 requires EPA to regulate *at least* to ensure that a chemical no longer presents an identified unreasonable risk. *See* 15 U.S.C. § 2605(a).

Other parts of Section 6 cast further doubt on Industry Petitioners' interpretation. For example, while Section 6(a) requires EPA to regulate at least "to the extent necessary," Section 6(c)(2)(E) requires EPA to regulate articles and categories of articles "*only* to the extent necessary." 15 U.S.C. § 2605(c)(2)(E) (emphasis added). Congress's inclusion of the word "only" in Section 6(c)(2)(E) but not Section 6(a) is a significant distinction that Industry Petitioners disregard. *See* Ind. Pets. Br. at 56

26

(asserting that "to the extent necessary" means that EPA "can *only* regulate 'no more than was necessary to achieve' the stated goal" (emphasis added)). If Congress meant for Section 6(a) to restrict EPA to regulate *only* "to the extent necessary," as Industry Petitioners argue, it would have used the word "only," just as it did in Section 6(c)(2)(E). *Cf. State Nat. Ins. Co. Inc. v. Yates*, 391 F.3d 577, 580–81 (5th Cir. 2004). Congress's intentional decision to use these two different phrases in Section 6 thus undermines Industry Petitioners' proposed interpretation.

Industry Petitioners' approach would interject surplusage not just into Section 6(c)(2)(E), but also Section 6(c)(2)(A) and Section 6(c)(2)(B). Section 6(c)(2)(B) provides that, when "selecting among prohibitions and other restrictions," EPA "shall factor in, to the extent practicable," a list of considerations set forth in Section 6(c)(2)(A). Industry Petitioners' restrictive reading of "to the extent necessary" would limit EPA's risk management option selection to a single option, rendering meaningless the option-selection authority contemplated by Section 6(c)(2)(B) and the corresponding consideration of the Section 6(c)(2)(A) factors.

By requiring EPA to regulate "to the extent necessary" to eliminate unreasonable risk while removing the mandate that it do so using the

27

"least burdensome" means, Congress empowered EPA to exercise its judgment in deciding how to attain TSCA's mandated risk reduction. Industry Petitioners' attempt to shoehorn the "least burdensome" requirement into the current statute is at odds with the statute's text and history and should be rejected.

## CONCLUSION

Industry Petitioners' challenges to EPA's methylene chloride rule raise significant and novel questions about EPA's authority under TSCA. This brief provides this Court with an in-depth analysis of TSCA's language and history, which are integral to the evaluation of those issues. For the reasons above, this Court should not treat TSCA as a mere statute of last resort and should reject Industry Petitioners' attempt to revive the deliberately excised "least burdensome" requirement.

# CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2025, I electronically filed the foregoing Brief of Professor Rachel Rothschild as Amicus Curiae in Support of Respondents using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Evan Bianchi*
Evan Bianchi

## CERTIFICATE OF COPMLIANCE

This brief complies with the type-volume limit of <u>Federal Rule of Appellate Procedure 29(a)(5)</u> because, excluding the parts of the document exempted by <u>Federal Rule of Appellate Procedure 32(f)</u> and Fifth Circuit Rule 32.2, it contains 6,236 words.

This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Evan Bianchi*
Evan Bianchi