No. 24-60227

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

EAST FORK ENTERPRISES, INCORPORATED; EPIC PAINT COMPANY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
JAMES PAYNE, Acting Administrator, United States Environmental Protection
Agency,

Respondents,

Consolidated with No. 24-60256

EAST FORK ENTERPRISES, INCORPORATED;
EPIC PAINT COMPANY; SIERRA CLUB;
AMERICAN CHEMISTRY COUNCIL,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
JAMES PAYNE, Acting Administrator, United States Environmental Protection
Agency,

Respondents,

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 39,254 (May 8, 2024)

**PETITIONER SIERRA CLUB'S REPLY BRIEF**

Filed: January 24, 2025

*/s/ Jonathan Kalmuss-Katz*
Jonathan Kalmuss-Katz
Lakendra S. Barajas
Earthjustice
48 Wall Street Floor 15
New York, New York 10005
T: 212-823-4989
T: 212-284-8025
jkalmusskatz@earthjustice.org
lbarajas@earthjustice.org

*Attorneys for Petitioner Sierra Club*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................... iii

TABLE OF AUTHORITIES ....................................................... v

INTRODUCTION ............................................................... 1

ARGUMENT ................................................................... 2

I. EPA VIOLATED TSCA'S REQUIREMENT TO DETERMINE AND
   ELIMINATE METHYLENE CHLORIDE'S UNREASONABLE RISKS TO
   FENCELINE COMMUNITIES ................................................. 2

   A. EPA Admits It Left Fenceline Communities Exposed to High Cancer
      Risks, Without Determining Whether Those Risks Are Unreasonable .... 2

   B. EPA's Defense of the Methylene Chloride Rule Is Contrary to TSCA .... 3

   C. To The Extent the Court May Consider It, ACC's Defense of the
      Methylene Chloride Rule Is Also Contrary to TSCA ................... 5

II. EPA AND ACC MISCONSTRUE PETITIONER'S ARGUMENT
    CONCERNING EPA'S DEPARTURE FROM ITS FENCELINE
    ASSESSMENT METHODOLOGY ............................................... 13

III. EPA CONTINUES TO UNDERSTATE FENCELINE COMMUNITY
     RISKS ................................................................ 17

   A. The Methylene Chloride Rule Fails to Protect People Who are Exposed
      to Methylene Chloride from Multiple Sources ....................... 17

   B. The Methylene Chloride Rule Fails to Protect People Whose Genetic
      Structure Leaves Them More Susceptible to Methylene Chloride's
      Risks ............................................................. 20

IV. EPA VIOLATED TSCA'S REQUIREMENT TO EVALUATE AND
    DETERMINE THE RISKS CAUSED BY METHYLENE CHLORIDE'S
    DEPLETION OF THE OZONE LAYER ......................................... 22

   A. EPA's Claim That Methylene Chloride Cannot Deplete the Ozone Layer
      Is Inconsistent with Prior EPA Positions and Unsupported by Substantial
      Evidence .......................................................... 22

   B. Sierra Club Has Standing to Pursue Its Ozone Claim ............... 27

V. EPA'S LEGAL ERRORS ARE NOT HARMLESS .................................. 30

CONCLUSION ................................................................ 32

CERTIFICATE OF SERVICE ..................................................................................33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ..................34

CERTIFICATIONS UNDER ECF FILING STANDARDS.....................................35

**TABLE OF AUTHORITIES**

## Cases

*Brown Express, Inc. v. United States*,
607 F.2d 695 (5th Cir. 1979) ..............................................................14

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ............................................................................23

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .................................................................... 14, 16

*ExxonMobil Pipeline Co. v. Landry,* No. 15-824-JWD-EWD,
2016 WL 320153 (M.D. La. Jan. 26, 2016) ......................................24

*Kinetica Partners, LLC v. U.S. Dep't of the Interior*,
505 F. Supp. 3d 653 (S.D. Tex. 2020) ........................................ 27, 29

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................................8

*Luminant Generation Co. v. EPA*,
675 F.3d 917 (5th Cir. 2012) ...................................................... 6–7, 23

*McCardell v. U.S. Dep't of Housing & Urban Dev.*,
794 F.3d 510 (5th Cir. 2015) ..............................................................29

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................6

*Nat. Res. Def. Council v. Thomas*,
805 F.2d 410 (D.C. Cir. 1986) .................................................... 12–13

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) .............................................................27

*Noranda Alumina, L.L.C. v. Perez*,
841 F.3d 661 (5th Cir. 2016) ........................................................ 6, 14

*Safer Chems., Healthy Fams. v. EPA*,
943 F.3d 397 (9th Cir. 2019) ...........................................................8–9

v

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Env't Quality*,
968 F.3d 419 (5th Cir. 2020) ........................................................ 29–30

*Smith v. Am. Pain & Wellness, PLLC*, No. 4:23-CV-295,
2024 WL 4028050 (E.D. Tex. Sept. 3, 2024) ...................................29

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..........................................................................27

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) ............................................................26

*U.S. Steel Corp. v. EPA*,
595 F.2d 207 (5th Cir. 1979)..................................................... 12, 30

*Wages & White Lion Invs., L.L.C. v. FDA*,
16 F.4th 1130 (5th Cir. 2021)...........................................................26

*Wages & White Lion Invs., L.L.C. v. FDA.*,
90 F.4th 357 (5th Cir. 2024).................................................... 30–31

**Statutes**

15 U.S.C. § 2602(12) .................................................................. 17, 20

15 U.S.C. § 2605(a)...................................................................... *passim*

15 U.S.C. § 2605(b)(4) ........................................................................1

15 U.S.C. § 2605(b)(4)(A) ............................................................ *passim*

15 U.S.C. § 2605(b)(4)(D).................................................................7, 8

15 U.S.C. § 2605(b)(4)(F)(i) ........................................................... 8, 27

15 U.S.C. § 2605(b)(4)(F)(ii)..............................................................18

15 U.S.C. § 2605(c)(1)(B) ..................................................................12

15 U.S.C. § 2618(c)(1)(B)(i)(1)..........................................................19

15 U.S.C. § 2625(h) ...........................................................................17

Toxic Substances Control Act, Pub. L. No. 94-469, 90 Stat. 2003 (1976)...............4

**Regulations**

40 C.F.R. § 702.33 ......................................................................................18

**Federal Register Notices**

Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA),
89 Fed. Reg. 21,970 (Mar. 28, 2024)....................................................13

Methylene Chloride; Regulation Under the Toxic Substances Control Act (TSCA),
88 Fed. Reg. 28,284 (proposed May 2, 2023) ....................................14

Methylene Chloride; Regulation Under the Toxic Substances Control Act (TSCA),
89 Fed. Reg. 39,254 (May 8, 2024)......................................... 5, 10, 14

Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 37,028 (May 3, 2024)............................... 6, 8, 9

Protection of Stratospheric Ozone: Proposed New Listings of Substitutes; Changes of Listing Status; and Reinterpretation of Unacceptability for Closed Cell Foam Products Under the Significant New Alternatives Policy Program; and Revision of Clean Air Act Section 608 Venting Prohibition for Propane,
81 Fed. Reg. 22,810 (Apr. 18, 2016) ..................................................25

**Other Authorities**

EPA, Supplemental File Environmental Releases to Ambient Air for Methylene Chloride (Jan. 2022),
https://www.regulations.gov/document/EPA-HQ-OPPT-2021-0415-0026.........11

EPA, *EPA Announces Path Forward for TSCA Chemical Risk Evaluations* (June 30, 2021) ............................................................................ 6, 14

WMO, *Scientific Assessment of Ozone Depletion: 2002* (2003),
https://csl.noaa.gov/assessments/ozone/2002/report.html...................24

WMO, *Scientific Assessment of Ozone Depletion: 2022* (2023),
https://csl.noaa.gov/assessments/ozone/2022/downloads/2022OzoneAssessment.pdf ....................................................................................................24

## INTRODUCTION

At its core, TSCA requires EPA to determine whether chemicals present unreasonable risks to health or the environment, 15 U.S.C. § 2605(b)(4), and, if so, to eliminate those risks.[1] *Id.* § 2605(a). Here, EPA admits that its regulation of methylene chloride leaves fenceline communities exposed to high cancer risks, without any determination of whether those risks are unreasonable. EPA also admits that, even though the latest studies have found that methylene chloride depletes the ozone layer, EPA never evaluated the risks associated with such ozone depletion. On those uncontested facts, the Methylene Chloride Rule violates TSCA.

In their opposition briefs, EPA and Intervenor American Chemistry Council ("ACC") attack arguments that Sierra Club never made and impermissibly advance arguments that EPA expressly disclaimed when issuing the Methylene Chloride Rule. They misstate the controlling legal standards and ignore the latest science. But they do not, and cannot, explain how a risk evaluation that ignores ozone depletion and a rule that leaves communities breathing unsafe levels of methylene chloride satisfy TSCA's mandate to determine and eliminate unreasonable risks. The Court should grant Sierra Club's petition for review and remand the

---

[1] Previously defined terms have the meanings set forth in Sierra Club's Opening Brief, ECF No. 95 ("Sierra Club Br.").

Methylene Chloride Rule, without vacatur, so EPA can conduct the analyses it previously failed to complete and provide the protections that TSCA requires.

ARGUMENT

## I. EPA VIOLATED TSCA'S REQUIREMENT TO DETERMINE AND ELIMINATE METHYLENE CHLORIDE'S UNREASONABLE RISKS TO FENCELINE COMMUNITIES

### A. EPA Admits It Left Fenceline Communities Exposed to High Cancer Risks, Without Determining Whether Those Risks Are Unreasonable

The facts underlying Sierra Club's petition for review are not disputed. EPA found that industrial releases of methylene chloride increase cancer risks in surrounding communities. Brief of Respondent EPA at 116–17, ECF No. 129 ("EPA Br."); Sierra Club Br. at 17–18. EPA also recognizes that "TSCA instructs EPA to make unreasonable risk determinations for [potentially exposed or] susceptible subpopulations," EPA Br. at 115, including "fenceline communities." *Id.* at 112. But the methylene chloride risk evaluation did not evaluate risks to fenceline communities, much less determine whether such risks are unreasonable. *Id.* at 114–15. Those failures violate TSCA's mandate to "conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury . . . to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator." 15 U.S.C. § 2605(b)(4)(A).

2

In an effort to address those flaws, after its risk evaluation EPA conducted a separate assessment of methylene chloride's risks to fenceline communities. This assessment found high cancer risks in multiple communities where methylene chloride is released, exceeding the "benchmark" risk level set by EPA. EPA Br. at 116; Sensitivity Analysis at 2, 6, JA_____, _____. But EPA once again failed to determine whether those risks are unreasonable or to address them in the Methylene Chloride Rule, which does not regulate releases resulting from any uses of methylene chloride that will continue under the Rule. *See* EPA Br. at 117 (predicting that exposures from ongoing methylene chloride releases "will remain consistent under the Rule"); Sierra Club Br. at 21. That failure violates TSCA's mandate to regulate methylene chloride "to the extent necessary so that [it] . . . no longer presents [unreasonable] risk." 15 U.S.C. § 2605(a). Without determining whether methylene chloride's unaddressed risks to fenceline communities are unreasonable, EPA cannot comply with its obligation to assure the elimination of unreasonable risk.

## B. EPA's Defense of the Methylene Chloride Rule Is Contrary to TSCA

EPA's defense of the Methylene Chloride Rule misstates the standard for chemical regulation under TSCA section 6(a). EPA claims that, because its prohibition of certain uses of methylene chloride will protect some communities, the Methylene Chloride Rule "provides adequate protection for fenceline

3

communities." EPA Br. at 113, 117–18. But TSCA does not direct EPA to "adequate[ly] protect[]" against some of a chemical's risks.[2] *Id.* at 118; *see also id.* at 115 (claiming the Methylene Chloride Rule would "largely address" risks to fenceline communities (citation omitted)). Instead, EPA must ensure that methylene chloride "no longer presents" unreasonable risk. 15 U.S.C. § 2605(a). That standard, by its terms, requires EPA to determine whether any unaddressed risks are unreasonable. Here, EPA admits that it did not do so.

EPA also argues that methylene chloride is regulated under the Clean Air Act, which "limit[s] [facilities'] leeway to vent methylene chloride" into surrounding communities. EPA Br. at 117–18. ACC, as well, points to the Clean Air Act's "comprehensive regulation" to excuse EPA's failure to address fenceline community risks under TSCA. Brief of Intervenor ACC at 37, ECF No. 139 ("ACC Br."). But, as explained in Sierra Club's opening brief, TSCA requires EPA to determine and eliminate methylene chloride's unreasonable risks regardless of whether the chemical has been regulated under other environmental laws. *See*

_____

[2] EPA's argument harkens back to the pre-2016 version of TSCA, which did require EPA to "protect adequately" against unreasonable risk. Toxic Substances Control Act, Pub. L. No. 94-469, § 6, 90 Stat. 2003, 2020 (1976). But that standard proved to be "an inadequate tool for . . . protect[ing] against chemical risks," so Congress replaced it with section 6(a)'s current mandate to fully eliminate unreasonable risk. *See* Testimony of Steve Owens, Assistant Adm'r, Off. of Chem. Safety & Pollution Prevention, EPA, Before the Subcomm. on Superfund, Toxics, & Env't Health of the S. Comm. on Env't & Pub. Works 2 (Feb. 3, 2011), https://www.epa.gov/sites/default/files/2013-10/documents/2011_0203_so.pdf.

Sierra Club Br. at 48–49. Moreover, industrial and commercial facilities release more than a million pounds of methylene chloride to the air each year, notwithstanding the chemical's regulation under the Clean Air Act. *See id.* at 12. EPA found that those releases, which have not been addressed by the Clean Air Act, present high risks to fenceline communities. Sensitivity Analysis at 6, JA_____. The relevant question is not, as EPA suggests, whether the Clean Air Act will keep methylene chloride emissions from rising, *see* EPA Br. at 117, but whether EPA regulated methylene chloride "to the extent necessary" to ensure that the risks EPA left in place are not unreasonable. 15 U.S.C. § 2605(a). Here, EPA has not done so. *See* Methylene Chloride; Regulation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 39,254, 39,284 (May 8, 2024), JA_____ (acknowledging that EPA cannot "formally determine" whether risks to fenceline communities are unreasonable).

### C. To The Extent the Court May Consider It, ACC's Defense of the Methylene Chloride Rule Is Also Contrary to TSCA

1. ACC's principal defense of the Methylene Chloride Rule is not only divorced from the reasoning of the Rule itself, but it was expressly rejected by EPA during the Rule's development. ACC claims that EPA should never have even calculated fenceline community risks, since, as construed by ACC, TSCA allows EPA to pick and choose which uses and exposure pathways to consider and which

potentially exposed or susceptible subpopulations to protect. *See* ACC Br. at 24–27.

Fatally for this argument, "an agency's action must be upheld, if at all, on the basis articulated by the agency" at the time of the rulemaking. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50 (1983); *Noranda Alumina, L.L.C. v. Perez*, 841 F.3d 661, 666 (5th Cir. 2016) ("This Court may only review reasoning articulated by the agency at the time of its decision."). In developing the Methylene Chloride Rule, EPA not only assessed risks to fenceline communities, but it explained that the exclusion of such communities from the methylene chloride risk evaluation had "resulted in a failure to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations." Path Forward, JA____. As ACC acknowledges, EPA conducted its fenceline assessment precisely because it interpreted TSCA to require the consideration of all exposure pathways and their associated risks. ACC Br. at 25 n.4, 26 ; *see also* Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 37,028, 37,033 (May 3, 2024) (codifying that interpretation in a separate regulation the week before the adoption of the Methylene Chloride Rule). The Court "must disregard [ACC's] post hoc rationalizations of the EPA's action and evaluate it solely on the basis of *the agency's stated rationale* at

the time of its decision." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (second emphasis added).

Even if ACC's position did not conflict with EPA's, the question of whether EPA could have excluded fenceline communities from consideration is not before the Court. In the Methylene Chloride Rule, EPA "identified . . . fenceline communities . . . as [a] 'potentially exposed or susceptible subpopulation[]'" and conducted an assessment of fenceline community risks. EPA Br. at 112, 113–14 (quoting 15 U.S.C. § 2605(b)(4)(A)). The issue raised by Sierra Club is whether, having calculated cancer risks exceeding its stated risk threshold, EPA was free to leave communities exposed to those risks without any determination of whether they were unreasonable. Sierra Club Br. at 4, 21. ACC's counterfactual about whether EPA could have ignored fenceline community risks is irrelevant to EPA's obligations once the agency chose to consider them and identified high cancer risks.

2.    If the Court were to consider it (and it should not), ACC's argument lacks merit. ACC's claim that EPA can ignore methylene chloride's risks to fenceline communities rests on TSCA's requirement that, before conducting a risk evaluation, EPA "shall . . . publish" a "scope" document that identifies the "hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider." 15 U.S.C. § 2605(b)(4)(D);

ACC Br. at 24. But the "best reading" of that provision, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024), is not as an authorization to disregard known exposures and risks to groups, like fenceline communities, that fall within TSCA's definition of potentially exposed or susceptible subpopulation. Instead, the phrase "expects to consider" is merely a recognition that, at the scoping stage, EPA often lacks the information needed to make conclusive determinations of a chemical's hazards, exposures, conditions of use. 89 Fed. Reg. at 37,032 (quoting 15 U.S.C. § 2605(b)(4)(D)). Indeed, TSCA does not require EPA to "integrate and assess available information on hazards and exposures," including "information on potentially exposed or susceptible subpopulations," until the risk evaluation process that follows the completion of scoping. 15 U.S.C. § 2605(b)(4)(F)(i) (requiring EPA to "integrate and assess available information on hazards and exposures," including "information on potentially exposed or susceptible subpopulations," during the risk evaluation process that follows the completion of scoping). In a risk evaluation, EPA may identify additional groups that are more susceptible to the chemical substance, or it may discover that some of the conditions of use that it "expect[ed] to consider" have been discontinued and thus no longer require analysis. *Id.* § 2605(b)(4)(D).

The sole court to interpret that phrase has rejected ACC's position. *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 419 (9th Cir. 2019) (finding that

phrases "plans to consider" and "expects to consider" in TSCA "simply refer[] to the Agency's role in determining what the conditions of use are for a particular substance" and "*do[] not* grant EPA discretion to exclude conditions of use"). Similarly, EPA "does not interpret the 'expects to consider' language in TSCA . . . to allow EPA to pick and choose which exposures to include in a risk evaluation of a chemical substance." 89 Fed. Reg. at 37,032. EPA's decision to assess fenceline community risks is wholly consistent with TSCA's statutory scheme. Its failure to determine whether those risks are unreasonable or to address them in the Methylene Chloride Rule is not.

3. ACC's other arguments misconstrue Sierra Club's positions. Sierra Club has never argued that TSCA requires EPA to regulate all "elevated" risks. *Compare* ACC Br. at 32, *with* Sierra Club Br. at 2–4, 9, 22–24, 26–27, 29, 31–32, 36, 48, 50, 52 (explaining that TSCA requires EPA to determine and eliminate a chemical's "unreasonable risks"). Nor has Sierra Club claimed that EPA's 1-in-1,000,000 cancer benchmark is a "bright line" indicator of unreasonable risk. *Compare* ACC Br. at 27–28, *with* Sierra Club Br. at 13 n.6 ("[T]hese benchmarks are 'not a bright line[]'. . . .").

Sierra Club's argument is straightforward: EPA cannot ensure the elimination of methylene chloride's unreasonable risks (as TSCA requires) unless EPA determines whether the risks it calculated and failed to address are unreasonable.

Here, EPA identified fenceline risks well above its cancer benchmark. Sierra Club Br. at 30–31. But EPA did not point to any other factors that render those elevated risks reasonable. Nor did EPA conduct a supplemental evaluation to refine its risk estimates and make an unreasonable risk determination. *See* 89 Fed. Reg. at 39,284–85, JA_____-__. And the Methylene Chloride Rule leaves communities exposed to the very risk levels that EPA acknowledges, at a minimum, may be unreasonable. *Id.* at 39,284, JA_____. Therefore, EPA has not regulated methylene chloride "to the extent necessary so that [it] . . . no longer presents [unreasonable] risk." 15 U.S.C. § 2605(a).

ACC argues that EPA's risk calculations should not be credited because the Fenceline Assessment Methodology was "overly conservative." ACC Br. at 32. But ACC's examples fail to support that characterization, and the record as a whole belies it. While EPA did not know the precise location within each facility where methylene chloride was released, *id.* at 31, and therefore used the longitudinal and latitudinal coordinates that facilities reported to EPA's Toxics Release Inventory as the release point, that assumption is just as likely to underestimate risks as to overestimate then. *See* Fenceline Assessment Methodology at 58, JA_____. As EPA explained, "the actual release point may be directly next to a residential community or school yard just outside the facility property-line," in which case the risks to local residents would be *greater* than EPA calculated in its fenceline assessment. *Id.* ACC

also complains that, where facilities have not reported releases of methylene chloride to the Toxic Release Inventory, EPA assumes that they release methylene chloride up to the reporting threshold of 500 pounds/year. ACC Br. at 31–32. But that assumption had no impact on the facilities from which EPA calculated risks above its benchmark levels, all of which release more than 500 pounds of methylene chloride annually. *See* Sensitivity Analysis at 6, JA____ (identifying facilities that exceed EPA's cancer risk benchmark); EPA, Supplemental File Environmental Releases to Ambient Air for Methylene Chloride (Jan. 2022), https://www.regulations.gov/document/EPA-HQ-OPPT-2021-0415-0026 (identifying facilities' methylene chloride releases). ACC also ignores the many ways in which EPA's scientific advisory panel found that the Fenceline Assessment Methodology "may not be protective overall because potential key exposure pathways are excluded and because cumulative exposures, multiple source exposures, [and] aggregate exposures . . . were not considered." SACC Report on Fenceline Assessment Methodology at 15, JA____. Moreover, even if the Fenceline Assessment Methodology was as conservative as ACC claims, the answer would be to conduct a supplemental evaluation that results in more refined risk calculations (as EPA's Methodology expressly permits), not to ignore findings of elevated cancer risk without any determination of whether they are or are not unreasonable.

4.     Finally, the ACC and EPA falsely claim that making an unreasonable risk determination for fenceline communities would have required EPA to "reopen the risk evaluation" and delay the Methylene Chloride Rule. EPA Br. at 115; ACC Br. at 30. ACC states that a determination of unreasonable risk to fenceline communities would have required EPA to "flout statutory deadlines" for risk management. ACC Br. at 3; *see also id.* at 22 ("Operating within the constraints of TSCA's statutory deadlines . . . EPA could not proceed further with that fenceline screening data.").

Here, "it is clear that the EPA did not regard the statutory deadline as sacrosanct," since the Methylene Chloride Rule itself was not finalized until nearly two years after the statutory deadline. *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979).[3] Moreover, the "the mere existence of deadlines for agency action" does not excuse an agency's violations of a statute's procedural and substantive requirements. *See id.* (holding that imminence of statutory deadline did not excuse agency's failure to undergo notice and comment procedures); *cf. Nat. Res. Def. Council v. Thomas*, 805 F.2d 410, 435 (D.C. Cir. 1986) (finding "no precedent or basis for excusing the agency from the [Clean Air Act's] statutory command" merely

---

[3] EPA released the final methylene chloride risk evaluation in June 2020, meaning the final risk management rule was due "not later than 2 years after" that date. *See* 15 U.S.C. § 2605(c)(1)(B). The Methylene Chloride Rule was finalized in May 2023, three years and eleven months later.

because the agency had fallen behind its statutory deadline). To the extent that EPA determined more analysis was needed to make an unreasonable risk determination for fenceline communities, nothing prevented the agency from finalizing the Methylene Chloride Rule's protections for workers and consumers while supplementing its evaluation of fenceline community risks and issuing a separate rule based on the results of that evaluation. *See, e.g.,* Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 21,970, 21,973 (Mar. 28, 2024) (finalizing risk management rule for current chrysotile asbestos while EPA conducted a "supplemental" evaluation of the risks from other asbestos fibers and legacy uses of chrysotile asbestos). But EPA cannot forgo the unreasonable risk determinations and public health protections that TSCA requires by claiming that it simply ran out of time to comply with the law.

## II.  EPA AND ACC MISCONSTRUE PETITIONER'S ARGUMENT CONCERNING EPA'S DEPARTURE FROM ITS FENCELINE ASSESSMENT METHODOLOGY

In addition to violating TSCA's risk management requirements, EPA arbitrarily departed from its own Fenceline Assessment Methodology by leaving risks above EPA's cancer risk benchmarks unaddressed. Sierra Club Br. at 32–35.[4]

---

[4] EPA and ACC refer to the Fenceline Assessment Methodology as the "Screening Level Approach" and the "Draft Fenceline Methodology," respectively. *See* EPA Br. at 114; ACC Br. at 16.

While labeled "draft," the Fenceline Assessment Methodology reflects EPA's sole statement of how it plans to evaluate and address fenceline community risks under TSCA. It was announced via an EPA press release, *see* Path Forward, JA____, and it is referenced throughout the Methylene Chloride Rule. *See, e.g.,* Methylene Chloride; Regulation Under the Toxic Substances Control Act (TSCA), 88 Fed. Reg. 28,284, 28,292 (proposed May 2, 2023), JA_____ ("In order to assess the potential for risk . . . in proximity to a facility releasing methylene chloride, EPA developed the [Fenceline Assessment Methodology] . . . ."); *see also id.* at 28,297, JA_____; 89 Fed. Reg. at 39,284, JA_____. Agencies must provide a "reasoned explanation" for their departure from existing policy, regardless of how policy was adopted or expressed. *See, e.g.*, *Noranda Alumina,* 841 F.3d at 665 (citation omitted) (requiring reasoned explanation for departure from unwritten agency policy developed through case-by-case adjudications); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (requiring reasoned explanation for departure from agency policy expressed in an opinion letter).[5] Here, EPA

---

[5] As for ACC's argument that the Fenceline Assessment Methodology bears a "Do Not Cite or Quote" label, ACC Br. at 34, EPA itself cited the Fenceline Assessment Methodology in the Methylene Chloride Rule, and it repeatedly invokes that document to explain its fenceline risk calculations. *See, e.g.*, 88 Fed. Reg. at 28,292, 28,326, 28,327, JA_____, _____, _____; 89 Fed. Reg. at 39,284, JA_____; Response to Comments on Risk Mgmt. Rule at 30 n.8, JA_____. As this Court has recognized, "[T]he label that the particular agency puts upon its given [action] . . . is not . . . conclusive; rather it is what the agency does in fact." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (citation omitted).

developed the Fenceline Assessment Methodology to ensure that "risks to fenceline communities will not go unidentified and unaddressed" during the risk management process, Fenceline Assessment Methodology at 17, JA_____, and then departed from that guidance in the Methylene Chloride Rule without any explanation.

As described in Sierra Club's opening brief, the Fenceline Assessment Methodology uses five hypothetical scenarios to describe "how results from the [fenceline assessments] may be used to further inform or support the Agency's risk management actions." *Id.* at 18, JA_____; Sierra Club Br. at 33–34. EPA notes that these hypotheticals "do[] not enumerate the full range of possible responses that EPA may take," and they were intended to be "illustrative, not prescriptive." EPA Br. at 120–21. Sierra Club has never claimed otherwise. *See* Sierra Club Br. at 33.

What the scenarios in the Fenceline Assessment Methodology "illustrat[e]" is a consistent approach to the assessment and management of fenceline community risks. *Id.* Under each scenario, the calculation of risk exceeding EPA's cancer benchmark of 1-in-1,000,000 triggers some responsive action to either (1) regulate the chemical so the risks fall below that benchmark level or (2) further evaluate the chemical and develop more detailed risk estimates that inform EPA's next steps. *Id.* at 33–34. Indeed, the identification of risks that require further attention was the core purpose of the Fenceline Assessment Methodology.

Fenceline Assessment Methodology at 17, JA_____. In the Methylene Chloride Rule, however, EPA identified risks exceeding that benchmark level and chose not to fully address them, departing from its guidance without explanation.

EPA claims that the Methylene Chloride Rule "end[ed] up resembling Outcomes Two and Three" in its Fenceline Assessment Methodology. EPA Br. at 121. EPA omits the fundamental difference between those scenarios, both of which eliminate the possibility of unreasonable risk to fenceline communities, and the Methylene Chloride Rule, which does not. Outcome Two involved a ban on the sole use that presented elevated risks to fenceline communities, which would eliminate the relevant exposures and "address *all identified risks*." Fenceline Assessment Methodology at 19, JA_____ (emphasis added). Outcome Three involved the establishment of workplace regulations that were "expected to reduce" fenceline communities' exposures "to levels below which an unreasonable risk is expected." *Id.* In contrast, the Methylene Chloride Rule would leave communities exposed to risks that exceed EPA's cancer benchmark, and EPA does not claim that its occupational exposure limit would reduce exposures or risks to those communities.

Even if the Fenceline Assessment Methodology is non-binding, EPA must still "provide a reasoned explanation" for its decision to depart from that guidance. *Encino Motorcars*, 579 U.S. at 221. Here, EPA has none.

## III. EPA CONTINUES TO UNDERSTATE FENCELINE COMMUNITY RISKS

### A. The Methylene Chloride Rule Fails to Protect People Who are Exposed to Methylene Chloride from Multiple Sources

EPA concedes that it did not consider or address the increased risks to people who are exposed to methylene chloride from multiple facilities or multiple uses of the chemical. EPA Br. at 118–20. It claims it did not have to consider those risks because TSCA grants EPA "the authority, but not the obligation, to consider aggregate exposures," and here EPA "reasonabl[y]" chose not to. *Id.* at 119–20.

But EPA's decision to ignore known combinations of methylene chloride exposures was neither lawful nor reasonable. TSCA requires EPA to evaluate whether a chemical presents unreasonable risks to "potentially exposed or susceptible subpopulation[s]" who experience "greater exposure . . . than the general population." 15 U.S.C. §§ 2602(12), 2605(b)(4)(A). People who are exposed to methylene chloride from multiple sources, or from multiple conditions of use, experience "greater exposure" than the general public, yet EPA failed to address the risks to that potentially exposed or susceptible subpopulation. Additionally, EPA's disregard of its own science advisory panel's recommendation to "include aggregate . . . exposures" in the assessment of fenceline risks also violates TSCA's mandate to conduct risk evaluations in a manner "consistent with the best available science." 15 U.S.C. § 2625(h); SACC Report on Fenceline

Assessment Methodology at 18, 58, 64, JA_____, _____, _____. And TSCA also requires EPA to eliminate the unreasonable risks caused by "any combination of" a chemical's conditions of use. 15 U.S.C. § 2605(a). While EPA is correct that this provision only requires it to regulate "'if' EPA determines that a 'combination' of activities presents an unreasonable risk," EPA Br. at 119, in order to make that determination EPA must first consider the risks posed by combinations of uses. Here, EPA fails to do so.

EPA claims that TSCA section 6(b)(4)(F)(ii)—which requires EPA to "describe whether" it considered "aggregate or sentinel exposures" in a risk evaluation, 15 U.S.C. § 2605(b)(4)(F)(ii)—makes the consideration of aggregate risk discretionary. EPA Br. at 118–19. But that section does not authorize EPA to ignore risks to potentially exposed or susceptible subpopulations, to depart from the best available science, or to leave the public exposed to unreasonable risks from combinations of chemical exposures. *See supra* pp. 17–18. To the contrary, that provision merely acknowledges that, in certain circumstances, a "sentinel assessment" based on "the plausible upper bound of exposure relative to all other exposures within a broad category" may also comply with those statutory mandates. 40 C.F.R. § 702.33. For instance, a sentinel assessment may be appropriate where aggregate exposures to a chemical are unlikely, or where exposures from a single condition of use are so great that they alone are likely to

exceed any other combination of exposures. But that is not the case here, where people experience methylene chloride exposures from multiple sources and EPA has not identified any other way of evaluating or addressing those risks. *See* Env't Def. Fund, Comments on Proposed Risk Management Rule for Methylene Chloride, at 18, 64 (2023) ("EDF Comments"), Index No. 1048, JA____, ____ (describing multiple facilities' releases of methylene chloride in Midland, Michigan).

EPA's failure to consider combinations of exposures is also unsupported by substantial evidence, and thus contrary to TSCA. 15 U.S.C. § 2618(c)(1)(B)(i)(1). The record confirms that communities are exposed to methylene chloride from multiple facilities. EDF Comments at 18, 64, JA_____, _____. The SACC also told EPA that, "[i]n many fenceline communities," residents work in the facility that releases the chemical and are thus exposed in their homes and workplaces. SACC Report on Fenceline Assessment Methodology at 48–49, JA_____-__. EPA's sole justification for ignoring those combinations of exposures was that "the science on . . . aggregate exposures to methylene chloride is still 'evolving'" and "EPA opted to address known unreasonable risks now rather than wait to see how the science on aggregate exposure risk might develop." EPA Br. at 119–20 (quoting Response to Comments on Risk Mgmt. Rule at 30, JA_____)). But, as explained by the SACC, "the [modeling] software used in [the Fenceline Assessment Methodology]

*allow[s] an analysis to include exposure to multiple facilities*." SACC Report on

Fenceline Assessment Methodology at 46, JA_____ (emphasis added). In other

words, EPA knew that multiple facilities were releasing methylene chloride in the

same communities and it had the ability to calculate aggregate exposures from

those releases. No scientific "evolution" was needed to assess those risks; EPA

simply chose not to do so.

### B. The Methylene Chloride Rule Fails to Protect People Whose Genetic Structure Leaves Them More Susceptible to Methylene Chloride's Risks

EPA also acknowledges that roughly a third of the U.S. population is more

susceptible to harm from methylene chloride, and that EPA did not calculate the

increased risks to that potentially exposed or susceptible subpopulation. EPA Br. at

122–23. This omission violates TSCA's requirement to evaluate and address risks

to subpopulations who "due to . . . greater susceptibility . . . may be at greater risk

than the general population." 15 U.S.C. §§ 2602(12), 2605(b)(4)(A).

EPA attempts to explain its failure to calculate risks to this subpopulation by

claiming that it "rel[ied] on a conservative estimate for the general population" and

that "it is reasonable to expect that risk to the [more susceptible] subpopulation is

reflected within the risks to the general population." EPA Br. at 124. EPA offers no

support for that claim, which runs counter to TSCA's mandates and to EPA's past

practice. In amending TSCA, Congress recognized that certain groups were more

susceptible to harm from chemical exposures, and it required EPA to determine whether the chemicals present unreasonable risks to those "potentially exposed or susceptible subpopulation[s]." 15 U.S.C. § 2605(b)(4)(A). Without attempting to determine the risks to people with this genetic susceptibility, EPA cannot know whether its purportedly "conservative" general population risk assessment captures methylene chloride's increased risks to this group. EPA Br. at 124.

Moreover, the only allegedly conservative assumption identified by EPA is the use of the 95th percent confidence limit to determine the hazards from methylene chloride (i.e., the selection of a toxicity value that EPA was 95 percent confident would result in a significant increase in tumors in mice). *See* EPA Br. at 123. As explained in Sierra Club's opening brief, that is not a conservative assumption. Instead, it is a recommended default for all EPA risk assessments—whether or not EPA had identified a more susceptible subpopulation—and it has nothing to do with the increased risks that many people experience because of their genetic makeup. Sierra Club Br. at 42–43. Consistent with EPA guidance, in prior assessments of methylene chloride EPA used the 95th percent confidence limit for the general population and separately calculated a cancer risk value for the most susceptible subpopulation. *Id.* at 40; *see also* IRIS Assessment at 233–34, 238, JA_____-__, _____; EPA, *TSCA Work Plan Chemical Risk Assessment: Methylene*

*Chloride – Paint Stripping Use* 273 (2014), Index No. 632, JA_____. EPA

provides no legal or scientific basis for departing from that practice here.

## IV. EPA VIOLATED TSCA'S REQUIREMENT TO EVALUATE AND DETERMINE THE RISKS CAUSED BY METHYLENE CHLORIDE'S DEPLETION OF THE OZONE LAYER

### A. EPA's Claim That Methylene Chloride Cannot Deplete the Ozone Layer Is Inconsistent with Prior EPA Positions and Unsupported by Substantial Evidence

EPA also violated TSCA by failing to evaluate or address the risks associated

with methylene chloride's depletion of the ozone layer. *See* Sierra Club Br. at 43–

52. EPA previously explained that omission by claiming that "ozone depletion risks

are adequately assessed . . . under the Clean Air Act," Response to Comments on

Scope at 6, JA_____, and are therefore "out of scope" for the methylene chloride

risk evaluation. Response to Comments on Risk Eval. at 219, JA____. In its

opening brief, Sierra Club explained that: (1) TSCA does not permit EPA to ignore

a chemical's risks merely because they are regulated under another statute; and (2)

the Clean Air Act does not regulate methylene chloride's contribution to ozone

depletion. Sierra Club Br. at 43–52. Instead of responding to those arguments, EPA

reverses course, claiming in its opposition brief that it actually did consider ozone

depletion and concluded that methylene chloride does "not . . . have ozone

depleting potential." EPA Br. at 126.

EPA's new argument is not properly before this Court, which must review the Methylene Chloride Rule "solely on the basis of the agency's stated rationale at the time of its decision," and not the "*post hoc* rationalizations" of EPA's counsel. *Luminant Generation*, 675 F.3d at 925 (5th Cir. 2012); *see also Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ."). When commenters informed EPA that rising methylene chloride emissions present a serious threat to the ozone layer and the SACC urged the agency to consider "the impact of methylene chloride . . . on ozone depletion," EPA never challenged the premise of those comments or denied that methylene chloride could cause ozone depletion. SACC Report on Risk Evaluation at 77, JA____; EIA Comments at 4, JA____. Instead, EPA claimed that ozone depletion was "out of scope" for the risk evaluation because it was covered by the Clean Air Act, a position that EPA no longer defends. Response to Comments on Risk Eval. at 219, JA_____; *see also* Response to Comments on Scopes at 6 ___, JA_____.

To the extent the Court does consider it, EPA's denial of methylene chloride ozone depleting potential is unsupported by substantial evidence. EPA does not cite a single study in the record that supports its position, since there are none. *See* EPA Br. at 126. Instead, EPA relies on the alternatives assessment that it prepared in support of the Methylene Chloride Rule, *id.* at 125, which in turn cites back to a

2002 report from the World Meteorological Organization ("WMO"). *See* EPA, *An Alternatives Assessment for Use of Methylene Chloride* 16, 49 (2022), Index No. 803, JA_____, _____ (citing WMO, *Scientific Assessment of Ozone Depletion: 2002* (2003) ("WMO 2002 Report"))[6]. While that 2002 report acknowledges that so-called "short lived . . . gases," such as methylene chloride, "have the potential to deplete stratospheric ozone," 2002 WMO Report at xiv, at that time their contribution to ozone depletion was considered negligible because it was believed that they would break down before they could have a measurable impact. Sierra Club Br. at 45.[7]

---

[6] The WMO 2002 Report is available at https://csl.noaa.gov/assessments/ozone/2002/report.html.

[7] It is unclear why EPA choose to rely on the 2002 *Scientific Assessment of Ozone Depletion*, as opposed to any of the five more recent versions of that same governmental report. *See* NOAA Chem. Sci. Lab., *WMO/UNEP Scientific Assessments of Ozone Depletion*, https://csl.noaa.gov/assessments/ozone/ (last visited Jan. 22, 2025) (listing *Scientific Assessment of Ozone Depletion* reports). While EPA inexplicably reaches back twenty years for its scientific assessment, the Court can take judicial notice of the fact that the position EPA attributes to the WMO 2002 Report, who is co-authored by U.S. government agencies and posted to those agencies' websites, is directly rejected by WMO's most recent assessment. *See* WMO, *Scientific Assessment of Ozone Depletion: 2022*, at 4 (2023), https://csl.noaa.gov/assessments/ozone/2022/downloads/2022OzoneAssessment.pdf ("Emissions of anthropogenic very short-lived chlorine substances, dominated by [methylene chloride], continue to grow and contribute to ozone depletion.); *id.* at 406 ("Currently, the most important chlorinated [very short lived substances] in terms of their potential to deplete ozone are [methylene chloride] . . . ."); *see also ExxonMobil Pipeline Co. v. Landry,* No. 15-824-JWD-EWD, 2016 WL 320153, at *2 n.2 (M.D. La. Jan. 26, 2016) ("The Court can take judicial notice of information on official government websites.").

Subsequent research has shown that is not the case. As set forth in comments on EPA's methylene chloride risk evaluation, short-lived substances like methylene chloride are now known to "significantly impact [ozone] loss rates in the lower stratosphere," delaying the recovery of the ozone layer. R. Hossaini et al., *Growth in Stratospheric Chlorine from Short-lived Chemicals Not Controlled by the Montreal Protocol*, 42 Geophysical Res. Letters 4573, 4579 (2015), Index No. 425, JA_____. Methylene chloride emissions alone "could delay full recovery of the ozone layer by 30 years." EIA Comments at 4, JA_____.

Over the last decade, EPA itself has acknowledged that "*recent research indicates that emissions of methylene chloride* from multiple industrial sources have been increasing and *could have a detectible impact on the ozone layer*." Protection of Stratospheric Ozone: Proposed New Listings of Substitutes; Changes of Listing Status; and Reinterpretation of Unacceptability for Closed Cell Foam Products Under the Significant New Alternatives Policy Program; and Revision of Clean Air Act Section 608 Venting Prohibition for Propane, 81 Fed. Reg. 22,810, 22,875 (Apr. 18, 2016) (emphasis added); *accord* EIA Comments at 4, JA_____. The World Meteorological Association, United Nations Environment Programme, National Oceanic and Atmospheric Association, National Aeronautics and Space Administration, and European Commission have similarly recognized methylene

chloride's contribution to ozone depletion. EIA Comments at 4 n.15, JA_____

(citing WMO, *Scientific Assessment of Ozone Depletion: 2018*, at ES20 (2019)).

EPA does not identify any error in these findings of methylene chloride's

contribution to ozone depletion. *See* EPA Br. at 125–27. Nor has EPA provided any

reason to credit its decades-old assessment of methylene chloride's ozone depletion

potential—which EPA itself has since cast doubt on—over that subsequent

research and analysis. *Id.* Instead, EPA's denial of methylene chloride's ozone

depletion is "conclusory, unsupported, and thus wholly insufficient." *Wages &*

*White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1137–38 (5th Cir. 2021); *see also*

*Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("We do not defer to the agency's

conclusory or unsupported suppositions." (citation omitted)).

Finally, since TSCA prohibits EPA from excluding known risks from

consideration, ACC's argument that EPA was not required to evaluate ozone

depletion fails. ACC argues that "EPA appropriately excluded ozone depletion

from the scope of the methylene chloride risk evaluation" because those risks are

"adequately assessed and effectively managed" under the Clean Air Act. ACC Br.

22–23, 39. However, for the same reasons this argument fails as to fenceline

communities, *see supra* Point I.C, it fails as to ozone depletion: TSCA requires the

evaluation of a chemical's hazards even if they are, or may be, regulated under

another law. *See also* Sierra Club Br. at 48–49.

## B.     Sierra Club Has Standing to Pursue Its Ozone Claim

Contrary to EPA's claim, EPA Br. at 127–29, Sierra Club has standing to pursue its claim that EPA violated TSCA by failing to evaluate the risks associated with methylene chloride's depletion of the ozone layer.[8] Sierra Club Br. at 53–56.

EPA's decision not to evaluate ozone depletion when completing the Risk Evaluation was a procedural failure, as EPA was required to "integrate and assess available information" about the effect of methylene chloride on the ozone layer when conducting the Risk Evaluation. 15 U.S.C. § 2605(b)(4)(F)(i). A "[p]rocedural injury occurs when a plaintiff is deprived of a procedural right to protect its concrete interests," *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024), and a "risk of real harm" can "satisfy the requirement of concreteness." *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 672 (S.D. Tex. 2020) (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016)).

EPA's failure to evaluate the impact methylene chloride has on the ozone layer threatens Sierra Club's concrete interest in protecting its members from a risk of real health harms stemming from increased ultraviolet radiation. Sierra Club members like Frank Lilly live at very high elevations, increasing their exposure to

---

[8] No party has contested Sierra Club's standing to challenge EPA's failure to determine and address methylene chloride's unreasonable risks to fenceline communities. *See* Sierra Club Br. at 53–54.

UV radiation and placing them at greater risk of harm from ozone depletion than the public at large. *See* Declaration of Frank Lilly ("Lilly Decl.") ¶ 7 (explaining that Lilly lives at 8,700 feet above sea level). These members also recreate outdoors for multiple hours on most days at high elevations, contributing to even higher exposure to ultraviolet radiation and an even greater risk of skin cancer, cataracts, and other health harms. *Id*. ¶¶ 8–16; Sierra Club Br. at 11.

EPA asserts that Sierra Club's injuries are "conjectural," and its members are not "likely to be harmed by EPA's alleged failure to adequately consider impacts to atmospheric ozone." EPA Br. at 127–28. However, EPA provides no evidence to challenge the facts Sierra Club presented to establish the harms its members face. And while multiple factors contribute to this harm, they are undisputed: ozone depletion increases ultraviolet radiation that in turn increases cancer risk; and Sierra Club members live at high elevations where they spend considerable time outside, which increases their susceptibility to the cancer risks created by the ozone depletion. Sierra Club Br. at 44–45; Lilly Decl. ¶¶ 7–16.

These impacts are grounded in science and facts, not conjecture. EPA's failure to evaluate the risks from methylene chloride's depletion of the ozone layer threatens Sierra Club's concrete interest in protecting its members from the harm caused by methylene chloride's ozone depletion. Since this depletion presents a

"risk of real harm" this harm is sufficient to establish Sierra Club's standing. *Kinetica*, 505 F. Supp. 3d at 672 (citation omitted).

EPA next argues that Sierra Club members' injuries are not "actual or imminent" and therefore are insufficient to support standing, EPA Br. at 128 (citation omitted). This argument also fails as Sierra Club's "threatened future injur[ies]" satisfy the "actual or imminent" requirement, where, as here, there is "a 'substantial risk' that the injury will occur." *Smith v. Am. Pain & Wellness, PLLC*, No. 4:23-CV-295, 2024 WL 4028050, at *8 (E.D. Tex. Sept. 3, 2024) (citations omitted). Sierra Club has produced evidence that methylene chloride depletes the ozone layer; that ozone depletion increases exposure to ultraviolet radiation; and that Sierra Club members experience substantial, and particularized, health risks from that exposure. Sierra Club Br. at 53–56. EPA's assertion that the risk of methylene chloride depleting the ozone layer is low should be given no weight as, in addition to being supported by outdated science, "courts must 'take as true' the factual evidence plaintiffs submit" "[w]hen evaluating plaintiffs' standing." *Kinetica*, 505 F. Supp. 3d at 664 (quoting *McCardell v. U.S. Dep't of Housing & Urban Dev.*, 794 F.3d 510, 520 (5th Cir. 2015)).

Finally, contrary to EPA's assertion, Sierra Club's members' injuries are distinct from the "non-particularized" claims of increased risk at issue in *Shrimpers and Fishermen of the RGV v. Texas Commission on Environmental Quality*, 968

F.3d 419, 424 (5th Cir. 2020). EPA Br. at 128. *Shrimpers* does not reject "probabilistic standing," but rather rejects standing based *on non-particularized increased risk* that "equally affects the general public." 968 F.3d at 424. Sierra Club does not assert that its members' injuries are equally felt by general population. Rather, it has shown that its members, who live and recreate at extremely high elevations and who spend considerable time outdoors, are at greater risk from increased ultraviolet radiation resulting from methylene chloride depleting the ozone layer. *See* Sierra Club Br. at 54–55; Lilly Decl. ¶¶ 7–16. These concrete, particularized harms are cognizable in this Circuit.

## V. EPA'S LEGAL ERRORS ARE NOT HARMLESS

Despite EPA's attempt to downplay their significance, the failure to determine whether methylene chloride presents unreasonable risks to fenceline communities or to evaluate the risks from methylene chloride's ozone depletion are not harmless errors. EPA Br. at 118, 127. Agencies' errors may be excused as "harmless" only when they "clearly had no bearing on the procedure used or the substance of decision reached.'" *U.S. Steel Corp.,* 595 F.2d at 215 (citation omitted).

Here, at a minimum, EPA's errors affected the procedures used in the Methylene Chloride Rule. *See Wages & White Lion Invs., L.L.C. v. FDA,* 90 F.4th 357, 390 (5th Cir. 2024) (finding it "hard to imagine an APA error that could have

'no bearing on the procedure used'"). Had EPA fully evaluated methylene chloride's risks to fenceline communities, including risks from combined exposures or to genetically susceptible subpopulations, it would have had to account for those risks in its unreasonable risk determinations. Had EPA faithfully applied its Fenceline Assessment Methodology, it would have had to either mitigate or further evaluate fenceline risks that exceeded EPA's cancer risk benchmark. And had EPA determined that such risks were unreasonable, it would have had to eliminate them. 15 U.S.C. § 2605(a). EPA cannot avoid the consequences of those errors by simply asserting, ipse dixit, that it would have adopted the same rule even if it had complied with TSCA. EPA Br. at 118.

Nor was EPA's failure to consider the risks from ozone depletion harmless. EPA suggests that, even if it had considered studies showing methylene chloride's depletion of the ozone layer, it "would have reached the same position that it has reached before." *Id.* at 127. But EPA never attempts to explain why that is the case, and it identifies no flaws in the research showing that methylene chloride emissions are slowing the recovery of the ozone layer. Had EPA followed proper procedures, it would have had to account for the evidence of methylene chloride's ozone depletion, determine whether the resulting increase in ultraviolet radiation present unreasonable risks to human health or the environment, and, if so, eliminate such risks. Without having even started this process, EPA is in no

position to predict where it may end and whether or not the ozone-related risks that EPA unlawfully ignored are unreasonable.

## CONCLUSION

For the foregoing reasons, as well as those stated in Sierra Club's opening brief, the Court should grant Sierra Club's petition and remand the Methylene Chloride Rule without vacatur.

Respectfully submitted,

/s/ Jonathan Kalmuss-Katz
Jonathan Kalmuss-Katz
Lakendra S. Barajas
Earthjustice
48 Wall Street Floor 15
New York, New York 10005
T: 212-823-4989
T: 212-284-8025
jkalmusskatz@earthjustice.org
lbarajas@earthjustice.org

*Attorneys for Petitioner Sierra Club*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2025, I electronically filed the foregoing

Reply Brief using the appellate CM/ECF system. Participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Jonathan Kalmuss-Katz
Jonathan Kalmuss-Katz

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and with this Court's September 24, 2024 Order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.1: this document contains 7,437 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

/s/ Jonathan Kalmuss-Katz
Jonathan Kalmuss-Katz

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R.25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Jonathan Kalmuss-Katz
Jonathan Kalmuss-Katz
