No. 24-60256

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 24-60227

East Fork Enterprises, Incorporated; Epic Paint Company,

*Petitioners*

v.

United States Environmental Protection Agency;
Lee Zeldin, Administrator, United States Environmental Protection Agency,

*Respondents*

CONSOLIDATED WITH

No. 24-60256

East Fork Enterprises, Incorporated; Epic Paint Company;
Sierra Club; American Chemistry Council,

*Petitioners*

v.

United States Environmental Protection Agency;
Lee Zeldin, Administrator, United States Environmental Protection Agency,

*Respondents*.

## INDUSTRY PETITIONERS' FINAL REPLY BRIEF

W. Caffey Norman
2550 M Street, NW
Washington, D.C. 20037
Tel: (202) 460-9495
caffeynorman@outlook.com

Norman Law & Policy PLLC

Keith Bradley
Kayla Marie Mendez
717 17th Street, Suite 1825
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com

Samuel B. Ballingrud
2550 M Street, NW
Washington, DC 20037

Katherine Wenner
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

Squire Patton Boggs (US) LLP

*Counsel for East Fork Enterprises, Inc. and Epic Paint Company*

David Chung
Amanda Shafer Berman
Warren Lehrenbaum
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Tel.: (202) 624-2587
dchung@crowell.com

Crowell & Moring, L.L.P.

*Counsel for American Chemistry Council*

# TABLE OF CONTENTS

**Page**

STANDARD OF REVIEW ......................................................................1

ARGUMENT ........................................................................................2

    I.     EPA's risk determination was unlawful and irrational. .......................2

        A.   EPA improperly treated any health risk as unreasonable..............2

        B.   "Whole chemical" determinations are impermissible. ................12

        C.   EPA improperly ignored PPE.....................................................17

    II.    EPA's exposure limits were improper. ..............................................21

        A.   The 2-ppm limit contradicts the scientific evidence. .................21

        B.   The 16-ppm short-term limit targeted zero risk. .........................27

    III.   EPA regulated more than necessary..................................................30

        A.   EPA had no evidence that businesses cannot comply with its 2-ppm and 16-ppm limits. ............................................................31

        B.   EPA should have consulted OSHA. ............................................33

        C.   Alternative products are ineffective. ...........................................35

    IV.   EPA blocked small retailers more than necessary. ...........................37

    V.    Vacatur is warranted.........................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Radio Relay League v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ............................................................. 20

*Barr v. SEC*,
   114 F.4th 441 (5th Cir. 2024) ............................................................... 8

*Bridgeport Hosp. v. Becerra*,
   108 F.4th 882 (D.C. Cir. 2024) ........................................................... 39

*Chamber of Com. v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) ............................................................ 36

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ............................................... 13, 23, 24

*Chem. Mfrs. Assoc. v. EPA*,
   859 F.2d 977 (D.C. Cir. 1988) .............................................................. 1

*Chevron Oil Co. v. Andrus*,
   588 F.2d 1383 (5th Cir. 1979) ........................................................... 16

*Clifford v. Pena*,
   77 F.3d 1414 (D.C. Cir. 1996) ........................................................... 34

*Corrosion Proof Fittings v. EPA*,
   947 F.2d 1201 (5th Cir. 1991) ......................................... 1, 2, 7, 31, 35

*County of L.A. v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999) .......................................................... 33

*Data Mktg. P'Ship v. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) .......................................................... 5, 26

*Dep't of Homeland Sec. v. Regents of Univ. of Ca.*,
   591 U.S. 1 (2020) ............................................................................ 23

*Energy Transfer Partners, L.P. v. FERC*,
   567 F.3d 134 (5th Cir. 2009) ............................................................. 33

*Env't Def. Fund v. FERC*,
 2 F.4th 953 (D.C. Cir. 2021)..................................................................39

*Environmental Defense Fund v. EPA*,
 598 F.2d 62 (D.C. Cir. 1978).........................................................34, 35

*FCC v. AT&T Inc.*,
 562 U.S. 397 (2011)...............................................................................9

*Groff v. DeJoy*,
 600 U.S. 447 (2023)...............................................................................9

*Lab. Council for Latin Am. Advancement v. EPA*,
 12 F.4th 234 (2d Cir. 2021) ..................................................................38

*Life Techs. Corp. v. Promega Corp.*,
 580 U.S. 140 (2017).............................................................................15

*McAlpine v. United States*,
 112 F.3d 1429 (10th Cir. 1997) ............................................................34

*Merck & Co. v. HHS*,
 962 F.3d 531 (D.C. Cir. 2020)..............................................................11

*Nat'l Assoc. of Mfrs. v .SEC*,
 105 F.4th 802 (5th Cir. 2024) ...............................................................38

*Ransom v. FIA Card Servs., N.A.*
 562 U.S. 61 (2011)................................................................................10

*Restaurant Law Ctr. v. Dep't of Labor*,
 120 F.4th 163 (5th Cir. 2024) .................................................................7

*Safer Chems., Healthy Families v. EPA*,
 943 F.3d 397 (9th Cir. 2019) ................................................................17

*Shell Chem. Co. v. EPA*,
 826 F.2d 295 (5th Cir. 1987) ...........................................................1, 2

*Slack Techs., LLC v. Pirani*,
 598 U.S. 759 (2023)..............................................................................14

*Southwest Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)..................................................................10

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) .....................................................25

*Tex. Pipeline Assoc. v. FERC*,
    661 F.3d 258 (5th Cir. 2011) .....................................................10

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .....................................................34

*United States v. Thomas*,
    877 F.3d 591 (5th Cir. 2017) .....................................................16

*Van Loon v. Dep't of the Treasury*,
    122 F.4th 549 (5th Cir. 2024) .....................................................8

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) .....................................................31

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) .......................................................................34

*Whitman v. Am. Trucking Assocs., Inc.*,
    531 U.S. 457 (2001)...................................................................12

**Statutes**

5 U.S.C. § 706(2)(D)........................................................................33

15 U.S.C. § 2602(4) ..................................................................17, 18

15 U.S.C. § 2604(h)(1)(B) ..............................................................10

15 U.S.C. § 2605(i) ..........................................................................16

15 U.S.C. § 2605(a) ..........................................................................30

15 U.S.C. § 2605(b)(4)............................................7, 12, 14, 15, 18, 19

15 U.S.C. § 2605(c)(2)(C) ...............................................................36

15 U.S.C. § 2608(a) ...................................................................34, 36

**Regulations**

40 C.F.R. § 1910.1052 (1997) ...............................................................20

82 Fed. Reg. 33,726 (July 20, 2017)................................................13, 17

**Other Authorities**

162 Cong. Rec. S3511-01 (Jun. 7, 2016)..............................................35

EPA, *ORD Staff Handbook for Developing IRIS Assessments* (Dec. 2022) .........................................................................................5, 6, 7

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) ........5, 9

NIOSH, *Isopropyl Alcohol*, CDC (Dec. 14, 2014) ................................29

OSHA, *Industry Profile for an OSHA Standard Results* ........................32

William M. Lee, *Acetaminophen-related Acute Liver Failure in the United States*, JAPAN SOC'Y OF HEPATOLOGY RESEARCH (2008) .......11

EPA asserts breathtaking authority.  First, it rejects any limitation on what risks it might deem "unreasonable."  Then, once EPA labels a substance an "unreasonable risk," EPA believes TSCA places no limit on what regulations it can impose.  The Methylene Chloride Rule reveals these problems.  There is no evidence that methylene chloride exposures near 2 ppm (long-term) or 16 ppm (short-term) present unreasonable risk to workers.  But EPA issued a sweeping ban because it insisted on those hyper-protective limits, and because it speculated businesses would find those limits challenging.

## STANDARD OF REVIEW

EPA cites various cases involving arbitrary-and-capricious review under other statutes to seek a more deferential standard of review than TSCA mandates.  *See* Opp.34-35.  "Congress specifically rejected the arbitrary and capricious standard in the TSCA context," *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 & n.13 (5th Cir. 1991), and TSCA's standard is "more rigorous than the arbitrary and capricious standard."  EPA characterizes the TSCA standard as "slightly more probing," Opp.35 (citing *Shell Chem. Co. v. EPA*, 826 F.2d 295 (5th Cir. 1987)), but actually it is "particularly demanding" for the agency.  *Chem. Mfrs. Assoc. v. EPA*, 859 F.2d 977, 992 (D.C. Cir. 1988).  *Shell* said the review standard is "less deferential than the arbitrary and capricious standard," 826 F.2d at 297—not "slightly more probing"—and, on the merits, remanded an inadequately supported

TSCA rule. 826 F.2d at 298. "[A] reviewing court must give careful scrutiny to agency findings" under TSCA, and "Congress put the substantial evidence test in the statute because it wanted the courts to scrutinize the [EPA's] actions more closely." *Corrosion Proof*, 947 F.2d at 1214.

## ARGUMENT

## I. EPA'S RISK DETERMINATION WAS UNLAWFUL AND IRRATIONAL.

When petitioners observed EPA's risk evaluation is buried in jargon (Br.18) that was not a complaint—*contra* Opp.39—but a warning. EPA attempts to distract this Court by spinning that jargon out for many pages and asserting petitioners misunderstood it. A careful reading of the briefs dispels that notion. Petitioners described EPA's methodology correctly; and, as discussed previously, that methodology is inappropriate because, rather than assessing whether a substance presents an *unreasonable* risk, EPA determined whether the substance presents any non-zero risk.

### A. EPA improperly treated any health risk as unreasonable.

#### 1. *EPA targeted zero risk.*

Though EPA claims petitioners mischaracterized the analysis, EPA's recounting of its analysis aligns with petitioners'.

First, EPA asserts that petitioners mistakenly think a "point of departure" is "the highest exposure level for zero risk." Opp.39. This is incorrect, per EPA,

because a point-of-departure is actually the "point on a dose response curve ... that 'marks the starting point for low-dose extrapolation.'" Opp.41-42. Moreover, EPA says a point-of-departure is evaluated with particular experimental conditions and people with different characteristics might have risks not apparent under those conditions. Opp.42-43. Petitioners had already stated that proposition; they said the point-of-departure used "the highest exposure level possible without any health consequences *in studies*." Br.18 (emphasis altered). "[I]n studies" meant the same proposition that EPA elaborates; EPA quotes petitioners' brief but omits that phrase. Opp.42. Furthermore, while the point-of-departure marks the "starting point" for "extrapolation," identifying that purpose says nothing about how to choose that point. EPA chose it by approximating the "no-observed adverse effect level." Br.18 (quoting JA152). EPA's brief later confirms petitioners were right: "EPA is identifying the point (or dosage) on a response curve that, based on the available data, is shown to either produce or not produce an adverse effect." Opp.57.

EPA says petitioners misstate the margin-of-exposure as "the highest exposure for zero risk." Opp.59. Yet again EPA omitted petitioners' pertinent words. EPA explains it divided the point-of-departure by the exposure levels "estimated for each condition of use." Opp.59. That is exactly what petitioners said EPA had done: "that highest exposure for zero risk, divided by the actual exposure level experienced in a 'specific scenario.'" Br.18.

Petitioners asserted EPA compared that margin-of-exposure to a "benchmark [margin of exposure]" that "accounts for the total uncertainty" about the point-of-departure (Br.18-19)—what might be called a fudge factor. EPA agrees that is what it did. Opp.59 ("The benchmark margins of exposure … account for uncertainty by incorporating uncertainty factors."). As EPA explains, a factor of 3 represented the uncertainty of inferring human risks from animal studies. Opp.60. Another factor of 3 to 10 was for the fact that some people might be at greater risk than those in a given study. Opp.59, Opp.61. And then EPA included yet another factor of 3 for one study that had stated a lowest level with effects, instead of a highest no-effect level (the type EPA preferred for the point-of-departure). Opp.61.

In sum, EPA did exactly what petitioners said. A given study might find no adverse health effects in animals at, say, 400-ppm exposures. EPA then regards a workplace as presenting risk not just for greater-than-400-ppm exposures, but for exposures 30 times *smaller*. Br.19. A workplace with 20-ppm exposures might seem relatively safe given those 400-ppm studies. For EPA, that workplace is unsafe, because EPA demands a 30X safety factor. "When the margin of exposure ... was less than the respective benchmark margin of exposure (30 or 10 [depending on the study details]), EPA concluded that risk existed for that condition of use." Opp.63. Recall, too, the safety factor starts from the most sensitive precursor effects that EPA could find.

Rather than zero risk, the government insists EPA was assessing for no "appreciable risk." Opp.64. The difference between those framings is purely metaphysical, as discussed below. Regardless, EPA did not offer this explanation during the rulemaking even though commenters complained about the zero-risk target. *See* JA1137. The Court "cannot consider *post hoc* rationalizations." *Data Mktg. P'Ship v. Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022). Citing nothing in the record presenting the purported "appreciable" concept, Opp.63-65, the government instead offers (Opp.64) a document about the Integrated Risk Information System ("IRIS") that is not in the administrative record.[1] That absence means EPA did not consider the document (ECF No. 92, p.2), thus confirming the government's current theory is *post-hoc* rationalization.

The government's new explanation is illogical anyway. "Appreciable" means "capable of being perceived or measured." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 57 (10th ed. 1998). That EPA sought to eliminate only the risks that could possibly be detected is cold comfort; a hypothetical risk that is not even perceivable is not—in the real world—meaningfully different from zero. EPA's own source confirms there is no real distinction: "[R]eference value"—the term for

---

[1] Indeed, the government's document postdates EPA's Risk Evaluation and even its Revised Risk Determination. JA146-171; JA283-654; EPA, *ORD Staff Handbook for Developing IRIS Assessments*, No. EPA-600/R-22/268 (Dec. 2022) ("IRIS Handbook").

what EPA's Risk Evaluation developed—"applies to … a 'benchmark' or exposure limit, below which adverse effects on human health are not expected to occur." IRIS Handbook, pp.1-4 n.7.

Trying to make "appreciable" sound like more than semantics, the government says EPA did leave one risk unaddressed, namely that a person might experience greater risk through the aggregate exposure of inhalation and skin contact. Opp.65. But EPA actually did not identify this as a remaining risk. Rather, EPA said that a model for "aggregating inhalation and dermal exposures is not reasonably available," and that fabricating an aggregated risk without a model "would introduce additional uncertainties." JA574. That choice "may lead to an underestimate of exposure," but "inhalation exposure represents the predominant exposure pathway." JA574. In other words, EPA did not have evidence the aggregate two-path risk is greater; and although an increased risk is theoretically possible, it probably would not arise, given the "physical chemical properties" of methylene chloride. JA574. In short, after EPA's fudge factor of 30 accounting for various unknowns, this last hypothetical concern was too speculative and unlikely even for EPA. EPA left no *actual* risk unaddressed.

EPA demands deference to its methodology, which it asserts is well-established under IRIS. Opp.44, 65-66. Its precedents for such deference used the lower arbitrary/capricious standard. For a TSCA rule, this Court "can,

and … do[es] … question the agency's reliance upon flawed methodology." *Corrosion Proof*, 947 F.2d at 1229.[2]  Meanwhile, the wisdom (or not) of EPA's methodology for IRIS[3] is not at issue here.  IRIS, according to the government's extra-record document, identifies exposure limits at which "the human population ... is likely to be without an appreciable risk of deleterious health effects over a lifetime."  IRIS Handbook, pp.8-11.  That is not the TSCA standard, which asks, rather, whether there is "unreasonable risk" in a given "condition of use."  15 U.S.C. § 2605(b)(4)(A).  That EPA's method is well-established for IRIS does nothing to defend EPA's disregard of the TSCA standard.

> 2. *The statutory phrase "unreasonable risk" conveys that not every risk justifies TSCA regulation.*

Although EPA insists that whether a risk is unreasonable is within EPA's discretion,  Opp.66, it cannot deny that the Court, not EPA, decides the meaning of "unreasonable risk."  The Court must "independently interpret[] the statute," by "us[ing] every tool at [its] disposal to determine the best reading of the statute." *Restaurant Law Ctr. v. Dep't of Labor*, 120 F.4th 163, 171 (5th Cir. 2024).  That EPA must carry out the determination on a case-by-case basis (Opp.67) does not

---

[2] The Court vacated EPA's old asbestos rule precisely because "we are concerned about some of the methodology employed by the EPA."  *Id.* at 1218.

[3] The IRIS method has not, to petitioners' knowledge, been tested in any court, because IRIS assessments are generally not final agency action.

obviate the Court's responsibility to interpret the statutory standard governing EPA's work.

EPA criticizes petitioners for "attempt[ing] to pour meaning" into the word "unreasonable" "from various dictionary definitions." Opp.68. Petitioners' approach is what the Court's precedents require. "Where a statute leaves terms undefined, we accord those terms their ordinary, contemporary, common meaning." *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024). "[W]e routinely consult dictionaries as a principal source of ordinary meaning." *Barr v. SEC*, 114 F.4th 441, 449 (5th Cir. 2024) (alteration in original). EPA asks the Court to ignore the ordinary meaning of "unreasonable" in favor of "the meaning that *Congress* gave that term through the detailed enumeration of information that EPA must consider." Opp.68-69. Those inputs are not a definition. While such context can inform an interpretation, it cannot justify departing from the "ordinary meaning" of the text.

EPA cannot dispute the ordinary understanding of "unreasonable" conveyed by the dictionaries that petitioners cited. Instead, EPA suggests the Court derive the meaning of the word by looking to dictionary definitions of "reasonable" and then treating "unreasonable" as meaning not those things. Opp.69.

This is the "etymological fallacy," Geoffrey Hughes, A History of English Words 27 (2000), that courts have repeatedly rejected. "[I]n ordinary

usage, a noun and its adjective form may have meanings as disparate as any two unrelated words." *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). That is also true for formations with the prefix "un-." "American" generally refers to nationality. "Unamerican" does not mean a person who is a citizen of some other country; it usually means something is contrary to American traditions. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1284 (10th ed. 1998). It is often pejorative (like "unreasonable"), so one would not describe, say, a Canadian person as "unAmerican" just to characterize his national origin. "Due" and "undue" are an even better analogy. "Due" means "something due or owed," either as a debt or as a right. *Id.* at 358. Thus, "due process" means the process that a person is owed. "Undue" is not synonymous with not "due." Rather, an "undue hardship" is one that "rises to an 'excessive' or 'unjustifiable' level." *Groff v. DeJoy*, 600 U.S. 447, 469 (2023). A person saying something was "not due" would have conveyed a very different meaning had she said it was "undue."

Nothing in TSCA points away from the ordinary understanding of "unreasonable": Only some risks "exceed[] the bounds of reason or moderation" so as to warrant regulation under TSCA. *Unreasonable,* MERRIAM-WEBSTER COLLEGIATE DICTIONARY 1295 (10th ed. 1998). EPA identifies no tension between that meaning and the statutory requirements that EPA consider various information. "[A]gencies cannot manufacture statutory ambiguity with semantics to enlarge their

congressionally mandated border." *Tex. Pipeline Assoc. v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011).

EPA contends "unreasonable" means the same as "not appropriate." Opp.68-69. But Congress used the word "appropriate" elsewhere in TSCA, such as allowing exemptions from certain requirements "as the Administrator considers appropriate." 15 U.S.C. § 2604(h)(1)(B). "[T]he presumption is that the different term denotes a different idea," *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022), so "unreasonable" must have its own meaning.

Really, EPA is saying the word "unreasonable" is nearly an empty vessel, doing nothing more than recalling the various inputs that EPA must consider. Opp.69. That approach also contravenes basic principles of statutory interpretation, by making the key word redundant. Section 6(b)(4)(F) itself requires EPA to consider a set of specified information when it evaluates risk. Opp.69. Had paragraph (b)(4)(A) omitted the word "unreasonable," paragraph (b)(4)(F) would still require EPA to consider those inputs. Unless Congress was just repeating itself, *see Ransom v. FIA Card Servs., N.A.* 562 U.S. 61, 70 (2011) ("each word in a statute" should "carr[y] meaning"), so the word "unreasonable" must convey some concept beyond the requirement to review the (b)(4)(F) inputs. The ordinary meaning of the word is a natural source for that content.

That Congress barred EPA from considering "costs and other nonrisk factors" in risk evaluation (Opp.70) does not drain "unreasonable" of its ordinary meaning. Some risks are so much greater than others as to be unreasonable. *Cf.* Opp.69 (acknowledging "unreasonable" is a "relative" concept). That comparison can be made without considering costs. As one comparison, acetaminophen overdoses are "the number one cause of acute liver failure ... in the United States; they account for 50% of all cases and carry a 30% mortality." William M. Lee, *Acetaminophen-related Acute Liver Failure in the United States*, 38 JAPAN SOC'Y OF HEPATOLOGY RESEARCH S3 (2008). By comparison, EPA set a methylene chloride long-term exposure limit 200-times smaller than a level that produced no detectable changes in liver metabolism in workers exposed for 10 years. Br.43. One need not consider costs to understand that such remote risks were not "unreasonable."

3. *The major-questions doctrine cabins interpretations of "unreasonable risk."*

EPA believes the scope of TSCA authority is not a "major question" because the Methylene Chloride Rule affects only a small percentage of the economy. Opp.72. But "the breadth of the [agency's] asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed." *Merck & Co. v. HHS*, 962 F.3d 531, 541 (D.C. Cir. 2020). TSCA authority covers the entire economy—nearly everything used in daily life and industry is comprised of a chemical substance under TSCA's definition (Br.35 n.9);

and once EPA identifies an "unreasonable risk" for a substance, it can *ban* the substance if it deems that appropriate to eliminate the asserted "unreasonable risk." Thus, what qualifies as an unreasonable risk—the characterization unleashing TSCA regulation—is indeed a question of massive significance, determining the scope of EPA's tremendous power under this statute. EPA now asserts that it can regulate *any* risk it chooses—without making any substantive showing that the risk is an "unreasonable" one—so long as it has considered information such as "available information on hazards and exposures," 15 U.S.C. § 2605(b)(4)(F)(i). The implications are hair-raising.

Petitioners also pointed out that a delegation of authority needs an intelligible principle. But EPA interprets away the only content governing its choice of what substances to regulate and how far by reading "unreasonable" out of TSCA. EPA purports to locate an intelligible principle in the procedures for risk determinations. Opp.74. What is needed are substantive "limits on the EPA's discretion," *cf. Whitman v. Am. Trucking Assocs., Inc.*, 531 U.S. 457, 473 (2001). If EPA is correct about what the statutory term "unreasonable" means (or rather, that it means nothing), there are no such limits.

**B.** **"Whole chemical" determinations are impermissible.**

EPA claims its statutory-interpretation error is harmless because EPA would have found the relevant activities to present unreasonable risk anyway. Opp.82. But

by EPA's own admission, at least one activity was subject to regulation solely because of EPA's "whole chemical" approach. Opp.75. In addition, EPA's changed evaluation of multiple activities was unlawful and arbitrary for reasons discussed elsewhere in petitioners' briefing. Br.26-29; *infra* 17-18. Consequently, EPA cannot show that its misinterpretation of TSCA "clearly had no bearing on the procedure used or the substance of the decision reached." *Chamber of Com. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023).

1. *TSCA requires determinations about particular activities with a chemical.*

The prerequisite for a 6(a) regulation—such as the Rule here—is for EPA to determine "the manufacture, processing, distribution in commerce, use, or disposal of a chemical ... presents an unreasonable risk." Br.25 (quoting 15 U.S.C. § 2605(a)). The sentence structure makes clear that the subjects of the verb "presents" are "manufacture" and the other activities, not "chemical substance." Thus, Congress expressly required determinations about the various activities—does a given activity, whether a type of processing, use, etc., present an unreasonable risk.

The Rule ignored that key text. 82 Fed. Reg. 33,726, 33,744 (July 20, 2017). EPA's brief does too, even though it is the opening sentence of section 6(a) and states the prerequisite for EPA's authority. Opp.80-82. An agency cannot put forth a reasonable interpretation of its authority without addressing the language actually conferring the authority.

Instead, EPA briefly mentions the end of paragraph (a), which specifies the degree of regulation as "the extent necessary so that the chemical substance ... no longer presents such risk." Opp.81. It is impossible to understand "such risk" without checking what risk it refers to; "[t]he word 'such' usually refers to something that has already been 'described.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023). So, the "to the extent necessary" clause cannot override the message from the first sentence, because "such risk" obviously refers to the risk introduced by that prior sentence—the risk presented by particular *activities*.

EPA prefers paragraph (b)(4)(A), which EPA reads as an "instruct[ion] ... [to] determine whether the chemical substance presents an unreasonable risk." Opp.81. But paragraph (b)(4)(A) does not instruct EPA to make determinations at all. It instructs EPA to "conduct risk evaluations." 15 U.S.C. § 2605(b)(4)(A). The purpose of those risk evaluations is "to determine" whether a "substance presents an unreasonable risk ... under the conditions of use," presumably to decide whether 6(a) regulations are warranted. The authority is nonetheless from section 6(a), namely that if EPA determines an *activity* presents a risk it may regulate appropriately. Elevating paragraph (b)(4)(A) above paragraph (a) turns the statute upside-down.

Even on its own terms, paragraph (b)(4)(A) supports petitioners' reading. EPA emphasizes that "conditions of use" is plural, while "chemical substance" is singular. Opp.80. Indeed, "[t]ext specifying" a "plural indicates that multiple"

instances are intended. *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 149 (2017). But the object of "conduct"—the (b)(4)(A) task—is also plural. EPA is to conduct "risk evaluations" of a "chemical substance." 15 U.S.C. § 2605(b)(4)(A). Particularly given the contrast to the singular "substance," this sentence must mean Congress expected multiple evaluations for a given substance. EPA offers no explanation for how whole-chemical determinations could fulfill that expectation. Petitioners' reading, by contrast, easily makes sense of the structure: For a given substance, EPA is to conduct an "evaluation" for each "condition of use." Since the "evaluations" are the (b)(4)(A) mandate, and "to determine" is only the purpose of the evaluations, the sentence structure naturally means that each evaluation is to determine whether the substance poses an unreasonable risk in the pertinent condition of use.

TSCA further confirms each evaluation should be about a particular activity. A given "evaluation" (singular) must "describe the weight of the scientific evidence for the identified hazard." 15 U.S.C. § 2605(b)(4)(F)(v). The "hazard," singular, surely does not mean the chemical substance. It must refer to the hazard being considered in the given evaluation.

Against these statutory clues, EPA invokes the principle that a phrase must have the same meaning throughout a statute. Opp.82. But there is no repeated phrase to which that doctrine would apply. The word "determination" does not

appear in paragraph (b)(4)(A) or (a). Nor does EPA's quoted phrase—"a determination ... that a chemical substance presents [or does not present] an unreasonable risk," 15 U.S.C. § 2605(i)—appear in either provision. Given the differences in sentence structure and wording, "Chief Justice Marshall's corollary to the 'consistent usage' canon is more apt": the meaning of the words is "controlled by context." *United States v. Thomas*, 877 F.3d 591, 597 (5th Cir. 2017). Paragraph (i)(2) refers to a single determination because this paragraph is about judicial review of a given (6)(a) rule. 15 U.S.C. § 2605(i)(2) ("[A] final rule promulgated under subsection (a) ... shall be considered to be a final agency action."). The "associated determination" in paragraph (i)(2) must be the determination triggering the (6)(a) rule; and under the first sentence of paragraph (6)(a) (whose existence EPA does not even acknowledge), that determination is unambiguously about a given activity.

2. *EPA's existing rules promised activity-by-activity determinations.*

"[A]n agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). EPA's only response is that the Ninth Circuit found the Risk Evaluation Rule preserved EPA's discretion to do whole-chemical determinations. Opp.80. Yet the Risk Evaluation Rule itself said:

> EPA will make individual risk determinations for all uses identified in the scope. … [T]he regulation ... clarif[ies] that ... each condition of use covered by the risk evaluation receives a risk determination. ... [R]isk determinations may be published in multiple documents or in a

single document containing all risk determinations for all identified uses. If the determinations are published in multiple documents, the final determination will be a composite document of all determinations made. EPA's determinations will specify whether each condition of use identified for a chemical substance does or does not present an unreasonable risk of injury to health or the environment.

82 Fed. Reg. at 33,744. This passage is explicit and unambiguous. EPA does not address it. *Compare* Br.26 (quoting key parts of this passage), *with* Opp.26 (not discussing the text of the Risk Evaluation Rule). The Ninth Circuit did not discuss this text, *see Safer Chems., Healthy Families v. EPA*, 943 F.3d 397 (9th Cir. 2019), so cannot be persuasive about the meaning of that rule.

## C. EPA improperly ignored PPE.

For multiple activities, EPA had found the risks sufficiently low because personal protective equipment ("PPE") limits exposures. JA291. EPA then changed its mind and assumed that workers are not using PPE. JA148-149.

It theorizes that PPE is not part of the "conditions of use," but just something that "affects the exposure intensity." Opp.77-78. This wordplay ignores the statutory definition of "conditions of use." They are the "circumstances ... under which a chemical substance is ... used." 15 U.S.C. § 2602(4). It is hard to see (and EPA does not even attempt to explain)—how the wearing of PPE by workers is not a "circumstance," alongside the circumstances of what they are doing and the workplace environments in which they use the chemical. It is particularly strange for EPA to suggest that something—it is hard to avoid using the word

"circumstance"—about how workers use methylene chloride is not a "condition of use" because it "affects the exposure intensity." Opp.77-78. TSCA instructed EPA to assess the "intensity ... of exposures under the conditions of use," 15 U.S.C. § 2605(b)(4)(F)(iv), so evidently Congress expected that the "conditions" can affect exposure intensity.

EPA also insists it must evaluate exposure using "reasonably available information about exposures ... not on assumptions about use patterns." Opp.77. Actually, TSCA expressly calls for assumptions about use patterns. "Conditions of use," as defined, means the "circumstances ... intended, known, *or reasonably foreseen*" in a use. 15 U.S.C. § 2602(4) (emphasis added).

Finally, EPA asserts that workers who are self-employed or otherwise not covered by OSHA regulations are a particularly vulnerable subpopulation; and it points out that workers not actively using methylene chloride might not have PPE. Opp.78-79. Each of these explanations is baseless given the record.

- OSHA regulations are only one of the reasons that workers use PPE. State employees would be subject to state-level safety regulations that would surely have comparable requirements about PPE—and EPA cites no evidence to the contrary.

- EPA's 2020 analysis already recognized that workers not using methylene chloride ("occupational non-users" or "ONUs") would not have PPE

against it.  JA291.  But they also have lower exposures precisely because they are not using the methylene chloride.  JA291.  For ONUs, the Risk Evaluation already accounted for their different levels of exposure.  *Id.*

•      The Risk Evaluation had analyzed the risks for susceptible subpopulations.  JA542-543.  There is not a word about self-employed workers. Were EPA serious that they are a "susceptible subpopulation," Opp.79, it would need to provide a technical analysis of their exposures, as TSCA requires, 15 U.S.C. § 2605(b)(4)(F)(i).  The failure to do so is yet another defect in the Rule.

•      Illustrating that deficiency, self-employed workers cannot justify EPA's changed views across every use and industry.  For example, the Risk Evaluation found disposal of methylene chloride does not pose unreasonable risks.  JA582.  That activity encompasses operations like "industrial pretreatment," "municipal landfill," and "underground injection."  JA582.  These activities are capital-intensive, and EPA has not cited evidence they involve self-employed workers.

•      Disregarding PPE means double-counting the risks.  The 2020 Risk Evaluation determined risks using "high-end exposure estimates, in order to account for the uncertainties related to whether or not workers are using PPE." JA291.  When EPA later rejected the assumption that workers use PPE, it excised those uncertainties.  So it had no further reason to base its determination on high-

end exposures. These levels of exposure are, according to EPA's own definitions, "highly uncertain." JA368 (defining "high end"). For example, in aerosol degreasing, the "central tendency" of chronic exposure of a worker without PPE is actually lower than the high-end exposure with PPE. JA558. The Revised Risk Determination did not recognize that changing the assumption about PPE necessitated revisiting the exposure assumptions intersecting it. *See generally* JA159-JA169.

The government's sole asserted evidence for the lack of PPE was a commenter's reference to a 2021 study finding that "between 1980 and 2018, at least 85 methylene chloride-related fatalities occurred, most often in the workplace." Opp.79. The study itself is not in the certified record, so EPA cannot have "considered" the document as the government now claims, *id.*[4] And EPA's description of the study shows nothing about the prevalence of PPE use. Since OSHA's methylene chloride standard took effect in 2000, 40 C.F.R. § 1910.1052 (1997), incidents between 1980 and 2000 do not reflect current conditions. Moreover, as discussed below, *infra*, such a rate of fatal incidents "related" to

---

[4] If it had, that alone would invalidate the Rule, because EPA had not provided public notice of the study. The APA "require[es] the 'most critical factual material' used by the agency [to] be subjected to informed comment." *Am. Radio Relay League v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

methylene chloride is comparatively low, not high; OSHA records nearly two thousand workplace fatalities *each year*.

## II. EPA'S EXPOSURE LIMITS WERE IMPROPER.

EPA acknowledges its 2-ppm long-term limit was based solely on beliefs about adverse liver effects, and its 16-ppm short-term limit came solely from a study about temporary decreases in peripheral vision. Br.40, 47-48; Opp.40. No other asserted health effect justified these draconian limits.

### A. The 2-ppm limit contradicts the scientific evidence.

EPA emphasizes that 2 ppm came from "a standard mathematical exercise." Opp.88. The math implemented EPA's chain of assumptions to conclude that because a 200-ppm exposure produced no changes in rat livers at all, and a 500-ppm exposure produced a *precursor* (not actual adverse effects), therefore 2-ppm exposures might risk liver damage in some humans. EPA's description (Opp.89) is more verbose (*e.g.*, EPA "ran the Nitschke data through the methylene chloride specific physiological-based pharmacokinetic model to more accurately account for both inter-species differences and intra-species difference[s]") than petitioners' but identical in substance. *See also* Opp.50-52 (elaborating other assumptions and extrapolations).

Under EPA's own guidelines—which it invokes, elsewhere in the brief (Opp.46 n.12) to justify itself—"[a]dequate human data are the most relevant for

assessing risks to humans." JA657. The "default assumption" that "animal data are relevant for humans" is only "intended to be used in the absence of experimental data that can provide direct information on the relevance of animal data." JA657. Here, actual human workers exposed *at up to 475 ppm* showed no adverse health effects in their livers. JA1526. Yet EPA insists its extrapolation from animal testing is dispositive. Nothing in the administrative record explains why EPA ignored its guidelines.

The government now says EPA found the three key human studies "*did show* indications of liver toxicity." Opp.89. That is the opposite of what EPA's Risk Evaluation said. There, EPA explained that while two of the studies saw an increase in one measurement (blood concentration of bilirubin), that outcome "do[es]n't provide clear evidence of adverse liver effects." JA494. The government says the increased bilirubin "could signify the potential for liver disease." Opp.52. That *post hoc* characterization appears nowhere in EPA's risk evaluation.[5]

A response to comments four years later said the three studies "provide some indication of liver injury." JA1146. That cannot explain the risk determination;

---

[5] The government contradicts EPA's statements in another way too. It describes the rat effects ("hepatic vacuolation") as "fatty liver disease." Opp.48. EPA had explained that vacuolization has "a range of underlying causes" and "can reflect … a normal physiological response"; and that it "*may lead* to ... fatty liver [disease]." JA670 (emphasis added). The government would like the Court to think some of Nitschke's rats developed disease, but EPA regarded vacuolation as only a "precursor to toxicity," JA671.

"[a]n agency must defend its actions based on the reasons it gave when it acted."
*Dep't of Homeland Sec. v. Regents of Univ. of Ca.*, 591 U.S. 1, 24 (2020). "When
an agency's initial explanation 'indicate[s] the determinative reason for the final
action taken,' the agency ... may not provide new ones." *Id.* at 23. "Alternatively,
the agency can 'deal with the problem afresh.'" *Id.* But EPA expressly refused to
do that. Commenters submitted an expert analysis by Jonathan Borak, a doctor and
professor of occupational medicine at Yale, who explained the three studies show
"no evidence of adverse hepatic effects." JA1610; JA1615. This was key evidence
refuting the statement on which the government now relies. EPA refused to respond
to the Borak paper precisely because EPA declined to "re-open or revis[e] the risk
evaluation." JA1139-1140. The government cannot have it both ways. An agency
must "consider all relevant factors raised by the public comments and provide a
response to significant points within." *Chamber of Com.*, 85 F.4th at 774. So the
failure to grapple with Dr. Borak's analysis makes EPA's rule arbitrary and
capricious. EPA's justification for that failure, on the other hand, makes it improper
to defend the Risk Evaluation on the basis of new views about the meaning of the
human studies. An agency cannot revise its analysis while ignoring record evidence
on the ground it is not revising its analysis.

Furthermore, while EPA's Risk Evaluation noted two of the human studies
saw "some evidence of increasing levels of serum bilirubin with increasing

exposure," EPA also explained that those same studies saw no signs of injury in "other serum hepatic enzyme levels." JA494. EPA said the *bilirubin* increase is not an appropriate marker of injury ("increased bilirubin is ... not consider[ed] ... an endpoint appropriate for ... the current risk evaluation") because on its own it does not show injury. *Id.*

The government acknowledges the "medium quality" rating of the human studies cannot justify EPA's rejection of them. Br.41-42; Opp.56. But it says EPA identified other reasons. Opp.54-55. Those, too, were *post hoc*, presented in the same document that insisted the Risk Evaluation was a closed matter that could not be changed. The Risk Evaluation itself stated only one reason, namely that the human studies had not "provide[d] clear evidence of adverse liver effects." JA494. That is an irrational explanation. In fact, the opposite inference would logically be appropriate, *i.e.*, that there was no clear evidence of adverse liver effects in the human studies because methylene chloride has no such effects at the levels studied. If a study of humans exposed far above 2 ppm, for years, shows no evidence of adverse liver effects, it makes little sense to ban a chemical just because 1% of rats show precursors of liver harm at 500 ppm and a collection of modeling assumptions and uncertainty factors extrapolate that back to *predict* that humans might have effects at 2 ppm— even though actual humans exposed at that level showed no such effects. EPA does not defend the explanation it gave in the Risk Evaluation (indeed

the government's arguments depend on contradicting it).

The later, *post hoc* explanations are also irrational in their own right.

*First*, EPA says the human studies were unusable because the workers were exposed for only 5 or 10 years, whereas the risk evaluation was for 30- or 40-year exposures. Opp.54. EPA, however, extrapolated across far larger gaps to use the rat study. The rats were exposed for 2 years; they showed no liver effects at exposures 100 times larger than the 2-ppm limit that EPA ended up selecting; and rats are not people. It is logically inconsistent to make those extrapolations, yet insist that human epidemiology cannot be used because EPA would have to extrapolate from 10 years to 40 years. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.").

*Second*, the government says the studies provided "limited to no information on participant selection or attrition." Opp.55. The word "attrition" is litigation counsel's revision; EPA's response to comments said "selection or retention." JA1146. And the government's theory about why the purportedly missing information would be important is also purely the musings of counsel, appearing nowhere in EPA's response to comments. *See* Opp.55. (not citing the record). "The very fact that the [agency] perceived the need to rehabilitate its Order with new and different arguments before our court underscores that the Order itself omitted a

reasoned justification." *Data Mktg.*, 45 F.4th at 856.

The studies themselves belie EPA's statement. The Soden study explains how it chose the workers included in the study, both the experimental and the control group; and how the author matched study subjects to avoid confounding variables. JA1522-1526. The Kolodner study goes on for pages about selection and categorization of study subjects. JA1490.1-1490.8. The Ott study, part of a series of reports from a particular health surveillance project, refers to the first in the series for details of the population selection. JA1510. EPA rejected the Ott study for lacking such information without consulting the source where the authors said they had provided it; their cited methodological paper is not in the record.[6]

The government's manufactured concern about retention in the studies makes little sense anyway. If (hypothetically) some workers dropped out because they developed liver disease from methylene chloride exposure, surely *some* of the remaining workers would have pre-symptomatic indicators detectable in the multiple physiological measurements that each study made. To the contrary, the Soden study saw no difference at all, and the study found multiple physiological parameters were *better* in the population with high exposure. JA1524.

*Third*, the government suggests "indicators of liver injury may not be

---

[6] The commenter submitting the Ott study could not have foreseen EPA's objection; by then, EPA reviewed that study at least twice without mentioning this purported concern about missing information. JA667; JA494.

detectable in the blood serum levels measured in the studies," an assertion it claims the Soden study supports. Opp.55. This mischaracterizes the Soden study by means of selective omission. After that author note "[s]ome functional tests … are fairly insensitive," he explained he therefore focused on "hepatocellular enzyme markers" that "provide for more sensitive tests." JA1524. Soden measured three such enzymes, JA1523 (describing them as enzymes), for workers exposed for at least 10 years to 475 ppm of methylene chloride and provided graphs showing the bell curves for each. *See*, *e.g.*, JA1524. *None* of them showed any difference between exposed and unexposed workers.

The government notes that some bilirubin increase was seen in the Kolodner study at 49-ppm exposure. While that is "approximately ten times lower than 475 ppm," Opp.52 n.18, it is also 25-times larger than EPA's 2-ppm exposure limit. The Kolodner study also reported on blood chemistry at 3-ppm exposure, and there was no difference—including for bilirubin—compared to unexposed workers. JA1495; JA1611.

## B. The 16-ppm short-term limit targeted zero risk.

EPA based the 16-ppm limit on a single study (Putz) showing a temporary decrease in peripheral vision that is not even an adverse health effect. Br.47-49. As petitioners observed, the researchers surely expected the exposure they used— 195 ppm for 1.5 hours—would present no health risk, because putting their

volunteers at risk would have been seriously unethical. Br.50.

EPA quibbles about the exact magnitude of the effects—for example, an additional 2.5 hours of exposure (after the initial 1.5 hours) produced an additional decrease in peripheral vision. Opp.90-91. But EPA cannot dispute that the Putz researchers themselves described the effect as "temporary" and "small." Br.50 (citing JA1520).[7]

The government thinks those temporary non-health effects justify an exposure limit far more stringent than the study's parameters because of "very real concern[s] for severe effects that can occur rapidly, including death." Opp.91. This is pure *post hoc* rationalization, citing not a word of explanation from EPA's rulemaking to this effect. The scaremongering is irrational and contrary to the record. EPA's Risk Evaluation listed 10 deaths potentially associated with high concentrations of methylene chloride. JA648-652. The "IDLH," the concentration "immediately dangerous to life or health," is 2,300 ppm. JA647. The exposures estimated in EPA's listing of fatalities were all in that range or higher. Yet EPA's short-term exposure limit is 140 times smaller. By comparison, the IDLH for rubbing alcohol is 2,000 ppm. NIOSH, *Isopropyl Alcohol*, CDC (Dec. 14, 2014),

_____

[7] EPA misreads petitioners' footnote about the Winneke study. Opp.46-47 (discussing Br.50 n.16). Petitioners did not mean Winneke saw no effects at all, but simply that on some of the measures investigated there was zero effect—thus confirming that the 195-to-500-ppm range shows equivocal effects. The 24-hour number in petitioners' footnote is simply a typographical error for "4-hour."

https://www.cdc.gov/niosh/idlh/67630.html. EPA has not proposed a 16-ppm limit for antiseptic wipes.

The government focuses on two instances but misstates them. For one, the government says the methylene chloride concentration was 109 ppm in the "breathing zone." Opp.91. In fact, coworkers reported the man was "very close to the solvent surface with his head"; the concentration there was **25,000 to 39,000 ppm**. JA648. For the other, the government says the methylene chloride concentration in the "breathing zone" was 64 ppm. Opp.91. The concentration near the solvent surface was 1,711 ppm; this person was simultaneously exposed to 771 ppm of methanol and 89 ppm of toluene; and his blood contained substantial levels of methanol but no detectable methylene chloride. JA648. To be sure, workplace chemical exposures should be appropriately regulated. Seven years after that man's death, OSHA imposed a short-term methylene chloride exposure limit of 125 ppm. Nothing in these cases studies justifies EPA's limit 8 times smaller.

The record further refutes the government's irrational fears. Putz exposed study subjects to 195 ppm for four hours (and the Winneke studies used 500 ppm). JA491-493. Surely those researchers did not expect any real risk. JA491-493. Soden studied a workplace where employees were subject to 475 ppm, for 8 hours a day, for at least 10 years. JA1522-1523. It did not report any deaths (or any other adverse health effects). JA1522-1523. OSHA's short-term limit, lower than all

those, is already conservative and cautious.  EPA's 16-ppm limit goes radically further.

EPA cited no studies observing adverse health effects in a 15-minute exposure to 16 ppm, or anything like it.  Treating the small, temporary Putz effect as a proxy for health risks at higher concentrations amounts to a safety margin against the risk the government says is the real concern.  But EPA set its limit **30X** below[8] the levels of the Putz study—one protective margin stacked on another.  Truly, EPA has regulated methylene chloride to achieve zero risk.

## III.  EPA REGULATED MORE THAN NECESSARY.

EPA's understanding of its authority is disturbing.  TSCA tells EPA to "apply ... requirements … to the extent necessary so that the chemical substance ... no longer presents" the identified unreasonable risk.  15 U.S.C. § 2605(a).  EPA thinks that empowers it to go as far as necessary but imposes no "limit[] on EPA's ability to regulate."  Opp.87.  Really, any congressional grant of authority to an agency is simultaneously a limitation; "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023).  Section 6(a) states the authority conferred, and EPA cannot go further.

---

[8] The 30X was applied to 480 ppm, because a 15-minute exposure is generally less risky than a 1.5-hour exposure and EPA extrapolated the 195 ppm to 480 ppm as the short-term equivalent.  *See* JA540-541.

**A.**   **EPA had no evidence that businesses cannot comply with its 2-ppm and 16-ppm limits.**

EPA does not dispute the ban on most uses of methylene chloride was based on the stringent exposure limits plus EPA's doubt that companies can meet them. Br.13-14. If either step fails, the ban is invalid.

The government does not defend EPA's stated rationale, "a high degree of uncertainty as to whether most industrial and commercial users will be able to comply" with the new limits. JA102. Instead, it says EPA concluded businesses *will not* comply. Opp.95. The purported finding does not come close to meeting EPA's "considerable burden" under TSCA, much less the even "heavier burden when it seeks a partial or total ban of a substance than when it merely seeks to regulate that product." *Corrosion Proof*, 947 F.2d at 1214.

EPA's first bit of purported evidence is a comment from the AFL-CIO, which EPA says confirmed respirators are challenging to use. Opp.94. In fact, this comment highlights the deficient nature of EPA's analysis. The comment emphasized the shortcomings of respirators in relation to the superior approach of using engineering controls. JA1163-1164. The comment does not suggest (or show) whether and when those kinds of controls might be ineffective, so it cannot support EPA's notion that businesses will be *unable* to achieve the exposure limits. JA 1163. Whatever the issues employers face in obtaining compliance with respirator use with every employee, there are no such concerns with industrial controls which may moot

31

the need for individual respirators. The commenter complained that respirators are undesirable, and then EPA banned methylene chloride without even contemplating whether, for example, fans and ventilation might be good enough.

EPA's second item of supposed evidence is that over one year, OSHA issued 44 citations under its methylene chloride standard. Opp.94 (discussing JA1135). These numbers, standing alone—as EPA has left them—are meaningless. How does 44 citations compare to the amount of methylene chloride use and the rate of OSHA enforcement? What kinds of violations were being cited—excessive exposure, or recordkeeping violations? EPA has not said. It simply assumes, baselessly, that 44 citations in a year means businesses are unable to comply. Last year, OSHA issued 193 citations under its flammable-liquids standard, and 487 for its noise standard. In 23 inspections for its foot-protection standard, it issued 23 citations. *See* OSHA, *Industry Profile for an OSHA Standard Results*, https://www.osha.gov/ords/imis/industryprofile.html. By comparison, 44 citations under the methylene chloride standard might show compliance is relatively good. EPA also notes OSHA documented a fatality from methylene chloride exposure during 2023. Opp, 94. In that year, OSHA documented 1,763 workplace fatalities, including at least 39 deaths from electrocution by high voltage (certainly a deadly hazard). *See Industry Profile for an OSHA Standard Results*, *supra* 32. Yet nobody thinks employers are *unable* to comply with OSHA's electricity safety standards.

There are "three great falsehoods: 'lies, damn lies, and statistics.'" *County of L.A. v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (refusing to accept an agency's misleading use of statistics). "Forty-four citations" seems to be the third.

## B.     EPA should have consulted OSHA.

EPA believes its failure to confer—despite regulating what OSHA's regulations already address—is unreviewable. Opp.97-98. That TSCA section 19 does not mention review of referral decisions, *id.*, is unsurprising and irrelevant. Intermediate administrative processes are usually reviewed only alongside the final action. For example, *Energy Transfer Partners, L.P. v. FERC* held objections to a hearing before an administrative law judge must "abide review of the final order." 567 F.3d 134, 144 (5th Cir. 2009). Section 19 does not mention review of a rule proposal (or lack thereof), yet a deficiency in that process could surely be contested in review of a final rule. The APA asks whether an agency's action was "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The omitted conferral process was such a procedure.

EPA's second contention is that conferral is "committed to agency discretion by law." Opp.97-98 (citing 5 U.S.C. § 701(a)(2)). That "narrow[]" exception is "restrict[ed] … to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S.

9, 23 (2018). "The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable … unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015). Section 9(a) provides an obviously applicable standard: whether "such risk may be prevented or reduced to a sufficient extent" by another agency's actions. 15 U.S.C. § 2608(a).

EPA's avoidance of review rests partly on the phrase "in the Administrator's discretion." Opp.12-13 (quoting *id.*). That a statute "certainly confers discretion" does not, by itself, earn the "committed to agency discretion" exception. *Weyerhaeuser*, 586 U.S. at 23. The D.C. Circuit held a statute stating a particular decision was "in [the agency's] discretion" was nonetheless subject to judicial review. *Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996). The Tenth Circuit has similarly carried out judicial review notwithstanding an "in his discretion" phrase. *McAlpine v. United States*, 112 F.3d 1429, 1433-34 (10th Cir. 1997).

EPA also invokes *Environmental Defense Fund v. EPA*, 598 F.2d 62 (D.C. Cir. 1978), and a passage from debate on the 2016 amendments to TSCA. Opp.97-98. Both the case and the floor speech were about something else; namely, EPA's choice to use TSCA for a given issue rather than another of EPA's own authorities. 598 F.2d at 76-78; 162 Cong. Rec. S3511-01, S3517 (Jun. 7, 2016).

Neither addresses section 9(a) and the need to confer with a different agency about that other agency's capabilities.

On the substance, EPA's defense of its failure to confer is illogical. EPA contended OSHA cannot fully protect against methylene chloride because OSHA rulemakings must consider "feasibility." Opp.99 (quoting proposed rule at 28287). But EPA next explained "the risk-based level of 2 ppm is achievable ... based on advances in technology." Opp.99 (quoting proposed rule at 28330). So OSHA's "feasibility" obligation is not a barrier to its regulation of methylene chloride.

EPA claims *Corrosion Proof* generally accepted EPA's decision not to "defer" to other agencies. Opp.100. Actually, *Corrosion Proof* noted that regulation by OSHA and other agencies "leave unaddressed dangers posed by asbestos exposure through product repair, installation, wear and tear, and the like," 947 F.2d at 1216 n.16—such as consumer handling of asbestos brakes, pipes, and shingles, *id.* at 1224-28. Such concerns are not at issue here. EPA's rule addresses workplace safety—fully within OSHA's purview.

EPA objects it should not have to confer with another agency "simply based on the mere possibility that other agencies *may* be able to regulate that risk." Opp.100. "May" is literally what the statute says. 15 U.S.C. § 2608(a).

## C.    Alternative products are ineffective.

EPA's alternatives analysis openly did not assess whether the identified

alternatives were "technically and economically feasible." JA983. EPA complained there were "considerable uncertainties" about the available alternatives. JA983. But TSCA requires that assessment. 15 U.S.C. § 2605(c)(2)(C). That an analysis might be "difficult" or lack "reliable basis" does not "excuse the [agency] from its statutory obligation. *See Chamber of Com. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). That EPA "identified several hundred" alternatives that might "functionally replace" methylene chloride (Opp.101) does not make up for the missing assessment of whether those replacements are actually feasible, "technically and economically," 15 U.S.C. § 2605(c)(2)(C).

Petitioners gave multiple specific examples detailing the deficiencies. Br.61-64. EPA's brief ignores half of them (specifically powder-coating and adhesive caulk). *Id.* at 64-65. For those EPA does discuss, it only reinforces the deficiencies. For automotive wheel-refinishing, EPA cites its analysis of "paint and other coating removers and aerosol cleaners/degreasers." Opp.102. That analysis did not assess whether the asserted alternatives are technically feasible substitutes for methylene chloride, and the government points to nothing else filling the gap. EPA does not have to "recommend specific substitutes," Opp.102, but it must do more than "identify" potential alternatives; it must assess whether they would actually work.

On paint stripping with material recycled from pharmaceutical manufacturing,

EPA points only (Opp.103) to the same section of the Alternatives Analysis that has no discussion of technical or economic feasibility. Indeed, EPA expressly excluded recycling from its alternatives analysis because adoption of alternatives will end the recycling market anyway. JA984.

EPA's response about brake cleaners is a non-sequitur. EPA's analysis had ignored the reality that its primary alternative is extremely flammable. Br.65. EPA thinks methylene chloride brake cleaners must have practical alternatives because they form only a small part of the market. Opp.104. The market share is small simply because these products fill a particular niche, which EPA did not bother to evaluate.

## IV. EPA BLOCKED SMALL RETAILERS MORE THAN NECESSARY.

EPA does not deny that any company that ever provides any substance to a consumer, once, is forever barred from distributing methylene chloride. Br.69-71.

EPA thinks this draconian restriction must be permissible because the Second Circuit rejected an APA challenge to such a limitation on distribution of paint strippers. Opp.108. That rule dealt with methylene chloride-containing products—paint strippers—often used by consumers, that had attraction and utility for consumers. *See generally*, *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234 (2d Cir. 2021). The new Rule bans those products (and most others)

outright.[9]  What remains are products designed for purposes such as "plastic and rubber products manufacturing."  JA9.  The restrictions justified for common paint strippers are not warranted for products that are not likely to end up in consumer hands anyway.

The entirety of EPA's response to complaints about distribution challenges was:

> "EPA continues to believe that distributors who are not retailers will evolve to meet the needs of both small and large businesses who use methylene chloride-containing products. EPA notes that, in response to its 2019 final rule 84 FR 11420 (Mar. 27, 2019), businesses of all sizes have been able to adapt their revenue streams to distribute directly to commercial entities."

JA1155.  "[E]ven 'predictive judgment[s] based on the evidence' available, must be 'reasonable and reasonably explained.'"  *Nat'l Assoc. of Mfrs. v .SEC*, 105 F.4th 802, 813 (5th Cir. 2024).  EPA's "belie[f]" rested, so far as the record reveals, on no evidence at all.

## V.     VACATUR IS WARRANTED.

EPA invokes the D.C. Circuit's *Allied-Signal* rubric.  Opp.129.  That analysis, properly conducted, yields vacatur.  The D.C. Circuit has more recently explained that remand without vacatur "is an exceptional remedy."  *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024).  But the *Allied-Signal* analysis yields

---

[9] One exception is specialty coating removal from aircraft and spacecraft.  JA44.

vacatur anyway.

It is "far from certain that [EPA] chose correctly." *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (cleaned up). Petitioners have identified defects going far beyond simply an inadequate explanation. Human studies show that exposure to 49 ppm and above, for a decade and more, produces no liver damage, which was the most sensitive indicator EPA conceived. Researchers exposed volunteers to 200 ppm and above for hours with no health consequences. No rational evaluation of the evidence can support the 2-ppm and 16-ppm limits; and without those limits EPA has no grounds for its across-the-economy bans.

EPA identifies no disruption to outside parties from a vacatur. Its only hypothesized disruption is that EPA itself would fall behind in its schedule of TSCA rules. Opp.130. EPA cites no case in which an agency's own desire not to do the necessary work could justify leaving a flawed rule in place.

To the contrary, complying with EPA's ban on methylene chloride will have major costs for the businesses it affects. If there is any doubt about whether EPA will adhere to that ban—and there is far more than mere doubt—the Court should lift that compliance duty, by vacating the rule while EPA rethinks it.

March 5, 2025                              Respectfully submitted,

                                       */s/ Keith Bradley* _____

KEITH BRADLEY
KAYLA MARIE MENDEZ
717 17th Street, Suite 1825
Denver, CO 80202
(303) 830-1776
keith.bradley@squirepb.com

SAMUEL B. BALLINGRUD
2550 M Street, NW
Washington, DC 20037

KATHERINE WENNER
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

SQUIRE PATTON BOGGS (US) LLP

W. CAFFEY NORMAN
2550 M Street, NW
Washington, D.C. 20037
(202) 460-9495
caffeynorman@outlook.com

NORMAN LAW & POLICY PLLC

*Counsel for East Fork Enterprises, Inc. and
Epic Paint Company*

DAVID CHUNG
AMANDA SHAFER BERMAN
WARREN LEHRENBAUM
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2587
dchung@crowell.com

CROWELL & MORING, L.L.P.

*Counsel for American Chemistry Council*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8,964 words, as determined by the word-count function of Microsoft Office 365.

This document further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman Font.

*/s/ Keith Bradley*
Keith Bradley

*Counsel for East Fork Enterprises, Inc.*
*and Epic Paint Company*